## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

**05 10969 NMG**

NATIONAL ELECTRICAL BENEFIT FUND,
by its TRUSTEES, JON F. WALTERS and
D.R. BORDEN, JR.,
      Plaintiffs

**MAGISTRATE JUDGE** Alexander

vs.

C.A. No.

UPPER CAPE ELECTRICAL, INC.,
      Defendant

and

CAPE COD BANK & TRUST COMPANY,
      Trustee

RECEIPT # 64162
AMOUNT $ 250
SUMMONS ISSUED
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY. CLK
DATE

## COMPLAINT

1.     This is an action brought pursuant to Sections 502 and 515 of the Employee

Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. §§1132(a)(3) and

(d)(1) and 1145, by a multi-employer pension plan to enforce an employer's obligations to make

contributions that are due the plan.

## JURISDICTION AND VENUE

2.     This Court has exclusive jurisdiction of this action pursuant to Sections 502(a),

(e), and (f) of ERISA, 29 U.S.C. §§ 1132(a), (e), and (f), without respect to the amount in

controversy or the citizenship of the parties. Venue is proper in this district because it is the

district in which the Defendant resides. Section 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2).

## PARTIES

3. Plaintiff Jon F. Walters is a Trustee of the NEBF within the meaning of Section 403 of ERISA, 29 U.S.C. § 1103, and as such, is a fiduciary to the NEBF. Section 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A). The NEBF is a multi-employer employee pension benefit plan within the meaning of Section 3(2) of ERISA, 29 U.S.C. § 1002(2). The NEBF is administered at 2400 Research Boulevard, Suite #500, Rockville, Maryland 20850-3238.

4. Plaintiff D.R. Borden, Jr. is a Trustee of the NEBF within the meaning of Section 403 of ERISA, 29 U.S.C. § 1103, and as such, is a fiduciary to the NEBF. Section 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A). The NEBF is a multi-employer employee pension benefit plan within the meaning of Section 3(2) of ERISA, 29 U.S.C. § 1002(2). The NEBF is administered at 2400 Research Boulevard, Suite #500, Rockville, Maryland 20850-3238.

5. The NEBF is a multi-employer employee pension benefit plan within the meaning of Section 3(2) of ERISA, 29 U.S.C. § 1002(2), that has been established pursuant to an agreement entered into between the International Brotherhood of Electrical Workers ("IBEW") and the National Electrical Contractors Association. Employers agree to participate in the NEBF pursuant to collective bargaining agreements with the IBEW or one of its affiliated local unions.

6. Defendant Upper Cape Electrical, Inc. (hereinafter "Upper Cape") is an employer engaged in an industry affecting commerce, is contractually and legally obligated to submit contributions to the NEBF, and is an employer within the meaning of Section 3(5) of ERISA, 29 U.S.C. § 1002(5). Upon information and belief, Upper Cape is a Massachusetts corporation with a business address and main place of business at 20 Perry Avenue, Bourne, MA 02532.

7. Cape Cod Bank and Trust Company is a banking institution which, upon

2

information and belief, is currently holding assets of the defendant.

## GENERAL ALLEGATIONS OF FACT

8.      Upper Cape is a signatory, and has been a signatory continuously during all relevant periods, to one or more collective bargaining agreements ("CBAs") with the International Brotherhood of Electrical Workers, Local 223, via a Letter of Assent, and to a NEBF Participation Agreement for Covered Employers ("Participation Agreement"), as and between the NEBF and Upper Cape. Pursuant to the Participation Agreement, Upper Cape has been and is currently obligated to submit contributions to the NEBF on behalf of its "alumni" bargaining unit employees. A true and accurate copy of the Letter of Assent and CBA are attached hereto as Exhibit A and a true and accurate copy of the Participation Agreement is attached hereto as Exhibit B.

9.      Upper Cape, pursuant to the CBAs and the Participation Agreement, has been and is also bound to all terms and conditions of the Restated Employees Benefit Agreement and Trust for the National Electrical Benefit Fund (the "Employees Benefit Agreement"), which has governed the administration of the NEBF at all times relevant to this action. A true and accurate copy of the Employees Benefit Agreement is attached hereto as Exhibit C.

10.     Section 6.1 of the Employees Benefit Agreement states that each employer, such as Upper Cape, must pay by the fifteenth day of each month to the NEBF an amount equal to 3% of the gross labor payroll for the preceding calendar month paid to, or accrued by, covered employees as fringe benefit contributions.

11.     The Employees Benefit Agreement authorizes the Trustees to take all necessary actions to recover delinquent contributions. In addition, it authorizes the Trustees to recover

3

interest on the delinquent contributions at a rate of ten percent (10%) per annum, liquidated damages in an amount equal to twenty percent (20%) of the delinquency, and all costs, including attorney's fees and audit expenses, incurred in collecting the delinquency.

## COUNT I - VIOLATION OF ERISA - DELINQUENT CONTRIBUTIONS

12.    Notwithstanding its obligations pursuant to the CBAs, the Participation Agreement and the Employees Benefit Agreement, Upper Cape has failed to make all of its required contributions to the NEBF for certain months during the period from January, 2000 to the present.

13.    Following an audit of Upper Cape's books and records by NEBF auditors, the NEBF has determined that Upper Cape owes $23,889.73 in delinquent contributions for the months January, 2000 through October, 2003. NEBF records show that Upper Cape owes an additional $2,126.78 for the post-audit period November, 2003 through February, 2004.

14.    The NEBF's counsel wrote to Upper Cape on February 27 and May 21, 2004, requesting that the company fully perform its obligations to the NEBF by paying its delinquent contributions with interest and liquidated damages. True and accurate copies of the February 27 and May 21, 2004 letters are attached hereto as Exhibit D.

15.    In October, 2004, Upper Cape agreed via a telephone call with the NEBF's counsel to repay all amounts due the NEBF in 48 monthly payments. Pursuant to that telephone conversation, the NEBF's counsel sent a repayment agreement to Upper Cape president Ernest Vohnoutka on November 4, 2004 for his review and signature. A true and accurate copy of the November 4, 2004 letter and accompanying repayment agreement are attached hereto as Exhibit

4

E.

16.    The NEBF renewed its request that Upper Cape sign and return the repayment agreement by letter dated January 3, 2005.

17.    However, despite further efforts at communication by the NEBF's counsel, Upper Cape failed and refused to respond to the November 4, 2004 and January 3, 2005 letters until February 10, 2005, at which time Mr. Vohnoutka finally informed counsel via letter that he could not agree to the proposed payment agreement. A subsequent demand letter dated March 22, 2005 received a response but did not result in any payments. Upper Cape has failed to make any payments toward its obligation to the NEBF.

18.    As a result, Upper Cape continues to owe $26,016.51 in contributions for the period January, 2000 through February, 2004.

19.    Despite Upper Cape's breach of its obligations, the Trustees to the NEBF will be required to provide benefits to NEBF participants employed by Upper Cape upon their retirement, based on their years of credited service, which would include that period during which Upper Cape failed to contribute. This could result in a reduction of the corpus of the trust, thereby endangering the rights and benefits of other participants and beneficiaries on whose behalf contributions have been properly made.

20.    Section 515 of ERISA requires an employer to make contributions to a multi-employer pension plan in accordance with its obligations under a collectively bargained agreement and the plan documents. 29 U.S.C. §1145.

21.    Section 502(g)(2) of ERISA provides that a fiduciary of a multi-employer plan, bringing suit to recover delinquencies under Section 515, shall recover in addition to the unpaid

5

contributions, interest thereupon, liquidated damages, attorney's fees and costs, audit fees and costs and other appropriate legal and equitable relief. 29 U.S.C. §1132(g)(2).

22.     Interest on the aforementioned delinquency and other late payments during the period January, 2000 through February, 2004 is equal to $6,731.87.

23.     Liquidated damages on the aforementioned delinquency and other late payments for the period January, 2000 through February, 2004 is equal to $8,421.30.

24.     The cost to the NEBF of the aforementioned audit was $2,748.04.

25.     Absent an order from this Court, Upper Cape will continue to refuse to pay the monies it owes the NEBF, as determined at the audit, and refuse to pay contributions now due and owing, and the NEBF and its participants will be irreparably damaged.

26.     A copy of this Complaint is being served upon the Secretary of Labor and the Secretary of the Treasury by certified mail as required by Section 502(h) of ERISA, 29 U.S.C. §1132(h).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment in their favor, and request this Court to grant the following relief:

a.     Order the attachment by trustee process of the bank accounts of Upper Cape held by Cape Cod Bank and Trust Company;

b.     Order the attachment of the machinery, inventory and accounts receivable of defendant Upper Cape;

c.     Enter a preliminary and permanent injunction enjoining Upper Cape from refusing or failing to make contributions and interest owed to the NEBF;

6

d.     Enter judgment in favor of the NEBF in the following amounts:

   (1)     an award of **$26,016.51**, representing all unpaid contributions due and
           owing for the period January, 2000 through February, 2004;

   (2)     an award of **$6,731.87**, representing interest at a rate of 10% per annum on
           the foregoing delinquent contributions and other late payments owed for
           the period January, 2000 through February, 2004, plus interest on all
           outstanding contributions at the rate of 10% per annum accruing
           hereinafter until such contributions are paid in full;

   (3)     an award of **$8,421.30**, representing liquidated damages in the amount of
           20% of the aforementioned delinquency and other late payments owed for
           the period January, 2000 through February, 2004, plus additional
           liquidated damages which may accrue;

   (4)     an award of **$2,748.04** representing the cost to the NEBF of the audit of
           Defendant's books and records;

   (5)     an award of all reasonable attorneys' fees and costs incurred by the NEBF
           in connection with this action; and

   (6)     an award of all other reasonable attorneys' fees and costs incurred in the
           enforcement of any ensuing judgment; and

e.     Such further and other relief as this Court deems appropriate.

                                        Respectfully submitted,

                                        NATIONAL ELECTRICAL BENEFIT
                                        FUND, by its TRUSTEES, JON F.
                                        WALTERS and D.R. BORDEN, JR.,

7

By their attorneys,

Gregory A. Geiman, Esquire
BBO #655207
Mary T. Sullivan, Esquire
BBO #487130
Segal, Roitman & Coleman
11 Beacon Street
Suite #500
Boston, MA  02108
(617) 742-0208

Dated: May ___, 2005

GAG/gag&ts
MTS 6924 05-080/complt.doc

8

  # LETTER OF ASSENT-A

[illegible]

SUBJECT TO THE APPROVAL OF THE INTERNATIONAL PRESIDENT, IBEW

NAME OF FIRM

[illegible]

SIGNED FOR THE EMPLOYER

BY [signature]

TITLE [illegible]

DATE [illegible]

SIGNED FOR LOCAL UNION

BY [signature]

TITLE [illegible]

DATE [illegible]

## INSTRUCTIONS

[illegible]

**NATIONAL ELECTRICAL BENEFIT FUND**

SUITE 500    2400 RESEARCH BOULEVARD    ROCKVILLE, MARYLAND 20850-3206 · (301) 590-8500

## NEBF PARTICIPATION AGREEMENT FOR COVERED EMPLOYERS

Between _____ UPPER CAPE ELECTRICAL, INC. _____
(hereinafter "Covered Employer") and the National Electrical Benefit Fund (hereinafter "NEBF").

Section 6.3.1(b) of the NEBF's Restated Employees Benefit Agreement and Trust (hereinafter "Restated Agreement") permits a Covered Employer, which has agreed to make contributions to the NEBF on behalf of its employees in the International Brotherhood of Electrical Workers' or one of its local union's bargaining unit, to also make contributions to the NEBF on behalf of employees not in that bargaining unit (hereinafter "non-bargaining unit employees").

Section 6.3.3(a) provides that such a Covered Employer who desires to contribute on behalf of its non-bargaining unit employees shall execute a written Participation Agreement which binds the Covered Employer to the terms of the Restated Agreement, thereby specifying the detailed basis upon which the contributions are to be made to the NEBF.

The Covered Employer hereby agrees to make payments to the NEBF on behalf of either 1) all of its non-bargaining unit employees or 2) each and every non-bargaining unit employee who meets the following conditions: the employee has earned at least one benefit service credit as defined in the "Plan of Benefits for the NEBF" and, during the current plan year or a prior plan year, at least one-half (1/2) of the employee's total hours of service for that year with any and all Covered Employers were performed in an IBEW or IBEW Local Union bargaining unit ("alumni coverage"), except, with regard to both 1) and 2) above, contributions need not be made on behalf of employees who are included in another unit of employees covered by a collective bargaining agreement with a labor union, if retirement benefits were the subject of good faith bargaining between such Covered Employer and the labor union. The Covered Employer hereby agrees to make contributions on (check one of the following):

_____ — All of its non-bargaining unit employees.

___✓___ — Its "alumni" non-bargaining employees only.

The Covered Employer must execute a new participation agreement if it wishes to change to the other type of non-bargaining unit coverage.

The amount to be contributed to the NEBF on behalf of each non-bargaining unit employee under this Participation Agreement shall be 3% of the gross labor payroll paid to, or accrued by, the employee. 3% of the gross labor payroll shall mean either a) 3% of all wages and other compensation which the Covered Employer would pay, or which the employee would accrue, if the employee were receiving the wage rate received by the highest number of employees in the appropriate IBEW bargaining unit and working the normal straight time hours provided for in the appropriate IBEW labor agreement, or b) 3% of all wages and other compensation paid to, or accrued by, the employee for services performed for the Covered Employer, if such amount is less than in a).

The Covered Employer hereby agrees to make contributions to the NEBF's local collection agent or to such depository as the Trustees of the NEBF shall designate, only by check or bank draft, made payable to the order of the NEBF, or such other method of transmitting money as the Trustees may permit. All contributions shall become a debt due and owing the NEBF on the last day of each month.

The Covered Employer hereby acknowledges receipt of a copy of the Restated Agreement and agrees to be bound by all terms and conditions of said Restated Agreement (including, but not limited to, provisions relating to the production of records, tax qualification related coverage/participation requirements, and the collection and enforcement of payments) and such Restated Agreement as amended from time to time.

In consideration of the Participation Agreement, the NEBF agrees to accept said Covered Employer's contributions to the NEBF for such non-bargaining unit employees.

This Participation Agreement shall be binding upon and shall inure to the benefit of the heirs, successors, and assigns of the respective parties hereto.

This Participation Agreement will expire as of the date the Covered Employer ceases to be obligated to contribute on behalf of IBEW represented employees or ceases to be eligible to contribute pursuant to Section 6.3.1(b) of the Restated Agreement, or as of the date the Covered Employer determines that it no longer desires to make payments in accordance with Section 6.3.1(b) of the Restated Agreement. In any such event, the Covered Employer shall give the NEBF at least thirty (30) days written notification of the cessation of contributions and the Covered Employer shall give written notification to all employees and former employees (who had previously been contributed upon) that contributions have ceased. The NEBF shall be furnished with a copy of each such notification.

This Participation Agreement may be terminated by the NEBF if the Covered Employer fails substantially to comply with the terms of this Participation Agreement or the terms of the Restated Agreement.

Date: ___4/18/94___

Date: ___4/29/94___

COVERED EMPLOYER ___Upper Cape Electrical___
/Name of Company

By: ___Seth W. Valenti    SK.    President___
Name and Title

NATIONAL ELECTRICAL BENEFIT FUND

By: ___Anthony J. Salamone___
Anthony J. Salamone



 

# RESTATED EMPLOYEES BENEFIT AGREEMENT AND TRUST FOR THE NATIONAL ELECTRICAL BENEFIT FUND

## *AND*

# PLAN OF BENEFITS FOR THE NEBF

## (January 1, 2000)



# RESTATED EMPLOYEES BENEFIT AGREEMENT AND TRUST
## FOR THE NATIONAL ELECTRICAL BENEFIT FUND
### (January 1, 2000)

## TABLE OF CONTENTS

PREAMBLE................................................................................1
PART I—COLLECTIVE BARGAINING AGREEMENT...........1
PART II—AGREEMENT AND DECLARATION OF TRUST....1

1. Definitions ........................................................................1
    Section 1.1    Act .............................................................1
    Section 1.2    Agreement ..............................................1
    Section 1.3    Association .............................................1
    Section 1.4    Beneficiary .............................................1
    Section 1.5    Brotherhood ..........................................1
    Section 1.6    Code........................................................1
    Section 1.7    Covered Employee.................................1
    Section 1.8    Covered Employer..................................1
    Section 1.9    Covered Employment.............................2
    Section 1.10   Electrical Contractor.............................2
    Section 1.11   Federal Tax Law.....................................2
    Section 1.12   Local Chapter.........................................2
    Section 1.13   Local Union ...........................................2
    Section 1.14   National Board or National Employees
                   Benefit Board.........................................2
    Section 1.15   National Board Co-chairmen.................2
    Section 1.16   National Electrical Benefit Fund............2
    Section 1.17   NEBF......................................................2
    Section 1.18   Participant.............................................2
    Section 1.19   Party or Parties......................................2
    Section 1.20   Plan........................................................2
    Section 1.21   Restated Employees Benefit Agreement or
                   Restated Agreement...............................2
    Section 1.22   Trust ......................................................2
    Section 1.23   Trustees .................................................2

2. Trust Provisions of the National Electrical Benefit Fund...........2
    Section 2.1    Creation and Purpose............................2
    Section 2.2    Conformance to Law..............................2
    Section 2.3    Situs of the NEBF..................................3

3. National Employees Benefit Board.................................3
    Section 3.1    Creation and Purpose............................3
    Section 3.2    Number, Appointment, and Term...........3
    Section 3.3    Resignation and Removal.......................3
    Section 3.4    Successor National Board Members and
                   Appointment...........................................3
    Section 3.5    Limitation of Liability of National Board
                   Members.................................................3
    Section 3.6    Indemnification......................................3
    Section 3.7    National Board Officers.........................3
    Section 3.8    Power to Act in Case of Vacancy...........3
    Section 3.9    National Board Meetings.......................3
    Section 3.10   Attendance at Meetings and Minutes .....3
    Section 3.11   Quorum, Voting, and Action without Meeting.....3
    Section 3.12   Manner of Acting in the Event of Deadlock...........4
    Section 3.13   Powers and Duties of National Board......4

4. Trustees.............................................................................4
    Section 4.1    Number, Appointment, and Term ..........4
    Section 4.2    Resignation and Removal ......................5
    Section 4.3    Successor Trustees and Appointment ....5
    Section 4.4    Successor Trustee and Assumption of Office .........5
    Section 4.5    Acceptance of the Trust by Trustees .......5
    Section 4.6    Limitation of Liability of Trustees ...........5
    Section 4.7    Indemnification ......................................5
    Section 4.8    Officers ..................................................5
    Section 4.9    Meetings and Notices ............................5
    Section 4.10   Attendance at Meetings and Minutes .....5
    Section 4.11   Quorum, Voting, Action without Meeting,
                   and Action by One Trustee.....................5
    Section 4.12   Manner of Acting in the Event of Deadlock .......5

5. Powers and Duties of Trustees.........................................6
    Section 5.1    General Powers.......................................6
    Section 5.2    Funding Policy.........................................6
    Section 5.3    Conduct of NEBF Business ....................6
    Section 5.4    Payment of Expenses..............................6
    Section 5.5    Providing Benefits..................................6
    Section 5.6    Withdrawals from NEBF..........................6
    Section 5.7    Investments ............................................6
    Section 5.8    Deposits and Disbursements..................7
    Section 5.9    Construction of the Agreement ..............7
    Section 5.10   Construction and Determinations With
                   Regard to Plan.......................................7
    Section 5.11   Rules, Regulations, and Policies.............7
    Section 5.12   Additional Authority................................7
    Section 5.13   Surety Bonds..........................................7
    Section 5.14   Insurance................................................7
    Section 5.15   Information to Participants and Beneficiaries........8
    Section 5.16   Executive Secretary-Treasurer, Executive
                   Director of Investments, and Other
                   Employees .............................................8
    Section 5.17   General Counsel .....................................8
    Section 5.18   Accountants and Actuaries.....................8
    Section 5.19   Appointment of Consultants and Advisers............8
    Section 5.20   Office Space...........................................8
    Section 5.21   General Reports.......................................8
    Section 5.22   Records of Trustee Transactions............8
    Section 5.23   Studies and Statistics.............................8
    Section 5.24   Reports to National Board......................8
    Section 5.25   National Electrical Annuity Plan .............8
    Section 5.26   Liability..................................................8
    Section 5.27   Reliance by Others..................................8
    Section 5.28   Amendment of Agreement......................9
    Section 5.29   Amendment of Plan.................................9

6. Contributions and Collections............................................9
    Section 6.1    Covered Employer Contributions...........9
    Section 6.2    3% of the Gross Labor Payroll................9
    Section 6.3    Coverage.................................................9
    Section 6.4    Acceptance of Agreement.....................10
    Section 6.5    NEBF's Designated Local Collection Agent.........10
    Section 6.6    Reports and Payments...........................11
    Section 6.7    Production of Records............................11
    Section 6.8    Collection and Enforcement of Payments.............11
    Section 6.9    Collection Costs.....................................11
    Section 6.10   Effect of Non-Payment..........................12
    Section 6.11   Violation of Agreement...........................12
    Section 6.12   Refund of Contributions.........................12

7. Termination of NEBF.........................................................12
    Section 7.1    Conditions of Termination......................12
    Section 7.2    Procedures in the Event of Termination...............12
    Section 7.3    Limitations.............................................12

8. Miscellaneous...................................................................12
    Section 8.1    Termination of Covered Employer.........12
    Section 8.2    Withdrawal of Covered Employers.........12
    Section 8.3    Vesting of Rights and Beneficial Interests.........12
    Section 8.4    Limitations Upon Beneficial Rights of
                   Participants and Beneficiaries................13
    Section 8.5    Judicial Settlements and Action by Trustees.........13
    Section 8.6    Withholding Payment.............................13
    Section 8.7    Amendment of Part II of Agreement......13
    Section 8.8    Indemnification......................................13
    Section 8.9    Law Applicable......................................13
    Section 8.10   Savings Clause.......................................13
    Section 8.11   Gender....................................................13
    Section 8.12   Part, Article and Section Titles..............13
    Section 8.13   Effective Date........................................13
    Section 8.14   Grandfather Clause................................13
    Section 8.15   Name......................................................13

## RESTATED EMPLOYEES BENEFIT AGREEMENT AND TRUST FOR THE NATIONAL ELECTRICAL BENEFIT FUND

**WHEREAS**, the International Brotherhood of Electrical Workers and the National Electrical Contractors Association, Inc. (the "Parties") originally entered into the Employees Benefit Agreement ("Agreement") on September 3, 1946, for the purpose of providing retirement and related benefits to employees in the electrical contracting industry and employees in other branches of the electrical industry; and

**WHEREAS**, the Agreement has been amended several times since it was originally entered into and the Parties hereby desire to further amend it and to restate it; and

**WHEREAS**, among other matters, the present restatement and amendment shall revise the name of the Agreement to be the "Restated Employees Benefit Agreement and Trust," in order to reflect the fact that the Agreement has embodied, and will continue to embody, not only the Parties' collective bargaining agreement, but also, the basic agreement and declaration of trust for the National Electrical Benefit Fund; and

**WHEREAS**, the Parties recognize that while the program of benefits payable from the National Electrical Benefit Fund (the "NEBF") has heretofore been set forth in Article III-B and Appendix A of the Agreement, hereafter, by this restatement and further amendment to the Agreement, such benefits, while continuing to be paid by the NEBF, shall be set forth in a separate plan document entitled the "Plan of Benefits for the NEBF."

**NOW, THEREFORE**, in consideration of the premises and mutual covenants and agreements herein contained, it is hereby agreed as follows:

## PART I
## COLLECTIVE BARGAINING AGREEMENT

The Parties agree as follows:

**Provision 1.** The International Brotherhood of Electrical Workers and the National Electrical Contractors Association, Inc. have been and shall continue as plan sponsors of the NEBF and shall execute this Restated Employees Benefit Agreement and Trust for the NEBF.

**Provision 2.** This Agreement, including the collective bargaining provisions, became effective on October 1, 1946, and has continued in effect thereafter on a calendar year basis. This Part I, constituting the Parties' collective bargaining agreement, shall continue in effect from year to year hereafter from January 1 to December 31 in each consecutive year, except as amended or terminated as provided below.

**Provision 3.** All collective bargaining agreements or other agreements covering construction employees entered into by the Brotherhood, or by any of its Local Unions, with Electrical Contractors (as such terms are defined in Sections 1.5, 1.13, and 1.10, respectively), shall, consistent with applicable law, require such Electrical Contractors to make contributions to the NEBF and to recognize and bind themselves to this Agreement.

**Provision 4.** Each Covered Employer (as defined in Section 1.8) shall contribute an amount equal to 3% of the gross labor payroll paid to, or accrued by, each Covered Employee (as defined in Section 1.7) as fully set forth in Part II of this Agreement.

**Provision 5.** The provisions of this Part I shall be subject solely to the joint interpretation of the Parties.

**Provision 6.**

(a) The provisions of this Part I shall be subject to revision or amendment solely by the Parties. Either party desiring to revise or amend the provisions in this Part I shall notify the other in writing at least ninety (90) days prior to January 1 of any year. The nature of the revision or amendment shall be specified in the notice. The provisions in this Part I may be revised or amended at any time by mutual consent of the Parties.

(b) This Part I shall be subject to termination solely by the Parties. Either Party desiring to terminate this Part I shall notify the other in writing at least ninety (90) days prior to January 1 of any year. This Part I may be terminated at any time by mutual consent of the Parties. This Part I shall terminate if the NEBF is terminated under Article 7 of Part II of this Agreement.

## PART II
## AGREEMENT AND DECLARATION OF TRUST

The Parties, as trustors, agree as follows:

## ARTICLE 1. DEFINITIONS

The following capitalized terms when used herein, if not otherwise defined, shall have the following meanings:

**Section 1.1 Act.** "Act" means the Employee Retirement Income Security Act of 1974, any amendments as may from time to time be made and any lawful regulations promulgated pursuant to the provisions of the Act.

**Section 1.2 Agreement.** "Agreement" means the Employees Benefit Agreement, initially entered into by the Parties on September 3, 1946, as it has been amended, including the amendments and restatement effectuated by this instrument, and including all amendments and modifications as may from time to time be made hereafter.

**Section 1.3 Association.** "Association" means the National Electrical Contractors Association, Inc.

**Section 1.4 Beneficiary.** "Beneficiary" means a person other than a Participant who is or may become entitled to a benefit from the NEBF under the terms of the Plan.

**Section 1.5 Brotherhood.** "Brotherhood" means the International Brotherhood of Electrical Workers.

**Section 1.6 Code.** "Code" means the Internal Revenue Code of 1986, as amended.

**Section 1.7 Covered Employee.** "Covered Employee" means any employee of a Covered Employer with respect to whom the Covered Employer is obligated consistent with this Agreement to make contributions to the NEBF.

**Section 1.8 Covered Employer.** "Covered Employer" means:

**1.8.1** An employer who is a member of, or who is represent-

ed in collective bargaining by, the Association or one of its Local Chapters and who is bound by a collective bargaining agreement with the Brotherhood or a Local Union which provides for the making of payments to the NEBF with respect to any Covered Employee.

**1.8.2**   An employer who is not a member of, nor represented in collective bargaining by, the Association or one of its Local Chapters, but who has executed, has assented to, or is bound by a collective bargaining agreement with the Brotherhood or a Local Union providing for the making of payments to the NEBF with respect to any Covered Employee.

**1.8.3**   Such other employer to which the Trustees may extend the coverage of this Agreement upon such terms and conditions consistent with this Agreement as the Trustees shall determine, provided such employer agrees in writing to conform to the terms and conditions of this Agreement and such other terms and conditions as determined by the Trustees.

**1.8.4**   An employer who does not meet the requirements of the definition of "Covered Employer" as stated in Sections 1.8.1, 1.8.2, or 1.8.3, but who is or will be making payments or contributions to the NEBF under any law, ordinance, or agreement applicable to or governing a State or Territory or any political subdivision or municipal corporation thereof, provided that the Brotherhood or Local Union enjoys the highest available form of recognition for the employees it represents and that the Trustees accept such participation upon such terms and conditions as the Trustees shall determine.

**Section 1.9   Covered Employment.** "Covered Employment" means employment by a Covered Employee for which a Covered Employer is obligated consistent with this Agreement to contribute to the NEBF.

**Section 1.10   Electrical Contractor.** "Electrical Contractor" means any individual or form of organization whose business is the erecting, installing, altering, repairing, servicing, or maintaining of electrical wiring devices, appliances, or equipment, including the purchasing from suppliers and the selling of manufactured parts and products.

**Section 1.11   Federal Tax Law.** "Federal Tax Law" means the Code, Treasury Regulations, and such other administrative or judicial rulings, notices, or other published guidance interpreting the Code or Treasury Regulations.

**Section 1.12   Local Chapter.** "Local Chapter" means any local association or group affiliated with the Association as a chapter.

**Section 1.13   Local Union.** "Local Union" means any local union affiliated with the Brotherhood.

**Section 1.14   National Board or National Employees Benefit Board.** "National Board" or "National Employees Benefit Board" means the National Employees Benefit Board as designated in this Agreement, with Brotherhood-appointed members sometimes hereafter referred to as "Brotherhood Members," Association-appointed members sometimes hereafter referred to as "Association Members," or otherwise, as the case may be (including "National Board Members" or "Members").

**Section 1.15   National Board Co-chairmen.** "National Board Co-chairmen" or "Co-chairmen" means the persons designated in this Agreement to serve as Co-chairmen of the National Employees Benefit Board.

**Section 1.16   National Electrical Benefit Fund.** "National Electrical Benefit Fund" means the employee benefit plan that is governed by this Agreement and comprises the entire trust estate governed by this Agreement as it may, from time to time, be constituted, including, but not limited to all funds received in the form of contributions, together with all contracts (including dividends, interest, refunds, and other sums payable to the Trustees on account of such contracts), all investments made and held by the Trustees, all income, increments, earnings and profits therefrom, and any and all other property or funds received and held by the Trustees by reason of their acceptance of this Agreement.

**Section 1.17   NEBF.** "NEBF" means the National Electrical Benefit Fund as defined herein.

**Section 1.18   Participant.** "Participant" means any person receiving a pension benefit from the NEBF, any person who has completed the requirements for a vested benefit from the NEBF, any person with credited service in the NEBF who has not lost all such credited service through a break in service, and any Covered Employee.

**Section 1.19   Party or Parties.** "Party" or "Parties" means the Brotherhood and/or the Association, as the case may be.

**Section 1.20   Plan.** "Plan" means the "Plan of Benefits for the NEBF," as provided in Section 3.13.2, including all amendments and modifications as may from time to time be made hereafter.

**Section 1.21   Restated Employees Benefit Agreement or Restated Agreement.** "Restated Employees Benefit Agreement" or "Restated Agreement" means the Agreement, as amended and restated herein, and including all amendments and modifications as may from time to time be made hereafter.

**Section 1.22   Trust.** "Trust" means the trust estate of the NEBF as provided in this Agreement.

**Section 1.23   Trustees.** "Trustees" means the Trustees designated in this Agreement.

## ARTICLE 2.   TRUST PROVISIONS OF THE NATIONAL ELECTRICAL BENEFIT FUND

**Section 2.1   Creation and Purpose.** The trust estate for the NEBF was created and is continuing, as set forth herein, for the purpose of the NEBF providing such benefits as now are, or hereafter may be, authorized or permitted by law for Participants and their Beneficiaries and in accordance with the provisions herein set forth and in the Plan.

**Section 2.2   Conformance to Law.** The NEBF will conform to the applicable requirements of the Labor-Management Relations Act of 1947, as amended (known as the Taft-Hartley Act), and qualify as an "exempt trust" pursuant to Section 501(a) and other pertinent provisions of the Code.

**Section 2.3 Situs of the NEBF.** The situs of the NEBF's principal office and its trust estate shall, so long as such location is feasible, be the District of Columbia. The location of the administrative offices of the NEBF shall, so long as such location is feasible, be the State of Maryland.

## ARTICLE 3.   NATIONAL EMPLOYEES BENEFIT BOARD

**Section 3.1   Creation and Purpose.** A National Employees Benefit Board has been established by the Parties for the purposes set forth herein.

**Section 3.2   Number, Appointment, and Term.** The National Board shall consist of not less than eighteen (18) National Board Members equally divided between Members appointed by the Brotherhood and Members appointed by the Association. The National Board Members shall serve without compensation or allowances and at the will of the Party appointing them, but they shall be reimbursed by the NEBF for all reasonable and necessary expenses properly and actually incurred by them in connection with the performance of their official duties. National Board Members shall serve for such terms as their appointing Party may decide. Vacancy for any cause shall be filled by the respective appointing Party.

**Section 3.3   Resignation and Removal.** A National Board Member may resign and to the fullest extent allowed by applicable law become and remain fully discharged from all further duty or responsibility hereunder upon giving at least thirty (30) days' notice in writing to the National Board Co-chairmen (as identified in Section 3.7) and to the Party by whom he was appointed, or such shorter notice as the appointing Party may accept as sufficient, in which notice shall be stated a date on which such resignation shall take effect; and such resignation shall take effect on the date specified in the notice unless a successor National Board Member shall have been appointed at an earlier date, in which event such resignation shall take effect immediately upon the appointment of such successor National Board Member. A National Board Member may be removed by the appropriate appointing Party.

**Section 3.4   Successor National Board Members and Appointment.** If any National Board Member shall die, become incapable of acting hereunder, resign, or be removed, a successor National Board Member shall be designated by the appropriate appointing Party. It is the intention hereof that there shall, at all times, be an equal number of Members appointed by the Brotherhood and Members appointed by the Association. If either Party refuses to designate one or more necessary successor National Board Members within a reasonable period of time, either Co-chairman may petition the senior judge on duty of the District Court of the United States for the District of Columbia to appoint appropriate and necessary successor National Board Members.

**Section 3.5   Limitation of Liability of National Board Members.** No National Board Member shall be liable or responsible for his own acts or omissions, except as otherwise provided for by the Act or by other applicable law. No National Board Member shall be liable or responsible for the acts or omissions of any other National Board Member or of a Trustee, except as otherwise provided for by the Act or by other applicable law. No National Board Member shall be liable for the acts or omissions of any employee, investment manager, attorney, agent or assistant employed by the NEBF, except as otherwise provided for by the Act or by other applicable law. No National Board Member shall in any way be liable or responsible for acts or omissions in the administration of the NEBF prior to the date of becoming a National Board Member. No National Board Member shall in any way be liable or responsible for acts or omissions in the administration of the NEBF subsequent to the date of National Board Member's resignation or removal from the National Board.

**Section 3.6   Indemnification.** To the fullest extent permitted by the Act or applicable law, the National Board Members shall be indemnified by the NEBF as provided in any contract, agreement or policy duly executed or adopted pursuant to this Agreement.

**Section 3.7   National Board Officers.** The Trustees appointed by the respective Parties, who shall also serve on the National Board, shall serve as Co-chairmen of the National Board. Each Co-chairman shall have the right to appoint an alternate to act for him at any meeting of the National Board. The Secretary of the Trustees (as identified in Section 4.8), or such other person as the Secretary may designate, shall keep minutes and records of all meetings, proceedings and acts of the National Board, which shall be on file at the business address of each Co-chairman.

**Section 3.8   Power to Act in Case of Vacancy.** No vacancy or vacancies on the National Board shall impair the power of the remaining National Board Members to act in the manner provided by this Agreement.

**Section 3.9   National Board Meetings.** An annual meeting of the National Board shall be held within the first six (6) months of each calendar year on such date and at such place as the Co-chairmen may decide. Special meetings may be called by the Co-chairmen at any time on fifteen (15) days' notice mailed to each National Board Member. A meeting of the National Board may be held at any time without notice if all the National Board Members consent in writing.

**Section 3.10   Attendance at Meetings and Minutes.** All official meetings of the National Board shall be attended only by the National Board Members and such other persons as may be designated or invited by the Parties, the National Board, or the Trustees, and as may be otherwise required by law. Written minutes, which need not be verbatim, shall be kept. Such minutes shall be approved by the National Board at its next meeting.

**Section 3.11   Quorum, Voting, and Action without Meeting.**

**3.11.1** At least seven (7) Association Members and seven (7) Brotherhood Members of the National Board present in person at any meeting of the National Board shall constitute a quorum for the transaction of business. If at any meeting the number of Association Members and Brotherhood Members shall be unequal, then the group of National Board Members lesser in number shall be entitled to cast the same number of votes as the other group of National Board Members. If such Members shall be unable to agree as to the manner in which such additional vote or votes shall be cast, then action on the matter under consideration shall be postponed and resolved by mail vote (as provided in Section 3.11.3), cast within thirty (30) days of the meeting.

**3.11.2** Any action taken by the National Board Members,

except as herein otherwise provided, shall be by affirmative vote of a majority of the votes cast at a meeting. The National Board Members must cast their votes in person, except as provided herein.

**3.11.3** Action may be taken without any meeting only if all of the National Board Members agree in writing that a meeting is not required, if a mail vote under Section 3.11.1 or Section 3.12.2 is needed, or if the National Board is acting on the adoption of the Plan as provided under Section 3.13.2. In any such event, action on any proposition shall require the affirmative written vote of at least a majority of the total Members of the National Board. Such written vote shall be mailed to the NEBF's administrative offices and the Co-chairmen shall prepare a special written report reflecting the results of any such vote.

### Section 3.12 Manner of Acting in the Event of Deadlock.

**3.12.1** A deadlock shall be deemed to exist whenever a proposal, motion or resolution made or proposed by any one of the National Board Members, within the scope of the National Board's authority as set forth herein, results in a tie vote and the maker of the proposal, motion or resolution notifies the remaining National Board Members in writing that a deadlock exists.

**3.12.2** In the event of such notice of a deadlock, the Co-chairmen shall reduce the proposal, motion or resolution to writing and call for a mail vote within thirty (30) days of the notice of the deadlock. Such mail vote shall be governed by Section 3.11.3.

**3.12.3** In the event such deadlock continues after the completion of the mail vote, the Co-chairmen shall meet within thirty (30) days after the completion of the mail vote for the purpose of agreeing upon an impartial umpire to break such deadlock by deciding the dispute in question. In the event of the inability of the Co-chairmen to agree upon the selection or the procedure for selection of an impartial umpire, then, on the petition of either Co-chairman, the senior judge on duty of the District Court of the United States for the District of Columbia shall appoint an impartial umpire. The impartial umpire shall immediately proceed to hear the dispute between the National Board Members and decide such dispute, and the decision and award of the umpire shall be final and binding upon the National Board. The reasonable compensation of the umpire and costs and expenses (including, without limitation, attorneys' and reporter fees) incidental to any proceedings instituted to break a deadlock shall be paid by the NEBF.

**3.12.4** Any impartial umpire selected or designated to break a deadlock shall be required to enter his decision within a reasonable time fixed by the Co-chairmen. The scope of any such proceeding before such impartial umpire shall be limited to the provisions of Article 3 of this Agreement. The impartial umpire shall have no jurisdiction or authority to change or modify the provisions of this Agreement or to decide any issue arising under or involving any Article other than this Article 3 of this Agreement, nor shall any decision conflict or be inconsistent with the Act or applicable law.

### Section 3.13 Powers and Duties of National Board.

**3.13.1** The National Board when it meets annually, as provided in Section 3.9, shall review the NEBF's operations and administration and shall review the administration of the Plan. At this annual meeting, the National Board shall also hear and review a report from the Trustees.

**3.13.2** The National Board shall adopt a "Plan of Benefits for the NEBF" to be effective as of January 1, 1993 for the governance of the payment of retirement pension benefits, permanent disability pension benefits, and related benefits. Such adoption shall be by mail vote as provided in Section 3.11.3. Such Plan shall be a plan qualified under the Code, and shall continue as a qualified plan, so as to ensure that the Covered Employers' contributions to the NEBF are proper deductions for income tax purposes. Such Plan shall also at all times comply with any other applicable federal law and with the provisions of this Agreement.

**3.13.3** The National Board is authorized to revise or amend the provisions of Part II of this Agreement, except as provided in Section 5.28.

**3.13.4** The National Board is authorized to amend the Plan, provided, however, that amendments with regard to increases in benefits may only be made jointly by the National Board and the Trustees and, at the time of the adoption of the amendment, a report by the NEBF's actuary must indicate that in the actuary's opinion (a) no withdrawal liability then exists, and (b) upon its effective date, the amendment will not produce withdrawal liability for any Covered Employer. Withdrawal liability, as used herein, shall mean the circumstances whereby a withdrawing Covered Employer would actually incur withdrawal liability to the NEBF under the Act (and, more particularly, the provisions added by the Multiemployer Pension Plan Amendments Act of 1980).

**3.13.5** The National Board shall vote on any recommendations or proposals, within the scope of the National Board's authority, placed before it by the Trustees.

**3.13.6** The National Board shall have authority to act with regard to any termination of the NEBF, as provided in Article 7.

**3.13.7** The National Board shall make a full and complete report to the Association and the Brotherhood once each year of the National Board's actions during the prior year, which obligation may be fulfilled by transmitting a copy of the minutes of its annual meetings, or other meetings, or any special reports to the Parties.

## ARTICLE 4. TRUSTEES

**Section 4.1 Number, Appointment, and Term.** There shall be two (2) Trustees who shall each be a "named fiduciary" as defined in Section 402(a)(2) of the Act. One (1) Trustee shall be appointed by the Association and one (1) Trustee shall be appointed by the Brotherhood. The Trustees shall serve without compensation or allowances and at the will of the Party appointing them, but they shall be reimbursed for all reasonable and neces-

4

sary expenses properly and actually incurred by them in connection with the performance of their official duties. Trustees shall serve for such terms as their appointing Party may decide. Vacancy from any cause shall be filled by the respective appointing Party. The Trustees shall also be appointed by their respective Parties as National Board Members and shall serve as Co-chairmen of the National Board.

**Section 4.2  Resignation and Removal.**  A Trustee may resign and to the fullest extent allowed by applicable law become and remain fully discharged from all further duty or responsibility hereunder upon giving at least thirty (30) days' notice in writing to the remaining Trustee and to the Party by whom he was appointed, or such shorter notice as the appointing Party may accept as sufficient, in which notice shall be stated a date on which such resignation shall take effect; and such resignation shall take effect on the date specified in the notice unless a successor Trustee shall have been appointed at an earlier date, in which event such resignation shall take effect immediately upon the appointment of such successor Trustee.  A Trustee may be removed by the appropriate appointing Party.

**Section 4.3  Successor Trustees and Appointment.**  If any Trustee shall die, become incapable of acting hereunder, resign, or be removed, a successor Trustee shall be designated by the appropriate appointing Party. It is the intention hereof that there shall, at all times, be one (1) Trustee appointed by the Brotherhood and one (1) Trustee appointed by the Association and a vacancy in the Trustees shall preclude the remaining Trustee from taking any action pursuant to this Agreement. If one Party refuses to designate a successor Trustee within a reasonable period of time, the other Trustee may petition the senior judge on duty of the District Court of the United States for the District of Columbia to appoint an appropriate successor Trustee.

**Section 4.4  Successor Trustee and Assumption of Office.**  Any successor Trustee shall, immediately upon his appointment as a successor Trustee and his acceptance of the Trusteeship in writing, as provided in Section 4.5, become vested with all the property rights, powers and duties of a Trustee hereunder with like effect as if originally named Trustee without the necessity of any formal conveyance or other instrument of title.

**Section 4.5  Acceptance of the Trust by Trustees.**  The Trustees shall immediately meet and sign this Agreement as evidence of their acceptance of the Trust, their consent to act as Trustees, and their agreement to administer the Trust as provided herein. Successor Trustees shall execute a written acceptance in a form satisfactory to the Parties and consistent with the Act and thereby shall be deemed to have accepted the Trust, to have consented to act as Trustees, and to have agreed to administer the Trust as provided herein.

**Section 4.6  Limitation of Liability of Trustees.**  No Trustee shall be liable or responsible for his own acts or omissions, except as otherwise provided for by the Act or by other applicable law. No Trustee shall be liable or responsible for the acts or omissions by any National Board Member or by the other Trustee, except as otherwise provided for by the Act or by other applicable law. Except as otherwise provided for by the Act or by other applicable law, no Trustee shall be liable for the acts or omissions of any employee, investment manager, attorney, agent or assistant employed by them, if such employee, investment manager, attorney, agent or assistant was selected pursuant to this Agreement and such person's performance was periodically reviewed by the Trustees who found such performance to be satisfactory; provid-

ed that nothing herein shall relieve any corporate trustee, if any, of any liability with regard to the performance of its employees. No Trustee shall in any way be liable or responsible for any act or omission in the administration of the NEBF prior to the date of becoming a Trustee. No Trustee shall in any way be liable or responsible for any act or omission in the administration of the NEBF subsequent to the date of the Trustee's resignation or removal as a Trustee.

**Section 4.7  Indemnification.**  To the fullest extent permitted by the Act or applicable law, the Trustees shall be indemnified by the NEBF as provided in any contract, agreement or policy duly executed or adopted pursuant to this Agreement.

**Section 4.8  Officers.**  The Trustee appointed by the Association shall serve as the Chairman of the Trustees and the Trustee appointed by the Brotherhood shall serve as the Secretary of the Trustees. The Secretary, or such other person as the Secretary may designate, shall keep minutes and records of all meetings, proceedings and acts of the Trustees and shall, with reasonable promptness, send copies of such minutes and records to the Trustees.

**Section 4.9  Meetings and Notices.**  The Trustees shall meet monthly, as practicable, and a special meeting of the Trustees may be called by either one of the Trustees. All meetings shall be held on such date and at such place as the Trustees may decide.

**Section 4.10  Attendance at Meetings and Minutes.**  All meetings of the Trustees shall be attended only by the Trustees and such other persons as may be designated or invited by the Trustees, and as may be otherwise required by law. Written minutes, which need not be verbatim, shall be kept by the Secretary or such other person as the Secretary may designate pursuant to Section 4.8, a copy of which shall be furnished to each Trustee. Such minutes shall be approved by the Trustees at a subsequent meeting.

**Section 4.11  Quorum. Voting. Action without Meeting. and Action by One Trustee.**  Both Trustees must be present in person at any meeting of the Trustees. Any action taken by the Trustees, except as otherwise provided herein, shall be by the vote of both Trustees. Action by the Trustees may also be taken without a meeting if the Trustees agree thereto. Nothing herein shall preclude the Trustees from authorizing one Trustee to take any action, including the execution of any document on behalf of the Trustees and/or the NEBF, provided that such authorization is embodied in a writing or resolution signed by both Trustees, or is made by a motion adopted and reflected in the Trustees' minutes, and all persons, partnerships, corporations, or associations may rely thereupon that such document has been duly authorized and is binding on the NEBF and the Trustees.

**Section 4.12  Manner of Acting in the Event of Deadlock.**

4.12.1  A deadlock shall be deemed to exist whenever a proposal, motion or resolution made or proposed by one of the Trustees is not adopted by the other Trustee and the maker of the proposal, motion or resolution notifies the other Trustee in writing that a deadlock exists.

4.12.2  In the event of such deadlock arising, the Trustees shall meet within thirty (30) days of the written notice of deadlock for the purpose of reconsidering the proposal, motion or resolution, or, if such deadlock continues, of agreeing upon an impartial umpire to break the deadlock by deciding the dispute in question. In the event of the inability of the Trustees to a—

selection or the procedure for selection of an impartial umpire at such meeting, then, on the petition of either Trustee, the senior judge on duty of the District Court of the United States for the District of Columbia shall appoint an impartial umpire. The impartial umpire shall immediately proceed to hear the dispute between the Trustees and decide such dispute, and the decision and award of the umpire shall be final and binding upon the Trustees. The reasonable compensation of the umpire and costs and expenses (including, without limitation, attorneys' and reporter fees) incidental to any proceedings instituted to break a deadlock shall be paid by the NEBF.

4.12.3 Any impartial umpire selected or designated to break a deadlock shall be required to enter his decision within a reasonable time fixed by the Trustees. The scope of any such proceeding before such impartial umpire shall be limited to the provisions of this Agreement relating to actions which may be undertaken by the Trustees. The impartial umpire shall have no jurisdiction or authority to change or modify the provisions of this Agreement or to decide any issue arising under or involving the interpretation of Part I of this Agreement or any provision of Part II of this Agreement unrelated to the Trustees, nor shall any decision conflict or be inconsistent with the Act or applicable law.

## ARTICLE 5.  POWERS AND DUTIES OF TRUSTEES

**Section 5.1  General Powers.** The Trustees are hereby empowered to do all acts, whether or not expressly authorized herein, which the Trustees may deem necessary to accomplish the general objectives of maintaining the NEBF solely in the interests of the Participants and Beneficiaries for the exclusive purpose of (a) providing benefits to Participants and Beneficiaries, and (b) defraying reasonable expenses of administering the NEBF. Such actions shall be taken with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. Such actions shall include the diversification of the investments of the NEBF so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so. All such actions shall be in accordance with this Agreement and any documents or instruments governing the NEBF, insofar as they are consistent with applicable law.

**Section 5.2  Funding Policy.** The Trustees shall determine the short-term and long-term financial needs of the NEBF for the payment of pension and related benefits and the reasonable expenses of administering the NEBF.

**Section 5.3  Conduct of NEBF Business.** The Trustees shall have general supervision of the operation of the NEBF and shall conduct the business and activities of the NEBF in accordance with this Agreement and applicable law. The Trustees shall hold, manage and protect the Trust and collect the income therefrom and contributions thereto. The Trustees may, in the course of conducting the business of the NEBF, execute all documents in the name of the NEBF. Such documents shall be signed by both Trustees, unless one Trustee has authorized the other Trustee to sign any such document pursuant to Section 4.11.

**Section 5.4  Payment of Expenses.** The Trustees shall have

the power and authority to use and apply the NEBF assets to pay or provide for the payment of all reasonable and necessary expenses: (a) of collecting the Covered Employer contributions and payments and other moneys and property to which the NEBF may be entitled, and (b) of administering the affairs of the NEBF, including the employment of such administrative, legal, expert and clerical assistance, the purchase or lease of such premises, materials, supplies and equipment and the performance of such other acts, as the Trustees find necessary or appropriate in the performance of their duties.

**Section 5.5  Providing Benefits.** The Trustees shall have the power and authority to use and apply the Trust for the purpose of providing benefits and other conventional forms of retirement, disability and related benefits to eligible Participants and Beneficiaries in accordance with the terms, provisions and conditions of the "Plan of Benefits for the NEBF."

**Section 5.6  Withdrawals from NEBF.** Withdrawals from the Trust shall not be made for any purposes other than for payment of benefits to Participants and Beneficiaries and for the administration of the NEBF as provided herein.

**Section 5.7  Investments.**

5.7.1  **General.** The Trustees shall have full and exclusive authority and discretion to manage, control, invest, divest and hypothecate the assets of the NEBF in accordance with this Agreement and applicable law, except to the extent that such authority to manage, control, invest, divest and hypothecate the assets of the NEBF is delegated to one or more investment managers in accordance with Section 5.7.3.

5.7.2  **Commingled Funds.** Notwithstanding any other provision of this Agreement, the Trustees may cause any part or all of this Trust to be commingled with the money of trusts created by others. Money of this Trust so added to any commingled fund at any time shall be subject to all of the provisions of the declaration of trust creating said commingled fund, as it is amended from time to time. Said Declaration of Trust creating the commingled fund is hereby made a part of this Agreement.

5.7.3  **Investment Managers.** The Trustees shall have the power and authority to appoint one or more investment managers in accordance with Section 402(c)(3) of the Act, who shall be responsible for the management, acquisition, disposition, investing and reinvesting of such of the assets of the Trust as the Trustees shall specify. In accordance with Section 405(d)(1) of the Act, the Trustees shall not be liable for the acts or omissions of such investment manager nor have any investment obligation with respect to any asset managed by such manager. Any appointment of an investment manager may be terminated by the Trustees upon written notice, or as specified in written agreements with such managers. The fees of such investment manager and its expenses to the extent permitted by law shall be paid by the NEBF. Any such investment manager shall be a fiduciary who is either (a) registered as an investment manager under the Investment Advisers Act of 1940, (b) a bank, as defined in the Investment Advisers Act of 1940, (c) an insurance company qualified to perform investment management services under the laws of more than one state, or (d) such other

person or organization authorized by the Act. Such investment manager shall acknowledge in writing that he is a fiduciary with respect to the NEBF.

**5.7.4** <u>Others</u>. The Trustees shall have the authority to allocate responsibilities and designate other persons to carry out certain responsibilities, as consistent with Section 405(c)(1) of the Act.

**5.7.5** <u>Investment Guidelines</u>. The Trustees shall from time to time adopt appropriate investment policies and/or guidelines.

**Section 5.8** <u>Deposits and Disbursements</u>. All NEBF monies not invested shall be deposited by the Trustees in such depository or depositories as the Trustees shall from time to time select, and any such deposit or deposits, or disbursements therefrom shall be made in the name of the NEBF in the manner designated by the Trustees and upon the signature(s) of persons designated and authorized by the Trustees or by an investment manager appointed in accordance with Section 5.7.3.

**Section 5.9** <u>Construction of the Agreement</u>. The Trustees shall have full discretionary power and authority to construe and interpret the provisions of Part II of this Agreement, the terms used herein, and the rules, regulations and policies issued pursuant to Section 5.11. Any such construction or interpretation issued or confirmed in writing by the Trustees shall be binding upon the Brotherhood, the Association, the National Board, Local Unions, Local Chapters, Covered Employers, Covered Employees, and Participants and Beneficiaries and their families, dependents and/or legal representatives. Constructions or interpretations which are not issued or confirmed in writing by the Trustees shall not be binding upon the NEBF, and, in particular, no matter respecting the Trustees' rights herein or any difference arising thereunder shall be controlled or determined by the grievance or arbitration procedure established in any local collective bargaining agreement or by any construction by local collective bargaining parties.

**Section 5.10** <u>Construction and Determinations With Regard to Plan</u>. The Trustees shall have full discretionary power and authority to construe and interpret the provisions of the Plan, the terms used therein, and the rules, regulations and policies related thereto. The Trustees shall have full, discretionary, and exclusive power and authority to administer the Plan and to determine all questions of coverage and eligibility, methods of providing or arranging for the benefits specified in the Plan and all other related matters. The Trustees shall not be under any obligation to pay any pension if the payment of such pension will result in loss of the NEBF's tax exempt status or qualified status under the applicable Federal Tax Law. Any such determination and any such construction or interpretation issued or confirmed in writing by the Trustees shall be final and binding upon the Brotherhood, the Association, the National Board, Local Unions, Local Chapters, Covered Employers, Covered Employees, and Participants and Beneficiaries and their families, dependents and/or legal representatives. Constructions or interpretations which are not issued or confirmed in writing by the Trustees shall not be binding upon the NEBF, and, in particular, no matter respecting the Trustees' rights herein or any difference arising thereunder shall be controlled or determined by the grievance or arbitration procedure established in any local collective bargaining agreement or by any construction or determination by local collective bargaining parties.

**Section 5.11** <u>Rules, Regulations, and Policies</u>.

**5.11.1** <u>Authority</u>. The Trustees are hereby empowered and authorized to promulgate, adopt and thereafter amend or rescind any and all necessary rules, regulations or policies which they deem needed or desirable to facilitate the proper administration of the NEBF, including the Plan. Said rules, regulations or policies may include, by way of illustration and not limitation: conditions of eligibility for Participants and Beneficiaries; procedures for applying for benefits; procedures for the distribution of benefits; indemnification of NEBF officials, fiduciaries, employees and service providers; and procedures for the collection of contributions. All such rules, regulations or policies adopted by action of the Trustees shall be binding upon the Brotherhood, the Association, the National Board, Local Unions, Local Chapters, Covered Employers, Covered Employees, and Participants and Beneficiaries and their families, dependents and/or legal representatives.

**5.11.2** <u>Limitation</u>. No such regulation, rule or policy made or adopted by the Trustees shall conflict or be inconsistent with any provision of this Agreement, the Plan, the Act, or applicable law.

**Section 5.12** <u>Additional Authority</u>. The Trustees are hereby empowered, in addition to such other powers as are set forth herein or conferred by law, and by way of illustration and not limitation:

**5.12.1** to enter into any and all contracts and agreements for carrying out the terms of this Agreement and for the administration of the NEBF, and to do all acts as they, in their discretion, may deem necessary or advisable;

**5.12.2** to investigate, file, litigate, compromise, settle, arbitrate, or release claims, suits, actions, proceedings or demands in favor of or against the NEBF or the Trustees on such terms and conditions as the Trustees may deem advisable;

**5.12.3** to make appropriate allocations of common administration expenses and disbursements shared or to be shared by the plans or funds administered by the Trustees pursuant to the provisions of this Agreement;

**5.12.4** to do all acts, whether or not expressly authorized herein, which the Trustees may deem necessary or proper for the protection of the property held hereunder;

**5.12.5** to do all acts, whether or not expressly authorized herein, which the Trustees may deem necessary or proper to accomplish the general objective of enabling the Covered Employees to obtain pension and related benefits in the most efficient and economical manner; and

**5.12.6** to do all acts which may be necessary to comply with any of the requirements of the Act or any other applicable law.

**Section 5.13** <u>Surety Bonds</u>. Every fiduciary and every person who handles funds or other property of the NEBF shall be bonded by a duly authorized surety company in the amount fixed at the beginning of each fiscal year, which amount shall be consistent with Section 412 of the Act, but no bond shall be required by any corporation exempt from such bonding requirement pursuant to Section 412(a)(2) of the Act.

**Section 5.14** <u>Insurance</u>. The Trustees may a____

purchase of insurance for the NEBF, for themselves collectively and/or individually, and for any other fiduciary employed by the Trustees, to cover liability or losses occurring by reason of the act or omission of a fiduciary and the cost of such insurance shall be paid by the NEBF; provided, however, that such insurance purchased by the NEBF must permit recourse by the insurer against the Trustee or other fiduciary in case of a breach of fiduciary obligation to the NEBF by such Trustee or other fiduciary. The Trustees or other fiduciary may purchase insurance containing a non-recourse option only as permitted under the Act and applicable law, and the premium for such options may not be paid from the NEBF unless permitted by the Act.

**Section 5.15** <u>Information to Participants and Beneficiaries</u>. The Trustees shall provide Participants and Beneficiaries such information as may be required by law.

**Section 5.16** <u>Executive Secretary-Treasurer, Executive Director of Investments, and Other Employees</u>. The Trustees shall engage the Executive Secretary-Treasurer and the Executive Director of Investments, to act as the Trustees may deem necessary, and such other employees as are needed and shall secure such special or regular services of others as the Trustees consider proper and shall pay out of the NEBF assets such salaries and expenses or operating overhead as the Trustees consider necessary.

**Section 5.17** <u>General Counsel</u>. The Trustees shall engage an attorney at law to act as General Counsel to the NEBF and to perform such legal services as the Trustees may deem necessary. To the fullest extent allowed by law, the Trustees shall not be liable for any action taken or omission suffered by them in good faith reliance upon the legal advice of such General Counsel.

**Section 5.18** <u>Accountants and Actuaries</u>. The Trustees shall engage one or more independent qualified public accountants and one or more enrolled actuaries to perform all services as may be required by applicable law and such other services as the Trustees may deem necessary. The Trustees shall be fully protected with respect to any action taken or omission suffered by them in good faith reliance upon the advice of such accountant or actuary.

**Section 5.19** <u>Appointment of Consultants and Advisers</u>. The Trustees may engage a qualified consultant or consultants to serve the Trustees. The Trustees may also engage a qualified adviser, as provided in Section 402(c)(2) of the Act, to render advice with regard to any Trustee responsibility under this Agreement. The Trustees shall be fully protected with respect to any action taken or omission suffered by them in good faith reliance upon the advice of any such consultant or adviser.

**Section 5.20** <u>Office Space</u>. The Trustees are authorized to obtain whatever office space and equipment the Trustees deem necessary for the administration of the NEBF.

**Section 5.21** <u>General Reports</u>. All reports required by law to be signed by one or more Trustees shall be signed by both of the Trustees, unless one Trustee has authorized the other Trustee to sign such reports pursuant to Section 4.11.

**Section 5.22** <u>Records of Trustee Transactions</u>. The Trustees shall keep true and accurate books of account and a record of all of their transactions and meetings which records and books shall be audited annually by a certified public accountant. A copy of the audit report shall be available for inspection by interested persons at the principal business office of the NEBF, and at the Brotherhood and the Association.

**Section 5.23** <u>Studies and Statistics</u>. The Trustees are authorized to secure and compile statistics regarding the number, age, health and employment records of employees in the electrical industry or in any of its branches and to make studies, including actuarial studies, based on such statistics as necessary and desirable to maintain suitable pension and related benefits.

**Section 5.24** <u>Reports to National Board</u>. The Trustees shall make a full and complete report annually to the National Board on their actions and the conditions of the monies under their charge. Such report, including the annual audit, shall be available for inspection by interested persons at the principal business office of the NEBF, and at the Brotherhood and the Association. At any authorized meeting of the National Board, the Trustees shall also place before the National Board any recommendations or proposals, within the scope of the National Board's authority, to be acted upon by the National Board.

**Section 5.25** <u>National Electrical Annuity Plan</u>. The Trustees shall be authorized to enter into an agreement with the National Retirement Board of the National Electrical Annuity Plan to provide, by way of illustration and not limitation, personnel, services, space, and such other matters as may be necessary to administer the National Electrical Annuity Plan. Such agreement shall provide for reimbursement, consistent with generally accepted accounting principles, and consistent with applicable law, of all expenses incurred by the NEBF in providing for these matters.

**Section 5.26** <u>Liability</u>.

**5.26.1** <u>Reliance on Writings</u>. The Trustees, to the extent permitted by applicable law, shall be fully protected and shall incur no liabilities in acting upon any instrument, certificate, application, notice, request, signed letter, telegram or other paper or document believed by them to be genuine, to contain a true statement of facts, and to be signed or presented by the proper person, and the Trustees shall be under no duty to make any investigation or inquiry as to any statement contained in any such writing, but may accept the same as conclusive evidence of the truth and accuracy of the statements therein contained.

**5.26.2** <u>Limitations on Liabilities of Parties</u>. Neither the Brotherhood nor the Association shall in any way be liable under or because of this Agreement in any respect for any of the acts, omissions, or obligations of the Trustees or the National Board Members, individually or collectively.

**Section 5.27** <u>Reliance by Others</u>.

**5.27.1** <u>Entities</u>. No entity dealing with the Trustees shall be obligated (a) to see the application to the stated NEBF purposes, of any funds or property of the Trust or (b) to see that the terms of this Agreement have been complied with or (c) to inquire into the necessity or expediency of any act of the Trustees.

**5.27.2** <u>Instruments</u>. Every instrument executed by both of the Trustees shall be conclusive evidence in favor of every person relying thereon (a) that at the time of execution of said instrument, the NEBF was a viable legal entity, (b) that the instrument was executed in accordance with the terms and conditions of this Agree-

ment, and (c) that the Trustees were duly authorized and empowered to execute the instrument.

**Section 5.28** **Amendment of Agreement.** The Trustees are not authorized to amend this Agreement, except as provided herein. The Trustees are authorized to amend Part II of this Agreement, prospectively or retroactively, where they deem it necessary to maintain the continuation of the NEBF's tax exempt status under Federal Tax Law and to preserve compliance with the Act or other applicable law, and any regulations or rulings issued with respect thereto.

**Section 5.29** **Amendment of Plan.** The Trustees are authorized to amend the Plan, prospectively or retroactively, where they deem it necessary to maintain the continuation of the NEBF's tax exempt status or the Plan's qualified status under Federal Tax Law or to otherwise preserve compliance with the Act or other applicable law, and any regulations or rulings issued with respect thereto. The Trustees are authorized to make whatever applications are necessary with the Internal Revenue Service to receive and maintain the determination of the qualified status of the NEBF and Plan. The Trustees are also generally authorized to amend the Plan, except where expressly limited as provided herein. Amendments with regard to increases in benefits may only be made jointly by the Trustees and the National Board and, at the time of the adoption of the amendment, a report by the NEBF's actuary must indicate that in the actuary's opinion (a) no withdrawal liability then exists, and (b) upon its effective date, the amendment will not produce withdrawal liability for any Covered Employer. Withdrawal liability, as used herein, shall mean the circumstances whereby a withdrawing Covered Employer would actually incur withdrawal liability to the NEBF under the Act (and, more particularly, the provisions added by the Multiemployer Pension Plan Amendments Act of 1980).

# ARTICLE 6.  CONTRIBUTIONS AND COLLECTIONS

**Section 6.1** **Covered Employer Contributions.** Each Covered Employer shall pay by the fifteenth of each calendar month (except as provided herein) to the NEBF's designated local collection agent an amount equal to 3% of the gross labor payroll for the preceding calendar month paid to, or accrued by, the Covered Employees, as described in this Article. The Covered Employer agrees that such contributions shall constitute a legally binding, absolute obligation to the NEBF, and such obligation shall not be subject to set-off or counterclaim which the Covered Employer may have for any liability of the NEBF, the Brotherhood, a Local Union, the Association, any Local Chapter thereof, or any Covered Employee.

**Section 6.2** **3% of the Gross Labor Payroll.** The term "3% of the gross labor payroll" shall mean:

**6.2.1** as to Covered Employees who are in a bargaining unit represented by the Brotherhood or Local Union, 3% of all wages and other compensation paid to, or accrued by, the Covered Employees in the Brotherhood bargaining unit or the Local Union bargaining unit for services performed for the Covered Employer; or

**6.2.2** as to Covered Employees who are not in a bargaining unit represented by the Brotherhood or Local Union, either (a) 3% of all wages and other compensation

which the Covered Employer would pay, or which the Covered Employees would accrue, if the Covered Employees were receiving the wage rate received by the highest number of employees in the appropriate Brotherhood bargaining unit or the Local Union bargaining unit and working the normal straight time hours provided for in the appropriate labor agreement, or (b) 3% of all wages and other compensation paid to, or accrued by, the Covered Employees for services performed for the Covered Employer, if such amount is less than in subsection (a).

**6.2.3** the term "wages and other compensation" shall exclude: the value of non-cash fringe benefits; bona fide contributions made by the Covered Employer to: (a) a trust fund establishing under § 302(c) of the Taft-Hartley Act, or (b) a separate entity or fund which provides retirement benefits or medical benefits; and, bona fide bonuses of an extraordinary nature (i.e., lump sum year-end bonuses, not ordinarily paid as part of a regular payroll period).

## Section 6.3  Coverage.

**6.3.1** Any Covered Employer who has agreed to contribute to the NEBF on behalf of the employees in a Brotherhood bargaining unit or a Local Union bargaining unit:

(a) shall contribute on behalf of each and every one of its employees in that Brotherhood bargaining unit or that Local Union bargaining unit;

(b) may contribute, either: (i) on behalf of all of its employees not in that Brotherhood bargaining unit or that Local Union bargaining unit (hereafter its "non-bargaining unit employees") provided that contributions are made on behalf of each and every such employee, including, without limitation all office clerical and other "overhead" employees; or, (ii) on behalf of each and every non-bargaining unit employee who meets the following conditions: the employee has earned at least one benefit service credit as defined in the "Plan of Benefits for the NEBF" and, during the current plan year or a prior plan year, at least one-half (1/2) of the employee's total hours of service for that year with any and all Covered Employers were performed in a Brotherhood bargaining unit or a Local Union bargaining unit ("alumni coverage"); and

(c) for purposes of coverage under (b)(i) and (b)(ii), need not contribute on behalf of employees who are included in another unit of employees covered by a collective bargaining agreement with a labor union, if retirement benefits were the subject of good faith bargaining between such Covered Employer and the labor union.

**6.3.2** The Trustees shall permit related organizations (meaning the Brotherhood, Local Unions, the Association and its Local Chapters, joint apprenticeship and training committees, the NEBF, jointly administered trust funds providing health and welfare coverage, pensions, and pooled vacations, similar funds affiliated with the Brotherhood and/or the Association, and State or National Labor Federations or similar organizations in which the IBEW or a Local Union is a member or in

which NECA or a Local Chapter is a member) which so elect and which agree to satisfy the following conditions, to be Covered Employers. Such a related organization:

(a) shall contribute on behalf of each and every one of its employees; or, in the alternative,

(b) shall contribute on behalf of each and every employee who meets the following conditions: the employee has earned at least one benefit service credit as defined in the "Plan of Benefits for the NEBF" and, during the current plan year or a prior plan year, at least one-half (1/2) of the employee's total hours of service for that year with any and all Covered Employers were performed in a Brotherhood bargaining unit or a Local Union bargaining unit ("alumni coverage").

(c) However, if the related organization is a State or National Labor Federation or similar organization in which the IBEW or a Local Union is a member or in which NECA or a Local Chapter is a member, it shall select "alumni coverage."

(d) For purposes of coverage under (a), (b), and (c), any such related organization need not contribute on behalf of employees who are included in another unit of employees covered by a collective bargaining agreement with a labor union, if retirement benefits were the subject of good faith bargaining between such related organization and the labor union.

6.3.3    For any coverage permitted under Sections 6.3.1(b) and 6.3.2, each Covered Employer must:

(a) execute a written participation agreement as required by the Trustees which binds the Covered Employer to the terms of this Agreement and, thereby, specifies the detailed basis upon which the contributions are to be made to the NEBF;

(b) specify in its written participation agreement whether such Covered Employer is electing coverage of all non-bargaining unit employees or only "alumni coverage," which election, when made, cannot be changed to the other type of non-bargaining unit coverage without a new written participation agreement;

(c) for coverage under Sections 6.3.1(b)(i) and 6.3.2(a), certify in a manner acceptable to the Trustees that it is, in fact, covering all of its employees not in that Brotherhood bargaining unit or that Local Union bargaining unit, except those who may be excluded pursuant to Sections 6.3.1(c) and/or 6.3.2(d);

(d) for "alumni coverage," under Sections 6.3.1(b)(ii) and 6.3.2(b) and (c), certify in a manner acceptable to the Trustees that it is, in fact, covering all of its "alumni" employees, except those who may be excluded pursuant to Sections 6.3.1(c) and/or 6.3.2(d); and

(e) execute such documents as may be required by the Internal Revenue Service, or reasonably required by

the Trustees, to enable the NEBF to secure a determination letter of federal tax exemption or to support its tax exemption and/or qualified plan status.

6.3.4    In administering the types of coverages provided in this Section, the Trustees shall not permit any coverage inclusions or exclusions which would contravene the non-discrimination requirements of the Code and Federal Tax Law. The Trustees are authorized to take any and all steps as outlined herein and otherwise to ensure compliance with such Federal Tax Law requirements, including requiring a Covered Employer to retroactively include in its coverage one or more of its eligible employees who are not highly compensated employees and make contributions on behalf of such employee(s) in accordance with the terms of this Agreement, and such authority is expressly recognized by all Covered Employers which hereby agree to be bound by such actions.

**Section 6.4  Acceptance of Agreement.** Covered Employers shall, by the making of payments to the NEBF, be deemed to have accepted and be bound by this Agreement.

**Section 6.5  NEBF's Designated Local Collection Agent.**

6.5.1    The NEBF's designated local collection agent (herein referred to as the "local collection agent") may be designated in each locality or area over which a chapter chartered by the Association has jurisdiction, or in such area as the Trustees may designate. Local collection agents shall serve without compensation or allowances, but they shall be reimbursed as reasonable for expenses incurred in connection with the performance of their official duties. However, no expense shall be incurred without the prior approval of the Trustees. Local collection agents shall serve for such terms as the Trustees may decide. Each local collection agent shall be appointed, and may be removed, by the Trustees.

6.5.2    Each local collection agent shall be covered by a bond covering acts of fraud and dishonesty. The NEBF shall pay the premium on the bond and determine the amount in which it shall be written.

6.5.3    Each local collection agent shall be instructed and authorized by the Trustees as follows:

(a) to establish and maintain an interest-bearing checking account in the name of the NEBF into which contributions sent to the local collection agent shall be deposited;

(b) to collect from all Covered Employers in their jurisdiction the required contributions at the time and in the manner specified herein and to deposit those contributions in the interest-bearing checking account in a timely manner as instructed by the Trustees;

(c) to remit to the Trustees on or before the 25th day of each month all such contributions collected for the preceding month, all accrued interest from the checking account, and such other forms or reports as required by the Trustees;

(d) to act in strict accordance with all instructions and authority issued by the Trustees and such further

10

instructions and authority as the Trustees may decide, including instructions with respect to the compiling of statistics; and

(e) to act in strict conformity with this Agreement.

**6.5.4**    Interpretations of this Agreement or of the Plan by a local collection agent shall not be binding on the NEBF or the Plan unless confirmed in writing by the Trustees.

**6.5.5**    The authority and/or agency of local collection agents is strictly limited to collection of contributions as set forth herein and in the Plan and/or applicable NEBF rules, regulations or policies.

### Section 6.6 Reports and Payments.

**6.6.1**    Covered Employers shall pay contributions to the local collection agent or to such depository as the Trustees shall designate, only by check or bank draft, made payable to the order of the NEBF, or such other method of transmitting money as the Trustees may permit. Except as provided herein, all contributions shall become a debt due and owing the NEBF on the last day of each month. The payment of contributions shall be made not later than fifteen (15) calendar days from the date on which the sum became a debt due and owing. All contributions shall be accompanied by a payroll report in such form as may be prescribed by the Trustees. .

**6.6.2**    If a Covered Employer's workforce did not perform any Covered Employment within a particular month, a payroll report shall nevertheless be filed as provided herein indicating that no Covered Employment was performed. Failure to do so shall subject the Covered Employer to liability for all fees and costs resulting from his failure to file such report.

### Section 6.7 Production of Records.

**6.7.1**    Each Covered Employer shall promptly furnish to the Trustees or their authorized representative, on demand, (i) for each such Covered Employer's employees: their names, Social Security numbers, number of hours worked, gross labor payroll, earnings records, W-2s, and time cards, and (ii) for such Covered Employer: all Federal and State payroll or unemployment tax returns, cash disbursements journal, cash receipts journal, payroll journal, canceled payroll checks, other personnel records, other tax reports, corporate minutes, stock certificates or other evidence of ownership, and (iii) such other information as the Trustees may reasonably require in connection with the administration of the NEBF. The Trustees may, by their authorized representative, audit and examine the pertinent employment and payroll records of each Covered Employer, as described above, at the Covered Employer's place of business, whenever such examination is deemed necessary or advisable by the Trustees in connection with the proper administration of the NEBF. The Brotherhood or Local Union shall, upon the request of the Trustees, promptly furnish employment information with respect to an employee's employment status.

**6.7.2**    In addition, in the event the Covered Employer does not maintain or otherwise does not have in his possession records of the gross labor payroll paid to, or

accrued by, each employee, the Covered Employer agrees that for all types of coverage in order to determine the gross labor payroll for which contributions are required to be submitted to the NEBF, the number of hours of the employee shall be multiplied by the basic hourly wage scale set forth in the appropriate collective bargaining agreement.

**Section 6.8 Collection and Enforcement of Payments.** The Trustees shall have the power to demand, collect and receive Covered Employer payments and all other money and property to which the Trustees may be entitled, and shall hold the same until applied to the purposes provided in this Agreement. The Trustees shall be authorized to adopt and amend a collection (or delinquency) policy or procedure. They shall take such steps, including the institution and prosecution of, or the intervention in, such legal or administrative proceedings and the compromise, settlement, or release thereof as the Trustees determine to be in the best interest of the NEBF for the purpose of collecting such payments, money and property. The Trustees may also, where appropriate, join in the collection actions of other funds. No matter respecting the Trustees' rights herein shall, without their written consent, be compromised or settled under, or subject to, the grievance or arbitration procedure established in any local collective bargaining agreement, provided, however, that this provision shall not affect the rights and liabilities of any of the parties to each other under any such collective bargaining agreement.

**Section 6.9 Collection Costs.** In the event a Covered Employer has failed or fails to make required contributions, the Trustees are authorized and empowered:

**6.9.1**    to impose on and receive from such Covered Employer all costs of any audit;

**6.9.2**    to assess and receive from such Covered Employer as liquidated damages an amount up to twenty percent (20%) of the amount found to be delinquent, in that the failure of the Covered Employer to make the required payment of contributions imposes additional burden and expense upon the Trustees in the collection thereof, in the administration of the NEBF, including but not limited to the communication with said Covered Employer, and, in addition thereto may cause a loss of benefits to Covered Employees, all of which are difficult of accurate ascertainment;

**6.9.3**    to assess and receive from such Covered Employer the lost interest from the delinquent amounts, to be calculated at a ten percent (10%) annual rate compounded monthly throughout the period of the delinquency;

**6.9.4**    to impose on and receive from such Covered Employer any amounts the Trustees are required to pay for the benefit of an eligible Covered Employee of such Covered Employer, or a Covered Employee who would be eligible except for the failure of such Covered Employer to make required contributions on his behalf;

**6.9.5**    to impose on and receive from such Covered Employer all costs, audit expenses, actuarial expenses, and attorneys fees incurred by the Trustees in enforcing the provisions hereof, whether by litigation or otherwise;

**6.9.6**    to require such Covered Employer to make weekly deposits of contributions in an amount determined by the Trustees, based on objective standards, provided

that the Trustees have given such Covered Employer reasonable notice of such requirement for weekly deposits, the amount to be deposited, the date such deposits are due and the basis on which the weekly deposit is determined and required;

**6.9.7** to require such Covered Employer to furnish to the Trustees a bond, with reputable surety thereon,

    (a) with the Trustees as obligee thereunder,

    (b) in an amount, determined by the Trustees, consistent with the anticipated future obligations of such Covered Employer, and

    (c) with notice provisions acceptable to the Trustees consistent with purposes of such bond; and/or

**6.9.8** to require such Covered Employer to furnish the Trustees an acceptable personal guaranty and/or irrevocable letter of credit.

**Section 6.10 Effect of Non-Payment.** Non-payment by any Covered Employer of any contribution or other moneys owed to the NEBF shall not relieve any other Covered Employer from his or its obligation to make required payments to the NEBF.

**Section 6.11 Violation of Agreement.** Failure of a Covered Employer to comply with this Agreement or with the rules regulations, or policies adopted by the Trustees shall constitute a violation of this Agreement and of the Covered Employer's collective bargaining agreement or other agreement with the Brotherhood or a Local Union, provided that neither the Association nor other Covered Employers shall be responsible for such violation.

**Section 6.12 Refund of Contributions.** The NEBF will refund mistaken Covered Employer contributions that were paid to the NEBF within the year prior to the date the Trustees first became aware that the contributions were made in error. Contributions paid to the NEBF more than one year prior to the date the Trustees first became aware that the contributions were made in error shall not be refundable.

## ARTICLE 7. TERMINATION OF NEBF

**Section 7.1 Conditions of Termination.** This Trust shall cease and terminate upon the happening of any one or more of the following events:

**7.1.1** the Trust shall, in the opinion of the Trustees and the National Board, upon advice of the Trust's actuary, be inadequate to carry out the intent and purpose of this Agreement, or be inadequate to meet the payments due or to become due under this Agreement and under the Plan;

**7.1.2** by written action of both of the Parties; or

**7.1.3** as may be otherwise provided by law.

**Section 7.2 Procedures in the Event of Termination.** In the event of termination, the Trustees shall, subject to National Board approval:

**7.2.1** make provision for the payment out of the Trust of any and all obligations of the NEBF, including expenses incurred up to the date of termination of the Trust and the expenses incidental to such termination;

**7.2.2** arrange for a final audit and report of their transactions and accounts, for the purpose of termination of their Trusteeship;

**7.2.3** give any notice and prepare and file any reports which may be required by law; and

**7.2.4** distribute the remaining assets among Participants and Beneficiaries in a manner and for a purpose as the Trustees deem proper and in accordance with applicable law.

**Section 7.3 Limitations.** No part of the corpus or income of said Trust shall be used for, or diverted to, purposes other than for the exclusive benefit of the Participants and Beneficiaries and their families, dependents and/or legal representatives, or the administrative expenses of the Trust or for other payments in accordance with the provisions of this Agreement or the Plan. Under no circumstances shall any portion of the corpus or income of the NEBF, directly or indirectly, revert or accrue to the benefit of any Covered Employer, the Association, the Brotherhood, a Local Chapter, or a Local Union.

## ARTICLE 8. MISCELLANEOUS

**Section 8.1 Termination of Covered Employer.** A Covered Employer may, in the discretion of the Trustees, cease to be a Covered Employer and the Trustees may refuse to accept contributions and may deny prospective participation in the NEBF by the Covered Employer and its employees when the Trustees conclude that such participation is no longer in the best interests of the Participants and Beneficiaries of the NEBF or when such Covered Employer (a) is no longer obligated to make contributions to the NEBF; (b) is delinquent in contributions or reports to the NEBF; (c) fails upon request to furnish the NEBF with a copy of such Covered Employer's collective bargaining agreement or other written agreement requiring contributions to the NEBF; (d) agrees to a collective bargaining agreement or other written agreement, the terms of which the Trustees determine are not consistent with this Agreement or the Plan; or (e) fails to agree to be bound by the terms and provisions of this Agreement, and any amendments and modifications hereof.

**Section 8.2 Withdrawal of Covered Employers.** Each Covered Employer agrees to notify the NEBF in writing should such Covered Employer cease to have an obligation to submit contributions to the NEBF, or if such Covered Employer conveys its assets to another party who does not have an obligation to contribute to the NEBF. In the event such a conveyance of assets does occur, the conveying Covered Employer also agrees to provide the NEBF with the name, address and chief executive officer of the receiver of its assets.

**Section 8.3 Vesting of Rights and Beneficial Interests.** The Trustees shall establish standards for vesting of benefits which conform to no less than minimum standards required by law. No Covered Employee, Participant, Beneficiary, Covered Employer, Local Union, or other person shall have any vested interest or right, title, or other interest in or to the NEBF or any part thereof or any property of the NEBF, except as may be required by the Act or Code, be provided by the Trustees, or be specifically provided for in the Plan. There shall be no pro rata or other distribution of any of the assets of the NEBF for any purpose or reason, except as required by law, as a result of any Local Union, Covered Employer or group of Covered Employers, Covered Employees, or Participants and their Beneficiaries, ceasing their participation in the NEBF.

**Section 8.4** <u>Limitations Upon Beneficial Rights of Participants and Beneficiaries</u>. Except as required by law or pursuant to a qualified domestic relations order (a "QDRO") as defined in the Act and the Code, all benefits shall be free from the interference and control of any creditor of a Participant or Beneficiary, and no benefits shall be subject to any assignment or other anticipation, nor to seizure or to sale under any legal, equitable or any other process, and in the event that any claim or benefit shall, because of any debt incurred by or resulting from any other claim or liability against any Participant or Beneficiary, by reason of any sale, assignment, transfer, encumbrance, anticipation or other disposition made or attempted by said Participant or Beneficiary, or by reason of any seizure or sale or attempted sale under any legal, equitable or other process, or in any suit or proceeding become payable, or be liable to become payable to any person other than the Participant or Beneficiary for whom the same is intended, as provided herein and pursuant hereto, the Trustees shall have power to withhold payment of such benefit to such Participant or Beneficiary until such assignment, transfer, encumbrance, anticipation or other disposition, writ or legal process is canceled or withdrawn in such manner as shall be satisfactory to the Trustees. Until so canceled or withdrawn, the Trustees shall have the option to use and apply the benefits as the Trustees may deem best, directly for the support and maintenance of such Participant or Beneficiary.

**Section 8.5** <u>Judicial Settlements and Action by Trustees</u>. The Trustees shall be entitled, at any time, to have a judicial settlement of their accounts and to seek judicial protection by any action or proceeding they determine necessary and, further, to obtain a judicial determination or declaratory judgment as to any question or construction of this Agreement or for instructions as to any action thereunder and, further, as to any question relating to the discharge of their duties and obligations under, or in connection with the administration of, this Agreement and as to the distribution of assets belonging to the NEBF. Any such determination, decision or judgment shall be binding upon all parties to, or claiming under, this Agreement.

**Section 8.6** <u>Withholding Payment</u>. In the event any question or dispute shall arise as to the proper person or persons to whom any payments shall be made hereunder, the Trustees may withhold such payment until there shall have been made an adjudication of such question or dispute which is satisfactory to the Trustees, or until the Trustees shall have been fully protected against loss by means of such indemnification agreement or bond as they determine to be adequate.

**Section 8.7** <u>Amendment of Part II of Agreement</u>. Except as provided in Section 5.28, the provisions of Part II shall be subject to revision or amendment by the National Board.

**Section 8.8** <u>Indemnification</u>. To the fullest extent permitted by the Act or applicable law, the National Board Members, the Trustees, NEBF fiduciaries, NEBF employees and NEBF service providers shall be indemnified (both as to advances and reimbursements) by the NEBF, as may be provided in any contract, agreement, or policy duly executed or adopted as provided under this Agreement.

**Section 8.9** <u>Law Applicable</u>. All questions pertaining to validity, construction and administration of the NEBF and of the acts and transactions with regard to the NEBF shall be determined in accordance with the laws of the District of Columbia, except as required by the Act.

**Section 8.10** <u>Savings Clause</u>. Should any provision of this Agreement or in the Plan or in the rules, regulations or policies adopted pursuant to this Agreement be held to be unlawful or invalid, or unlawful or invalid as to any person or instance, such fact shall not adversely affect the other provisions herein or therein contained or the application of said provisions to any other person or instance, unless such unlawfulness or invalidity shall make impossible the functioning of the NEBF, and in such case the appropriate parties shall as quickly as practicable adopt a new provision to take the place of the unlawful or invalid provision.

**Section 8.11** <u>Gender</u>. Whenever any words are used in this Agreement in the masculine gender, they shall also be construed to include the feminine or neuter gender in all situations where they would so apply and wherever any words are used in the plural, they shall also be construed to include the singular.

**Section 8.12** <u>Part, Article and Section Titles</u>. The Part, Article and Section titles are included solely for convenience and shall, in no event, be construed to affect or modify any part of the provisions of this Agreement or be construed as part thereof.

**Section 8.13** <u>Effective Date</u>. This Restated Agreement shall be effective as of January 1, 1993; provided that the authority given to the National Board under Sections 3.13.2 and 3.11.3 shall be effective upon the date of execution hereof. The National Board shall thereby, and then, be authorized to adopt the Plan, and such Plan shall be effective as of January 1, 1993.

**Section 8.14** <u>Grandfather Clause</u>. This Restated Employees Benefit Agreement and Trust for the NEBF contains certain administrative or other provisions that may differ from provisions in prior Agreements. As a result, certain administrative forms and other documents may need to be modified. The Trustees shall make all necessary modifications to forms or other documents, as practicable, within a reasonable period of time. Until modified, such forms and documents shall be valid for all purposes and shall be construed in accordance with the administrative or other provisions of this Restated Agreement. Moreover, policies, explanations or interpretations previously adopted or issued by, or at the direction of, the National Board or the Trustees, may contain references to the Agreement or phraseology that may differ from this Restated Agreement; nevertheless, unless expressly modified or rescinded by the Trustees, those earlier policies, explanations or interpretations shall remain valid and shall be construed in accordance with this Agreement. In addition, certain phraseology in certain collective bargaining agreements or other agreements requiring Covered Employers to contribute to the NEBF may differ from certain phraseology of this Agreement, as restated. Such collective bargaining agreements or other agreements shall be deemed valid and binding for all purposes and shall be construed in accordance with the administrative or other provisions of this Agreement. All new collective bargaining agreements or other agreements or existing collective bargaining agreements or other agreements which are renewed or renegotiated on or after January 1, 1993 shall not be inconsistent with this Agreement.

**Section 8.15** <u>Name</u>. This Restated Employees Benefit Agreement and Trust delineates this plan as the National Electrical Benefit Fund (or NEBF). Said name (or acronym) henceforth shall be the exclusive and the official reference to this plan. Nonetheless, the prior use of certain other names (or acronyms) for this plan (e.g., "Board of Trustees of the National Electrical Contractors Association Pension Benefit Trust Fund," "National Electrical Contractors Association Pension Benefit Trust Fund," "NECA/PBTF," "PBTF," "National Electrical Benefit Fund" or "NEBF") in contracts, agreements, and other documents or instru-

ments shall remain effective and valid, and shall be deemed to be a reference to the National Electrical Benefit Fund (or NEBF).

**IN WITNESS WHEREOF,** each of the Parties has caused this Restated Employees Benefit Agreement and Trust to be executed by its duly authorized officers this 2nd day of December, 1992, and the Trustees hereby sign this instrument for the reasons set forth herein.

Signed for the
National Electrical
Contractors Association, Inc.

_____

Signed for the
International Brotherhood
of Electrical Workers

_____

Trustee for the
National Electrical
Contractors Association, Inc.

_____

Trustee for the
International Brotherhood
of Electrical Workers

_____

# PLAN OF BENEFITS
# FOR THE NEBF

## (January 1, 2000)

# PLAN OF BENEFITS FOR THE NEBF
## (January 1, 2000)

## TABLE OF CONTENTS

1. Definitions ....................................................................................1
   1.1   Act .....................................................................................1
   1.2   Agreement .......................................................................1
   1.3   Association .......................................................................1
   1.4   Beneficiary ......................................................................1
   1.5   Benefit Service Credits ...................................................1
   1.6   Brotherhood .....................................................................1
   1.7   Code ..................................................................................1
   1.8   Covered Employer ...........................................................1
   1.9   Covered Employment .......................................................1
   1.10  Disability Pension Benefit .................................................1
   1.11  Early Retirement Pension Benefit .....................................1
   1.12  Federal Tax Law ..............................................................1
   1.13  Hour of Service ................................................................1
   1.14  Joint and Survivor Annuity Benefit ................................1
   1.15  Local Chapter ..................................................................1
   1.16  Local Union .....................................................................1
   1.17  National Board .................................................................2
   1.18  NEBF ...............................................................................2
   1.19  Non-Covered Employment ..............................................2
   1.20  Normal Retirement Age ...................................................2
   1.21  Normal Retirement Pension Benefit .................................2
   1.22  Participant .........................................................................2
   1.23  Past Service Credits .........................................................2
   1.24  Pension Benefit ................................................................2
   1.25  Plan ..................................................................................2
   1.26  Related Organization ........................................................2
   1.27  Retirement Pension Benefit ..............................................2
   1.28  Trustees ............................................................................2
   1.29  Vested Pension ................................................................2
   1.30  Vesting Service Credits ....................................................2
   1.31  Year .................................................................................2
2. Summary of Entitlement ..............................................................2
3. Eligibility for Participation ..........................................................2
4. Benefit Service Credits .................................................................2
   4.1   Service Prior to 1965 .......................................................2
   4.2   Service During 1965 and Thereafter .................................2
   4.3   First Year Rule .................................................................2
   4.4   Past Service Credits .........................................................2
   4.5   Military Service ...............................................................2
5. Vesting Service Credits .................................................................3
   5.1   Service Prior to 1965 .......................................................3
   5.2   Service During 1965 and Thereafter .................................3
   5.3   First Year Rule .................................................................3
   5.4   Non-Covered Employment ..............................................3
   5.5   Past Service Credits .........................................................3
   5.6   Military Service ...............................................................3
   5.7   Maternity and Paternity Leave .........................................3
6. Vested Pension ..............................................................................3
7. Past Service Credits ......................................................................4
   7.1   Maximum Credits ...........................................................4
   7.2   One to One Rule ..............................................................4
   7.3   Covered Employer Requirement ......................................4
   7.4   Occupational Classifications ............................................4
   7.5   Breaks in Service .............................................................4
   7.6   Employer Out of Business ...............................................4
8. Loss of Prior Benefit and Vesting Service .....................................4
   8.1   Break in Service Rules .....................................................4
   8.2   Periods of Time Not Considered a Break in Service ...........4
   8.3   Exception for Vested Pension ...........................................5
9. Eligibility, Amount, and Method of Payment of Normal
   Retirement Pension Benefit ..........................................................5

   9.1   Eligibility ........................................................................5
   9.2   Amount ...........................................................................5
   9.3   Method of Payment .........................................................5
10. Eligibility, Amount, and Method of Payment of Early
    Retirement Pension Benefit .........................................................5
   10.1  Eligibility ........................................................................5
   10.2  Amount ...........................................................................5
   10.3  Method of Payment .........................................................6
11. Eligibility, Amount, and Method of Payment of Disability
    Pension Benefit ...........................................................................6
   11.1  Eligibility ........................................................................6
   11.2  Amount ...........................................................................6
   11.3  Method of Payment .........................................................6
12. Pension Calculations ...................................................................6
   12.1  Basic Rule ......................................................................6
   12.2  Pension Rates ..................................................................6
   12.3  Applicable Pension Rate ..................................................6
   12.4  Less than 3% ...................................................................7
13. Effective Date of Pension Benefits ...............................................7
   13.1  Normal Retirement Pension Benefit .................................7
   13.2  Early Retirement Pension Benefit .....................................7
   13.3  Disability Pension Benefit ................................................7
   13.4  Retroactive Payments ......................................................8
14. Commencement of the Payment of Pension Benefits .......................8
   14.1  Retirement Pension Benefits ............................................8
   14.2  Disability Pension Benefits ..............................................8
   14.3  Age 70 1/2 .......................................................................8
15. Return to Work ...........................................................................8
   15.1  Suspension of Retirement Pension Benefits ......................8
   15.2  Return to Employment While on Disability .......................8
   15.3  Subsequent Application for Benefits .................................8
16. Joint and Survivor Annuity Benefit ..............................................8
   16.1  Eligibility for Joint and Survivor Annuity Benefit .............8
   16.2  Election Against Joint and Survivor Annuity Benefit .........9
   16.3  Amount and Payment of Joint and Survivor Annuity Benefit ...9
17. Pre-Retirement Surviving Spouse Benefit ....................................10
   17.1  Death On or After Age 62 ...............................................10
   17.2  Death Prior to Age 62 .....................................................10
18. Maximum Benefit .......................................................................10
19. Construction and Determinations with Regard to Plan ...................10
20. Claims Procedures ......................................................................10
   20.1  Application .....................................................................10
   20.2  Processing of Application ...............................................11
   20.3  Denial of Application .....................................................11
   20.4  Appeal ...........................................................................11
   20.5  Decision on Appeal .......................................................11
21. Rules, Regulations, and Policies ..................................................11
22. Contributions .............................................................................11
   22.1  Payment of Contributions ...............................................11
   22.2  Refund of Contributions .................................................11
23. Limitations Upon Beneficial Rights and Interests .........................11
24. Withholding Payment ..................................................................12
25. Overpayments and Mistaken Payments ........................................12
26. Anti-Reversion Provision ............................................................12
27. No Divestiture ............................................................................12
28. Termination or Merger of NEBF ..................................................12
29. Gender and Plural Usages ............................................................12
30. Section Titles .............................................................................12
31. Savings Clause ...........................................................................12
32. Amendment of Plan .....................................................................12
33. Applicable Plan or Agreement .....................................................12

The National Electrical Benefit Fund (the "NEBF") has been in existence since September 3, 1946, for the purpose of providing retirement and related benefits to employees in the electrical contracting industry and employees in other branches of the electrical industry. The provisions governing the rules and procedures for the payment of retirement and related benefits have been previously contained in Article III-B and Appendix A of the Employees Benefit Agreement entered into by the International Brotherhood of Electrical Workers and the National Electrical Contractors Association, Inc. (the "Parties"). Pursuant to Section 3.13.2 of the Restated Employees Benefit Agreement and Trust, the National Employees Benefit Board was authorized by the Parties to adopt a distinct document entitled the "Plan of Benefits for the NEBF." Accordingly, the following Plan of Benefits for the NEBF was adopted by the National Employees Benefit Board to be effective on January 1, 1993, and as duly amended thereafter.

## PLAN OF BENEFITS FOR THE NEBF

1. **DEFINITIONS.** The following capitalized terms when used herein, if not otherwise defined, shall have the following meanings:

1.1 **Act.** "Act" means the Employee Retirement Income Security Act of 1974, any amendments as may from time to time be made and any lawful regulations promulgated pursuant to the provisions of the Act.

1.2 **Agreement.** "Agreement" means the Employees Benefit Agreement, initially entered into by the Brotherhood and the Association on September 3, 1946, as it has been amended and restated and delineated as the Restated Employees Benefit Agreement and Trust, including all amendments and modifications as may from time to time be made.

1.3 **Association.** "Association" means the National Electrical Contractors Association, Inc.

1.4 **Beneficiary.** "Beneficiary" means a person other than a Participant who is or may become entitled to a Pension Benefit from the NEBF under the terms of the Plan.

1.5 **Benefit Service Credits.** "Benefit Service Credits" mean the credits (accrued as set forth in Section 4) upon which a Participant's Pension Benefit shall be based.

1.6 **Brotherhood.** "Brotherhood" means the International Brotherhood of Electrical Workers.

1.7 **Code.** "Code" means the Internal Revenue Code of 1986, as amended.

1.8 **Covered Employer.** "Covered Employer" means:

(a) An employer who is a member of, or who is represented in collective bargaining by, the Association or one of its Local Chapters and who is bound by a collective bargaining agreement with the Brotherhood or a Local Union which provides for the making of payments to the NEBF with respect to any employee.

(b) An employer who is not a member of, nor represented in collective bargaining by, the Association or one of its Local Chapters, but who has executed,

has assented to, or is bound by a collective bargaining agreement with the Brotherhood or a Local Union providing for the making of payments to the NEBF with respect to any employee.

(c) Such other employer to which the Trustees may extend the coverage of the Agreement upon such terms and conditions consistent with the Agreement as the Trustees shall determine, provided such employer agrees in writing to conform to the terms and conditions of the Agreement and such other terms and conditions as determined by the Trustees.

(d) An employer who does not meet the requirements of the definition of "Covered Employer" as stated in subsections (a), (b), or (c) of this Section, but who is or will be making payments or contributions to the NEBF under any law, ordinance, or agreement applicable to or governing a State or Territory or any political subdivision or municipal corporation thereof, provided that the Brotherhood or Local Union enjoys the highest available form of recognition for the employees it represents and that the Trustees accept such participation upon such terms and conditions as the Trustees shall determine.

1.9 **Covered Employment.** "Covered Employment" means employment of an employee for which a Covered Employer is obligated consistent with the Agreement to contribute to the NEBF.

1.10 **Disability Pension Benefit.** "Disability Pension Benefit" means a Disability Pension Benefit as set forth in Section 11.

1.11 **Early Retirement Pension Benefit.** "Early Retirement Pension Benefit" means an Early Retirement Pension Benefit as set forth in Section 10.

1.12 **Federal Tax Law.** "Federal Tax Law" means the Code, Treasury Regulations, and such other administrative or judicial rulings, notices, or other published guidance interpreting the Code or Treasury Regulations.

1.13 **Hour of Service.** "Hour of Service" means an hour of service for which an employee is paid, or entitled to payment, for the performance or non-performance of duties, or an hour for which back pay, regardless of mitigation of damages, is either awarded or agreed to by the employer. Hours of Service shall be further computed and credited in accordance with Department of Labor Regulation § 2530.200b-2. Overtime Hours of Service shall be the actual hours worked and shall be computed on a non-multiple basis, without reference to any premium rate.

1.14 **Joint and Survivor Annuity Benefit.** "Joint and Survivor Annuity Benefit" means a Joint and Survivor Annuity Benefit as set forth in Section 16.

1.15 **Local Chapter.** "Local Chapter" means any local association or group affiliated with the Association as a chapter.

1.16 **Local Union.** "Local Union" means any local union affiliated with the Brotherhood.

1

**1.17 National Board.** "National Board" means the National Employees Benefit Board, as set forth in the Agreement.

**1.18 NEBF.** "NEBF" means the National Electrical Benefit Fund, which is the employee benefit plan that is governed by the Agreement and this Plan and comprises the entire trust estate governed by the Agreement as it may, from time to time, be constituted.

**1.19 Non-Covered Employment.** "Non-Covered Employment" means employment of an employee for which an employer is not obligated consistent with the Agreement to contribute to the NEBF.

**1.20 Normal Retirement Age.** "Normal Retirement Age" means age sixty-five (65).

**1.21 Normal Retirement Pension Benefit.** "Normal Retirement Pension Benefit" means a Normal Retirement Pension Benefit as set forth in Section 9.

**1.22 Participant.** "Participant" means any person receiving a Retirement Pension Benefit or Disability Pension Benefit from the NEBF, any person who has completed the requirements for a Vested Pension, any person with Benefit Service Credits or Vesting Service Credits who has not lost all such credits through a break in service (as provided in Section 8.1), and any employee employed consistent with the Agreement in Covered Employment.

**1.23 Past Service Credits.** "Past Service Credits" mean the credits a Participant may accrue (as set forth in Section 7) for service with an employer prior to the Participant's Covered Employment. Such Past Service Credits shall apply as Benefit and Vesting Service Credits.

**1.24 Pension Benefit.** "Pension Benefit" means a Retirement Pension Benefit or Disability Pension Benefit.

**1.25 Plan.** "Plan" means the "Plan of Benefits for the NEBF", including all amendments and modifications as may from time to time be made.

**1.26 Related Organization.** "Related Organization" means the Brotherhood, Local Unions, the Association and its Local Chapters, Joint Apprenticeship and Training Committees, the NEBF, jointly administered trust funds providing health and welfare coverage, pensions, pooled vacations, and similar funds affiliated with the Brotherhood and/or the Association.

**1.27 Retirement Pension Benefit.** "Retirement Pension Benefit" means a Normal Retirement Pension Benefit as set forth in Section 9 or an Early Retirement Pension Benefit as set forth in Section 10.

**1.28 Trustees.** "Trustees" means the Trustees designated in the Agreement.

**1.29 Vested Pension.** "Vested Pension" means a nonforfeitable right to a Pension Benefit as set forth in Section 6.

**1.30 Vesting Service Credits.** "Vesting Service Credits" mean the credits (accrued as set forth in Section 5) upon which a Participant's entitlement to a Vested Pension is based.

**1.31 Year.** "Year" means calendar year.

**2. SUMMARY OF ENTITLEMENT.** A Participant who has accrued Benefit Service Credits (as set forth in Section 4) and who has accrued sufficient Vesting Service Credits (as set forth

in Section 5) to be entitled to a Vested Pension (as set forth in Section 6), shall, consistent with this Plan, be entitled to a Normal Retirement Pension Benefit (as set forth in Section 9), an Early Retirement Pension Benefit (as set forth in Section 10), or a Disability Pension Benefit (as set forth in Section 11), payable for the period of his life or the period of his disability or payable as a Joint and Survivor Annuity Benefit (as set forth in Section 16).

**3. ELIGIBILITY FOR PARTICIPATION.** An employee shall become a Participant in the NEBF upon the performance of Covered Employment. There are no minimum age or service requirements for participation. An employee shall cease to be a Participant upon the loss of his Vesting Service Credits as provided in Section 8.

**4. BENEFIT SERVICE CREDITS.** A Participant shall be credited with Benefit Service Credits in the following manner:

4.1    **Service Prior to 1965.** A Participant shall be credited with one (1) Benefit Service Credit for each Year in which the Participant performed any Covered Employment during the period 1947 through and including 1964.

4.2    **Service During 1965 and Thereafter.** A Participant shall be credited with one (1) Benefit Service Credit for each one thousand (1000) Hours of Service of Covered Employment performed during the period 1965 and thereafter, provided that: (a) for purposes of this subsection, Hours of Service of Covered Employment shall not include any Hours of Service earned during a Year in which such Hours of Service did not equal or exceed three hundred (300) Hours of Service of Covered Employment; and (b) the Benefit Service Credits computed under this subsection shall not exceed the aggregate number of Years in which the Participant earned Hours of Service of Covered Employment equal to or exceeding three hundred (300) such Hours of Service during the period 1965 and thereafter.

4.3    **First Year Rule.** Notwithstanding the three hundred (300) Hours of Service requirements of Section 4.2, if (a) the first Year in which contributions are made on the Participant's behalf is 1976 or thereafter, or (b) the first Year in which contributions are made on the Participant's behalf after a loss of prior service credits (pursuant to Section 8) is 1976 or thereafter, the Hours of Service in such Year shall be included in the calculation of a Benefit Service Credit and the first Year shall be included in the aggregate number of Years governing the maximum Benefit Service Credits under Section 4.2.

4.4    **Past Service Credits.** A Participant shall be credited with one (1) Benefit Service Credit for each earned Past Service Credit (as provided in Section 7).

4.5    **Military Service.** On or after January 1, 1993, a Participant who leaves Covered Employment for the reason of entering military service for the first time or being recalled to such military service, under the laws of the United States, shall be, for purposes of Section 4.2, credited with eighty-three and one third (83 1/3) Hours of Service of Covered Employment for each month during the term of such military service plus the length of time taken to return to Covered Employment or Non-Covered Employment as defined in Section 5.4. No Benefit Service Credits shall be granted, however, if the Par-

ticipant does not perform any Covered Employment, or Non-Covered Employment as defined in Section 5.4, within three (3) months following the date of discharge or release from military service. Further, no Benefit Service Credits shall be granted if the Participant remains in military service beyond his first term of service or beyond the period of recall. Military service prior to January 1, 1993, shall be governed by the Agreement in effect in 1992 and the rules regarding military service in the Agreement in effect in 1992 are expressly adopted by reference herein.

**5. VESTING SERVICE CREDITS.** A Participant's entitlement to a Vested Pension is determined by computing the number of Vesting Service Credits the Participant has accrued at the time of retirement or disability. Vesting Service Credits are accrued in the following manner:

**5.1 Service Prior to 1965.** A Participant shall be credited with one (1) Vesting Service Credit for each Year in which the Participant performed any Covered Employment during the period 1947 through and including 1964.

**5.2 Service During 1965 and Thereafter.** A Participant shall be credited with one (1) Vesting Service Credit for each one thousand (1000) Hours of Service of Covered Employment performed during the period 1965 and thereafter, provided that: (a) for purposes of this subsection, Hours of Service of Covered Employment shall not include any Hours of Service earned during a Year in which such Hours of Service did not equal or exceed three hundred (300) Hours of Service of Covered Employment; and (b) the Vesting Service Credits computed under this subsection shall not exceed the aggregate number of Years in which the Participant earned Hours of Service of Covered Employment equal to or exceeding three hundred (300) such Hours of Service during the period 1965 and thereafter.

**5.3 First Year Rule.** Notwithstanding the three hundred (300) Hours of Service requirements of Section 5.2, if (a) the first Year in which contributions are made on the Participant's behalf is 1976 or thereafter, or (b) the first Year in which contributions are made on the Participant's behalf after a loss of prior service credits (pursuant to Section 8) is 1976 or thereafter, the Hours of Service in such Year shall be included in the calculation of a Vesting Service Credit and the first Year shall be included in the aggregate number of Years governing the maximum Vesting Service Credits under Section 5.2.

**5.4 Non-Covered Employment.** A Participant who has previously worked in Covered Employment shall be entitled to one (1) Vesting Service Credit for (a) each Year in which the Participant performed any Non-Covered Employment for a Covered Employer or Related Organization prior to 1965, and (b) each Year in which the Participant worked for three hundred (300) or more Hours of Service in such Non-Covered Employment for a Covered Employer or Related Organization during 1965 or thereafter.

**5.5 Past Service Credits.** A Participant shall be credited with one (1) Vesting Service Credit for each earned Past Service Credit (as provided in Section 7).

**5.6 Military Service.** On or after January 1, 1993, a Par-

ticipant who leaves Covered Employment, or Non-Covered Employment as defined in Section 5.4, for the reason of entering military service for the first time or being recalled to such military service, under the laws of the United States, shall be, for purposes of Section 5.2, credited with eighty-three and one third (83 1/3) Hours of Service of Covered Employment for each month during the term of such military service plus the length of time taken to return to Covered Employment or Non-Covered Employment as defined in Section 5.4. No Vesting Service Credits shall be granted, however, if the Participant does not perform any Covered Employment, or Non-Covered Employment as defined in Section 5.4, within three (3) months following the date of discharge or release from military service. Further, no Vested Service Credits shall be granted if the Participant remains in military service beyond his first term of service or beyond the period of recall. Military service prior to January 1, 1993, shall be governed by the Agreement in effect in 1992 and the rules regarding military service in the Agreement in effect in 1992 are expressly adopted by reference herein.

**5.7 Maternity and Paternity Leave.** A Participant who would otherwise not be entitled to include a Year in the calculation of a Vesting Service Credit under Section 5.2 or Section 5.4 because of a failure to work for three hundred (300) or more Hours of Service in such Year where such failure was the direct result of the happening of one of the following events: (a) the pregnancy of the Participant; (b) the birth of the Participant's child; (c) the adoption of a child by the Participant; or (d) the provision of child care during the period immediately following the birth of the Participant's child or the adoption by the Participant, shall be entitled to:

(a) include the Hours of Service that could otherwise have been performed into the calculation of a Vesting Service Credit under Section 5.2 where the happening of the event precluded Covered Employment under Section 5.2; or

(b) a Vesting Service Credit where the happening of the event precluded Non-Covered Employment under Section 5.4.

In no event shall a Participant be entitled to more than one (1) Vesting Service Credit per event.

**6. VESTED PENSION.** Effective January 1, 1988, a Participant shall be entitled to a Vested Pension by accruing five (5) or more Vesting Service Credits (pursuant to Section 5) before losing such Vesting Service Credits due to a break in service (pursuant to Section 8). Moreover, a Participant who has any Benefit Service Credits which have not been lost due to a break in service (pursuant to Section 8), shall have a nonforfeitable right to a Pension Benefit upon attainment of Normal Retirement Age. Notwithstanding the above, the NEBF has, in the past, had differing requirements for the attainment of a Vested Pension and the prior, applicable Agreement shall govern a Participant's right to a Vested Pension; accordingly, the rules regarding Vested Pensions in the prior Agreements are expressly adopted by reference herein.

**7. PAST SERVICE CREDITS.** A Participant may be entitled to Past Service Credits for employment with an employer who is not a Covered Employer if the employer subsequently

becomes a Covered Employer and if the Participant subsequently enters any Covered Employment. A Participant who has previously worked in a non-covered occupational classification for a Covered Employer may also be entitled to Past Service Credits if the Participant subsequently performs Covered Employment and if the Covered Employer subsequently makes contributions for employees in that occupational classification. The following rules shall govern the crediting of Past Service Credits:

**7.1    Maximum Credits.** A Participant shall be entitled to no more than five (5) Past Service Credits.

**7.2    One to One Rule.** Past Service Credits are earned on a one-for-one basis. The Participant shall earn one (1) Past Service Credit for each Year of past service with an employer matched by a subsequent Year of Covered Employment by the Participant. Such Covered Employment need not be with the employer under which the Participant performed the past service. The reference to "Years" in this subsection shall mean (a) a Year in which the Participant performed any employment for Years prior to 1965 and (b) a Year in which the Participant performed employment for three hundred (300) or more Hours of Service for Years in and after 1965. Such Years do not need to be consecutive Years.

**7.3    Covered Employer Requirement.** A Participant shall only earn Past Service Credits if the employer under which the Participant performed the past service subsequently becomes or remains a Covered Employer. Furthermore, the number of Past Service Credits which can be granted to such Participant shall be limited to the number of Years such employer was a Covered Employer as of the date of the Participant's retirement or disability.

**7.4    Occupational Classifications.** Past Service Credits shall not be granted for Years of past service in an occupational classification if the employer does not subsequently contribute to the NEBF on behalf of employees in that classification.

**7.5    Breaks in Service.** Any break in service causing a loss of prior service credits pursuant to Section 8 shall cause a loss of accrued and potential Past Service Credits.

**7.6    Employer Out of Business.** Past Service Credits may be granted where a Participant worked for an employer who went out of business and such business was taken over by a Covered Employer, or other comparable situations, if the Trustees, in their sole discretion, are satisfied on the basis of evidence submitted to them that it is appropriate to treat the Covered Employer as one who has succeeded to the business of the employer who went out of business.

**8.    LOSS OF PRIOR BENEFIT AND VESTING SERVICE CREDITS.** A Participant who suffers a break in service under the following rules before becoming entitled to a Vested Pension shall lose prior Benefit Service Credits and Vesting Service Credits, as set forth below, and such lost Benefit Service Credits shall not be considered in computing the Participant's Pension Benefit and such lost Vesting Service Credits shall not be considered in computing a Participant's entitlement to a Vested Pension.

**8.1    Break in Service Rules.** The following breaks in service, except as identified in Section 8.2 and Section 8.3, shall result in a loss of some or all prior Benefit Service Credits and Vesting Service Credits.

**(a)    1947 Through 1975.** A failure to perform Covered Employment, as defined in this subsection, for three (3) consecutive Years from 1947 through 1975 shall result in a loss of all prior Benefit Service Credits and Vesting Service Credits. Prior to 1965, a failure to perform Covered Employment in a Year occurred when a Participant failed to perform any Covered Employment in that Year. From 1965 through 1975, a failure to perform Covered Employment in a Year occurred when a Participant failed to perform work for three hundred (300) or more Hours of Service in Covered Employment in that Year.

**(b)    1976 Through 1984.** Each Year in which a Participant failed to perform work for three hundred (300) or more Hours of Service in Covered Employment from 1976 through 1984 shall result in a loss of one prior Benefit Service Credit and one prior Vesting Service Credit. However, in no event shall a Participant lose any prior Benefit Service Credits or Vesting Service Credits until such Participant fails to perform work for three hundred (300) or more Hours of Service in Covered Employment for a number of consecutive Years equal to the number of accrued Vesting Service Credits.

**(c)    1985 Through Present.** Each Year in which a Participant fails or failed to perform work for three hundred (300) or more Hours of Service in Covered Employment from 1985 through the present shall result in a loss of one prior Benefit Service Credit and one prior Vesting Service Credit. However, in no event shall a Participant lose any prior Benefit Service Credits or Vesting Service Credits until such Participant fails to perform work for three hundred (300) or more Hours of Service in Covered Employment for a total of five (5) consecutive Years.

**8.2    Periods of Time Not Considered a Break in Service.** Certain periods of time in which a Participant is out of Covered Employment because of special circumstances shall not be considered a failure to perform work in Covered Employment and shall not be included in the computation of breaks in service as set forth in Section 8.1. A Participant shall be responsible for proving to the satisfaction of the Trustees that one or more of the following circumstances precluded the performance of Covered Employment:

**(a)** Periods of time in which a Participant is totally disabled. A Participant shall be considered totally disabled, for purposes of this subsection only, if he has become totally incapacitated by bodily injury, sickness or disease so as to be prevented thereby from engaging in his employment classification in Covered Employment.

**(b)** Periods of time in which a Participant is disabled, but less than totally disabled. A Participant shall

4

be considered disabled, for purposes of this sub-section only, if he is receiving or entitled to receive accident and/or sickness benefits or workmen's compensation.

(c) Periods of time, up to a maximum of six (6) months, during which a Participant is physically able and available to work in Covered Employment, but during which he does not work in Covered Employment because of a strike or lockout.

(d) Periods of time during which a Participant is absent from Covered Employment because such Participant is serving as a full-time employee of a State or National Labor Federation or similar organization in which the Brotherhood or a Local Union is a member or in which the Association or a Local Chapter is a member.

(e) Periods of time in which a Participant is accruing Vesting Service Credits pursuant to Sections 5.4, 5.6, and/or 5.7.

8.3    Exception for Vested Pension. Notwithstanding Sections 8.1 and 8.2, a Participant who is entitled to a Vested Pension shall not lose any prior Benefit Service Credits or Vesting Service Credits.

## 9. ELIGIBILITY, AMOUNT, AND METHOD OF PAYMENT OF NORMAL RETIREMENT PENSION BENEFIT.

9.1    Eligibility. A Participant who is retired from the electrical industry shall be eligible for a Normal Retirement Pension Benefit upon reaching the Normal Retirement Age of sixty-five (65), if such Participant:

(a) is entitled to a Vested Pension; or
(b) has retained accrued Benefit Service Credits.

9.2    Amount. A Participant who retires with such a Normal Retirement Pension Benefit shall be entitled to a monthly Retirement Pension Benefit equal to the sum of the product of each Benefit Service Credit and its applicable pension rate (as delineated in Section 12).

9.3    Method of Payment. Unless a Joint and Survivor Annuity Benefit is payable pursuant to Section 16, the monthly Normal Retirement Pension Benefit shall be paid only for the life of the Participant.

## 10. ELIGIBILITY, AMOUNT, AND METHOD OF PAYMENT OF EARLY RETIREMENT PENSION BENEFIT.

10.1    Eligibility. A Participant who is retired from the electrical industry shall be eligible for an Early Retirement Pension Benefit upon reaching the early retirement age of sixty-two (62), if such Participant is entitled to a Vested Pension. Further, in some instances, if such Participant would otherwise be eligible for the Nonreduced Early Retirement Pension Benefit as set forth in Section 10.2(a), the Participant shall be eligible for an Early Retirement Pension Benefit upon reaching the age of sixty (60) as set forth in Section 10.2(b).

10.2    Amount.

(a) Nonreduced on or after Age 62. A Participant who retires with such an Early Retirement Pension Benefit on or after attaining the age of sixty-two (62) shall be entitled to a monthly Retirement Pension Benefit equal to the sum of the product of each Benefit Service Credit and its applicable pension rate (as delineated in Section 12) if, during any one of the seven (7) Years immediately preceding the Participant's effective date of Retirement Pension Benefit (not including the Year in which said effective date occurs), the Participant performed three hundred (300) or more Hours of Service in the following types of employment:

(1) the Participant was employed in Covered Employment;
(2) the Participant was employed in Non-Covered Employment by a Covered Employer; or
(3) the Participant was employed in Non-Covered Employment by a Related Organization.

However, if a Participant retires with an Early Retirement Pension Benefit with an effective date of Retirement Pension Benefit in 1998 or 1999 and has not performed three hundred (300) or more Hours of Service in the types of employment recognized in Section 10.2(a)(1) through (3) in 1993, 1994, 1995, 1996, or 1997 (or 1998 for a 1999 effective date), such Participant shall be entitled to a reduced Early Retirement Pension Benefit calculated as set forth in Section 10.2(c).

(b) Reduced at Ages 60 and 61. A Participant who would be eligible for the Nonreduced Early Retirement Pension Benefit set forth in Section 10.2(a) if he applied on or after attaining the age of sixty-two (62), shall be eligible to retire at ages sixty (60) or sixty-one (61) and shall be entitled to a monthly Retirement Pension Benefit equal to the sum of the product of each Benefit Service Credit and its applicable pension rate (as delineated in Section 12) less a monthly reduction of a total of nine and one-fourths percent (9 1/4%) for each year or part thereof the Participant was under the age of sixty-two (62) at the Participant's effective date of Retirement Pension Benefit.

However, Hours of Service earned during the Year in which the effective date of Retirement Pension Benefit occurs shall not be considered in determining whether the Participant would be eligible for the Nonreduced Early Retirement Pension Benefit set forth in Section 10.2(a) if he applied on or after attaining the age of sixty-two (62).

(c) Reduced on or after Age 62. A Participant who retires with such an Early Retirement Pension Benefit on or after attaining the age of sixty-two (62) and who was not employed for three hundred (300) or more Hours of Service in any of the types of employment recognized in Section 10.2(a)(1) through (3) in any one of the seven (7) Years immediately preceding the Participant's effective date of Retirement Pension Benefit, shall be entitled to a monthly Retirement Pension Benefit equal to the sum of the product of each Benefit Service Credit and its applicable pension rate (as delineated in Section 12) less a monthly reduction of a total

of six and two-thirds percent (6 2/3%) for each year or part thereof the Participant was under the age of sixty-five (65) at the Participant's effective date of Retirement Pension Benefit.

**10.3 Method of Payment.** Unless a Joint and Survivor Annuity Benefit is payable pursuant to Section 16, the monthly Early Retirement Pension Benefit shall be paid only for the life of the Participant.

## 11. ELIGIBILITY, AMOUNT, AND METHOD OF PAYMENT OF DISABILITY PENSION BENEFIT.

### 11.1 Eligibility.

(a) **Disabilities Prior to March 1, 1981.** A Participant who becomes disabled, as defined in Section 11.1(c), prior to March 1, 1981, shall be entitled to a Disability Pension Benefit if such Participant meets the following conditions at the time of the occurrence of the disability:

    (1) the Participant is less than sixty-five (65) years of age;

    (2) the Participant is entitled to a Vested Pension; and

    (3) the Participant was employed in any of the types of employment recognized in Section 10.2(a)(1) through (3).

(b) **Disabilities On or After March 1, 1981.** A Participant who becomes disabled, as defined in Section 11.1(c), on or after March 1, 1981, shall be entitled to a Disability Pension Benefit if such Participant meets the following conditions at the time of the occurrence of the disability:

    (1) the Participant is less than sixty-five (65) years of age;

    (2) the Participant is entitled to a Vested Pension; and

    (3) within the five (5) Years immediately preceding the occurrence of the disability, the Participant was employed in any of the types of employment recognized in Section 10.2(a)(1) through (3).

(c) **Disability Defined.** To be entitled to a Disability Pension Benefit, a Participant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve (12) months, provided, however, that any of the following disabilities will not entitle a Participant to a Disability Pension Benefit:

    (1) disability which was contracted, suffered or occurred while the Participant was engaged in, or resulted from his having engaged in, a felonious act or enterprise;

    (2) disability which was self-inflicted;

    (3) disability arising out of, or occurring during, service in the armed forces of any country; or

    (4) disability which results in a Participant receiving other disability benefits or workmen's compensation benefits as a result of employment outside of the electrical industry.

Proof of such disability must be filed with the NEBF and shall consist of a Social Security Disability Award or such other proof as the Trustees may require.

**11.2 Amount.** A Participant who retires with such a Disability Pension Benefit shall be entitled to a monthly Disability Pension Benefit equal to the sum of the product of each Benefit Service Credit and its applicable pension rate (as delineated in Section 12). If, however, a Participant has fewer than twenty (20) Benefit Service Credits, the Participant shall be entitled to a monthly Disability Pension Benefit calculated by multiplying twenty (20) by the pension rate applicable to the Participant's Benefit Service Credits (as delineated in Section 12).

**11.3 Method of Payment.** Unless a Joint and Survivor Annuity Benefit is payable pursuant to Section 16, the monthly Disability Pension Benefit shall be paid only for the life of the Participant or the term of the disability.

## 12. PENSION CALCULATIONS.

**12.1 Basic Rule.** For a Participant entitled to a Pension Benefit under Sections 9, 10, or 11, the following pension rates shall be used to calculate such Participant's Pension Benefit (by computing the sum of the product of each Benefit Service Credit and its applicable rate, as referenced in Section 12.3).

**12.2 Pension Rates.**

| | |
|---|---|
| Prior to July 1, 1977 | $7.87 |
| July 1, 1977 through Dec. 31, 1980 | 11.85 |
| Jan. 1, 1981 through Dec. 31, 1982 | 13.16 |
| Jan. 1, 1983 through Dec. 31, 1984 | 14.98 |
| Jan. 1, 1985 through Feb. 28, 1986 | 15.68 |
| Mar. 1, 1986 through Dec. 31, 1986 | 17.63 |
| Jan. 1, 1987 through Dec. 31, 1988 | 18.26 |
| Jan. 1, 1989 through Dec. 31, 1989 | 18.81 |
| Jan. 1, 1990 through Dec. 31, 1990 | 19.29 |
| Jan. 1, 1991 through Dec. 31, 1991 | 20.87 |
| Jan. 1, 1992 through Dec. 31, 1992 | 21.39 |
| Jan. 1, 1993 through Dec. 31, 1993 | 22.51 |
| Jan. 1, 1994 through Nov. 30, 1995 | 23.18 |
| Dec. 1, 1995 through Dec. 31, 1996 | 24.64 |
| Jan. 1, 1997 through Dec. 31, 1997 | 25.71 |
| Jan. 1, 1998 through Dec. 31, 1998 | 27.05 |
| Jan. 1, 1999 through Dec. 31, 1999 | 28.56 |
| Jan. 1, 2000 and Thereafter | 30.00 |

The above pension rates reflect the rates in effect as of the effective date of this Plan. Future amendments to these pension rates and/or the rate under Section 12.3(b), once adopted, may be reflected in an attachment to this Plan document.

**12.3 Applicable Pension Rate.**

(a) For persons who are not receiving a Pension Benefit as of the effective date of this Plan, the pension rate applicable to their Benefit Service Credits shall be as follows:

(1) For persons who have, subsequent to the accrual of Benefit Service Credits and prior to January 1, 1993, not worked for three hundred (300) or more Hours of Service in Covered Employment for three (3) or more consecutive Years, the pension rate applicable to each of the prior accrued Benefit Service Credits shall be the rate in effect at the end of said three (3) Year period. The periods of time described in Section 8.2 shall be considered to be employment in Covered Employment for purposes of this subsection.

(2) For persons who have accrued Benefit Service Credits without a three (3) Year break as defined in Section 12.3(a)(1) or who have accrued Benefit Service Credits subsequent to such three (3) Year break, but who have, subsequent to the accrual of Benefit Service Credits and subsequent to January 1, 1993 but prior to January 1, 1998, not worked for three hundred (300) or more Hours of Service in Covered Employment for five (5) or more consecutive Years, the pension rate applicable to each of those accrued Benefit Service Credits shall be the rate in effect at the end of said five (5) Year period. The periods of time described in Section 8.2 shall be considered to be employment in Covered Employment for purposes of this subsection.

(3) For persons who have accrued Benefit Service Credits without a three (3) Year break as defined in Section 12.3(a)(1) or a five (5) Year break as defined in Section 12.3(a)(2), or who have accrued Benefit Service Credits subsequent to such three (3) or five (5) Year break, but who have, subsequent to the accrual of Benefit Service Credits and subsequent to January 1, 1998, not worked for three hundred (300) or more Hours of Service in Covered Employment for seven (7) or more consecutive Years, the pension rate applicable to each of those accrued Benefit Service Credits shall be the rate in effect at the end of said seven (7) Year period. The periods of time described in Section 8.2 shall be considered to be employment in Covered Employment for purposes of this subsection.

(4) For persons who have accrued Benefit Service Credits without a three (3) Year break as defined in Section 12.3(a)(1), without a five (5) Year break as defined in Section 12.3(a)(2), or without a seven (7) Year break as defined in Section 12.3(a)(3), or who have accrued Benefit Service Credits subsequent to such three (3), five (5) or seven (7) Year break, the pension rate applicable to each of those accrued Benefit Service Credits shall be the rate in effect on the effective date of the Participant's Pension Benefit (as set forth in Section 13).

(b) For persons who began receiving a Pension Benefit prior to the effective date of this Plan, their Pension Benefit shall be adjusted upward, if applicable, by recomputing their Pension Benefit using the rates as revised applicable to the date or dates previously used when their original Pension Benefit was computed. Notwithstanding the above, for persons who began receiving a Pension Benefit prior to January 1, 1965, their Pension Benefit shall be one hundred thirty dollars and thirty-nine cents ($130.39) per month.

12.4 **Less than 3%.** The pension rates set forth above shall apply to a Participant whose last Covered Employer contributed 3% of the gross labor payroll paid to, or accrued by, the Participant to the NEBF. If the Participant's last Covered Employer contributed on behalf of the Participant at a rate less than 3%, the pension rate applicable to such Participant shall be one-half (1/2) the rate set forth in Section 12.2. Notwithstanding the above, if the Covered Employer agreed to contribute at the 3% level subsequent to the Participant's retirement, the Participant's Pension Benefit shall be computed using a rate that is one-half (1/2) the highest pension rate effective the first month in which such Covered Employer commenced contributions at the 3% level.

**13. EFFECTIVE DATE OF PENSION BENEFITS**. The effective date of the Pension Benefit is the date for which the Participant first receives a benefit. The following rules shall govern the effective date of the Participant's Pension Benefit.

13.1 **Normal Retirement Pension Benefit.** The effective date of the Normal Retirement Pension Benefit shall be the later of:

(a) the month following the receipt of the Participant's pension application;

(b) the month following the Participant's sixty-fifth (65th) birthday; or

(c) the month following the Participant's retirement from the electrical industry.

However, the effective date of the Normal Retirement Pension Benefit for any Participant who files an application for a Normal Retirement Pension Benefit and who is already retired from the electrical industry and age sixty-five (65) or older, shall be no later than sixty (60) days after December 31 of the Year in which the Participant attained the age of sixty-five (65) or retired from the electrical industry, whichever occurs later.

13.2 **Early Retirement Pension Benefit.** The effective date of the Early Retirement Pension Benefit shall be the later of:

(a) the month following the receipt of the Participant's pension application;

(b) the month following the Participant's sixty-second (62nd) birthday; or

(c) the month following the Participant's retirement from the electrical industry.

13.3 **Disability Pension Benefit.** The effective date of the Disability Pension Benefit shall be as follows:

(a) For disabilities occurring prior to June 30, 1987, the effective date shall be six (6) months following the occurrence of the disability; or

(b) For disabilities occurring on or after June 30, 1987, the effective date shall be the month following the date of the disability.

**13.4    Retroactive Payments.** All Retirement Pension Benefits and Disability Pension Benefits that are paid retroactively under the rules set forth in this Section shall be paid without interest.

## 14. COMMENCEMENT OF THE PAYMENT OF PENSION BENEFITS.

**14.1    Retirement Pension Benefits.** Payment of Retirement Pension Benefits shall commence the month following the month in which the Trustees approve the Retirement Pension Benefit.

**14.2    Disability Pension Benefits.** Payment of Disability Pension Benefits shall commence the month following the month in which the Trustees approve the Disability Pension Benefit.

**14.3    Age 70 1/2.** Notwithstanding any other provision of this Plan, and regardless of whether the Participant continues working in Covered Employment, distribution of Retirement Pension Benefits shall commence no later than April 1 of the Year following the Year in which such Participant attains the age of seventy and one-half (70 1/2), in accordance with Section 401(a)(9) of the Code and the Treasury Regulations promulgated thereunder.

## 15. RETURN TO WORK.

**15.1    Suspension of Retirement Pension Benefits.** A Participant who is receiving a Retirement Pension Benefit and who subsequently completes forty (40) or more Hours of Service in any calendar month in the electrical industry, at a trade or craft in which the Participant was employed at any time while covered by the NEBF, and within the geographic area covered by the NEBF, shall have his monthly Retirement Pension Benefit suspended for that month and any subsequent month in which the Participant completes forty (40) or more such Hours of Service. In such event, payment of Retirement Pension Benefits shall be suspended until the Participant advises the Trustees in writing that he is no longer so employed. Every Participant receiving payment of Retirement Pension Benefits must advise the Trustees in writing of any such employment which exceeds forty (40) or more Hours of Service in any calendar month. If a Participant fails to so notify the Trustees and the Trustees become aware that such Participant is employed in the manner described above, the Trustees may act on the basis of a rebuttable presumption that the Participant has completed forty (40) or more Hours of Service for that month and suspend payment of Retirement Pension Benefits for such month. A Participant who works as an instructor in an apprenticeship program recognized by the Association and the Brotherhood or as an electrical inspector for a governmental authority, where such instructors or electrical inspectors are not contributed upon, shall not have his monthly Retirement Pension Benefit suspended due to such work.

**15.2    Return to Employment While on Disability.** A Disability Pension Benefit shall cease at the close of the last day of the month preceding the day:

(a) upon which a Participant who has been receiving a Disability Pension Benefit returns to any substantial gainful employment, if the Trustees, in their discretion, make a determination that the Participant is no longer disabled, as defined in Section 11.1(c); or

(b) upon which the Trustees make a determination on the basis of proof that the Participant is no longer disabled, as defined in Section 11.1(c).

**15.3    Subsequent Application for Benefits.**

(a) A Participant who has had his Retirement Pension Benefit suspended pursuant to Section 15.1, upon his subsequent retirement, shall receive the same Retirement Pension Benefit which he received prior to the suspension plus any additional Retirement Pension Benefit he may be entitled to because he has accrued additional Benefit Service Credits. Such Participant's Retirement Pension Benefit shall be similarly recomputed each time he returns to Covered Employment and subsequently retires.

(b) A Participant whose Disability Pension Benefit was terminated pursuant to Section 15.2 shall:

(1) in the event he subsequently applies and is determined to be eligible for a Disability Pension Benefit as a result of the same disability, or the recurrence or continuation of the same disability, receive the same Disability Pension Benefit which he received prior to the termination plus any additional Disability Pension Benefit he may be entitled to because he has accrued additional Benefit Service Credits, however, if the additional Benefit Service Credits combined with the prior earned Benefit Service Credits do not exceed twenty (20), he shall not be entitled to accrue additional Benefit Service Credits, and if the additional Benefit Service Credits combined with the prior earned Benefit Service Credits do exceed twenty (20), he shall not be entitled to combined Benefit Service Credits in excess of the number actually earned; or

(2) in the event he subsequently applies and is determined to be eligible for a Disability Pension Benefit based on a different disability or for a Retirement Pension Benefit, receive a Disability or Retirement Pension Benefit based upon his accrued Benefit Service Credits and the pension rate, as defined in Section 12, applicable to those Benefit Service Credits without regard to the amount of Disability Pension Benefits previously received.

(c) A Participant's Hours of Service of Covered Employment performed prior to the effective date of the original Retirement Pension Benefit or Disability Pension Benefit shall not be used to compute any subsequent Benefit Service Credits under Sections 15.3(a) or 15.3(b)(1).

## 16. JOINT AND SURVIVOR ANNUITY BENEFIT.

**16.1    Eligibility for Joint and Survivor Annuity Benefit.** A Participant who retires under a Disability Pension

Benefit or Retirement Pension Benefit shall receive monthly Pension Benefits for the period of his life or the period of his disability only, unless the Pension Benefit is payable as a Joint and Survivor Annuity Benefit under this Section.

(a) **Retirement Pension Benefit.** A Participant who (1) retires under a Normal or Early Retirement Pension Benefit, (2) has had at least one Hour of Service in Covered Employment on or after September 1, 1974, and (3) is survived by a spouse to whom he has been legally married throughout the one year period ending at the effective date of the Participant's Retirement Pension Benefit, shall, except as provided in Section 16.2, be paid a reduced monthly Retirement Pension Benefit in the form of a Joint and Survivor Annuity Benefit. Notwithstanding the above, a Participant and spouse who marry within the one year prior to the effective date of the Participant's Retirement Pension Benefit and who have been married for at least a one year period ending on or before the date of the Participant's death shall be treated as having been married throughout the one year period ending at the effective date of the Participant's Retirement Pension Benefit.

(b) **Disability Pension Benefit.** A Participant who (1) becomes disabled on or after January 1, 1985 and who retires under a Disability Pension Benefit, and (2) is survived by a spouse to whom he has been legally married throughout the one year period ending at the commencement date of the Participant's Disability Pension Benefit, shall, except as provided in Section 16.2, be paid a reduced monthly Disability Pension Benefit in the form of a Joint and Survivor Annuity Benefit. Notwithstanding the above, a Participant and spouse who marry within the one year prior to the commencement date of the Participant's Disability Pension Benefit and who have been married for at least a one year period ending on or before the date of the Participant's death shall be treated as having been married throughout the one year period ending at the commencement date of the Participant's Disability Pension Benefit.

16.2    **Election Against Joint and Survivor Annuity Benefit.** A Participant shall be paid his regular Disability or Retirement Pension Benefit for his life or for the term of the disability only, if such Participant, who meets the eligibility requirements of Sections 16.1(a) or 16.1(b), elects not to receive the Joint and Survivor Annuity Benefit and either the Participant's spouse consents in writing to such election or it is established to the satisfaction of the Trustees that such consent cannot be obtained because the Participant has no spouse, because the Participant's spouse cannot be located, or because of such other circumstances as the Secretary of the Treasury by regulations may prescribe. Such election shall be made within the ninety (90) day period prior to the effective date of the Participant's Retirement Pension Benefit or prior to the commencement date of the Participant's Disability Pension Benefit and may be changed at any time and any number of times

during such period. After the Participant has cashed his first Pension Benefit payment, such election cannot be made or cannot be revoked, as the case may be.

16.3    **Amount and Payment of Joint and Survivor Annuity Benefit.**

(a) **Amount of Joint and Survivor Annuity Benefit.**

(1) A Participant's regular Retirement Pension Benefit shall be computed and then reduced by nine and three-fourths (9 3/4) percentage points plus or minus the following percentage points based on the difference between the Participant's and the spouse's ages. The nine and three-fourths (9 3/4) percentage points' reduction is (i) further reduced by one-half (1/2) percentage point for each year or part thereof that the Participant's spouse is younger than the Participant or (ii) increased by one-half (1/2) percentage points for each year or part thereof that the Participant's spouse is older than the Participant.

(2) A Participant's regular Disability Pension Benefit shall be computed and then reduced by nine and three-fourths (9 3/4) percentage points plus or minus the following percentage points based on the number of years the Participant's spouse is under or over the age of sixty-five as of the effective date of the Disability Pension Benefit. The nine and three-fourths (9 3/4) percentage points' reduction is (i) further reduced by one-half (1/2) percentage point for each year or part thereof that the Participant's spouse is under the age of sixty-five (65) as of the effective date of the Disability Pension Benefit, or (ii) increased by one-half (1/2) percentage points for each year or part thereof that the Participant's spouse is over the age of sixty-five (65) as of the effective date of the Disability Pension Benefit.

(b) **Payment.** A Participant whose Pension Benefit is paid in the form of a Joint and Survivor Annuity Benefit shall receive the reduced monthly Pension Benefits as set forth in Section 16.3(a) from the date of the commencement of the Pension Benefit until the month of his death. As of the month following the month of the Participant's death, if the Participant's spouse survives the Participant, such spouse shall commence receiving one-half (1/2) of the Joint and Survivor Annuity Benefit which had been previously payable to the Participant until the month of the surviving spouse's death. Notwithstanding the above, for any Participant who is receiving a Pension Benefit in the form of a Joint and Survivor Annuity Benefit and whose spouse is still alive on July 1, 1998, and for any Participant who commences receiving a Pension Benefit in the form of a Joint and Survivor Annuity Benefit on or after July 1, 1998, in the event the Participant's spouse predeceases the Participant, the Participant shall thereafter be paid his regular Pension Benefit rather than the reduced Joint and Survivor Annuity Benefit. This regular Pension Benefit shall be effective as of the first day of the month

9

following the death of the spouse. Furthermore, for these same Participants, if the Participant and the spouse shall become divorced on or after July 1, 1998, and the divorce decree or qualified domestic relations order provides that the spouse is no longer eligible for the Joint and Survivor Annuity Benefit, the Participant shall thereafter be paid his regular Pension Benefit rather than the reduced Joint and Survivor Annuity Benefit. This regular Pension Benefit shall be effective as of the first day of the month following the divorce.

## 17. PRE-RETIREMENT SURVIVING SPOUSE BENEFIT.

17.1    **Death On or After Age 62.** If a participant (a) dies after August 23, 1984, after attaining the age of sixty-two (62), but before applying for and receiving Pension Benefits (including Disability Pension Benefits), (b) is entitled to a Vested Pension, (c) had at least one Hour of Service in Covered Employment on or after September 1, 1974, and (d) is survived by a spouse to whom he has been legally married throughout the one year period ending at the time of his death, such surviving spouse shall be entitled to certain reduced monthly benefits for the surviving spouse's life. Such surviving spouse shall commence receiving monthly benefits as of the month following the month of the Participant's death in the amount of one-half ($\frac{1}{2}$) of the monthly Pension Benefit the Participant would have been entitled to had he commenced receiving a Joint and Survivor Annuity Benefit on the date prior to his death. The monthly benefit payable to such spouse shall be payable until the month of the surviving spouse's death.

Notwithstanding the above reference to death after age 62, for a Participant who would be eligible for the Reduced Early Retirement Pension Benefit at ages sixty (60) or sixty-one (61), as set forth in Section 10.2(b), but who dies after attaining the age of sixty (60), the surviving spouse shall be eligible to commence receiving monthly benefits, based on the rate set forth in Section 10.2(b) and as set forth above, as of the month following the month of the Participant's death.

17.2    **Death Prior to Age 62.** If a Participant (a) dies after August 23, 1984, before attaining the age of sixty-two (62), and before applying for and receiving Pension Benefits (including Disability Pension Benefits), (b) is entitled to a Vested Pension, (c) had at least one Hour of Service in Covered Employment on or after September 1, 1974, and (d) is survived by a spouse to whom he has been legally married throughout the one year period ending at the time of his death, such surviving spouse shall be entitled to certain reduced monthly benefits for the surviving spouse's life. Such surviving spouse shall commence receiving monthly benefits as of the month following the date the Participant would have attained the age of sixty-two (62) in the amount of one-half ($\frac{1}{2}$) of the monthly Pension Benefit if the Participant would have been entitled to had he retired from the electrical industry on the date of his death, survived to age sixty-two (62), and com-

menced receiving a Joint and Survivor Annuity Benefit the month after he attained the age of sixty-two (62). The monthly benefit payable to such spouse shall be payable until the month of the surviving spouse's death.

Notwithstanding the above reference to death prior to age 62, for a Participant who would be eligible for the Reduced Early Retirement Pension Benefit at ages sixty (60) or sixty-one (61), as set forth in Section 10.2(b), but who dies prior to attaining the age of sixty (60), the surviving spouse shall be eligible to commence receiving monthly benefits, based on the rate set forth in Section 10.2(b) and as set forth above, as of the month following the date the Participant would have attained the age of sixty (60).

18.    **MAXIMUM BENEFIT.** Notwithstanding any other provision of this Plan, the annual Pension Benefit payable to any Participant in any Year shall not exceed the maximum amount permitted under Section 415 of the Code.

19.    **CONSTRUCTION AND DETERMINATIONS WITH REGARD TO PLAN.** The Trustees shall have full discretionary power and authority to construe and interpret the provisions of this Plan, the terms used herein, and the rules, regulations, and policies related thereto. The Trustees shall have full, discretionary, and exclusive power and authority to administer the Plan and to determine all questions of coverage and eligibility, methods of providing or arranging for the benefits specified in this Plan and all other related matters. The Trustees shall not be under any obligation to pay any Pension Benefit if the payment of such Pension Benefit will result in loss of the NEBF's tax exempt status or qualified status under the applicable Federal Tax Law. Any such determination and any such construction or interpretation issued or confirmed in writing by the Trustees shall be final and binding upon the Brotherhood, the Association, the National Board, Local Unions, Local Chapters, Covered Employers, and Participants and Beneficiaries and their families, dependents and/or legal representatives. Constructions or interpretations which are not issued or confirmed in writing by the Trustees shall not be binding upon the NEBF, and, in particular, no matter respecting the Trustees' rights herein or any difference arising thereunder shall be controlled or determined by the grievance or arbitration procedure established in any local collective bargaining agreement or by any construction or determination by local collective bargaining parties. The Trustees shall delegate to the Executive Secretary-Treasurer the authority to make the initial determination of an applicant's eligibility for Pension Benefits subject to the applicant's right of appeal under Section 20.4 of this Plan.

## 20. CLAIMS PROCEDURES.

20.1    **Application.** A timely application for Pension Benefits should be submitted to the business address of the NEBF's administrative offices, now located at 2400 Research Boulevard, Suite 500, Rockville, Maryland 20850-3266. The application must be submitted on a printed application which may be obtained from the NEBF, a Local Union, a Local Chapter, or the Brotherhood. When the application is submitted, the applicant should make certain he completes the form which permits the NEBF to obtain certain information from

the Social Security Administration. The applicant will be required to submit proof of age, such as a birth certificate, with the application. In addition, the applicant must submit proof of age of his spouse and proof of marriage in order for Pension Benefits to be payable as a Joint and Survivor Annuity Benefit. This information may be necessary to determine if the applicant is entitled to a Pension Benefit, and the amount of the Pension Benefit to be paid.

**20.2    Processing of Application.** When the NEBF receives a completed application, the Executive Secretary-Treasurer will make a decision as to whether the applicant is eligible for Pension Benefits, and if so, the amount of Pension Benefits to be paid, within ninety (90) days after receiving the application, if possible. However, inasmuch as the NEBF may require the assistance of the Social Security Administration in order to determine eligibility for and amounts of Pension Benefits, the NEBF may not have full information during said ninety (90) day period. In that event, the applicant will be notified during the ninety (90) day period that an extension of time is necessary and the circumstances requiring the extension. The NEBF will have an additional ninety (90) days in which to make a determination of eligibility and amount of Pension Benefits due. If, at the end of the total one hundred eighty (180) day period, the NEBF still has been unable to process the necessary information, the NEBF will make a decision as soon as possible. However, the applicant may, if he so desires, consider that his application has been denied and submit an appeal.

**20.3    Denial of Application.** If any application for Pension Benefits is wholly or partially denied by the Executive Secretary-Treasurer, written notice of the denial of Pension Benefits will be sent to the applicant within the period described above. The notice will state the specific reason or reasons for the denial and will also explain the time limits and procedures for appealing the denial of Pension Benefits.

**20.4    Appeal.** The applicant shall be entitled to request that the Trustees reconsider his application by filing with the NEBF a written request for appeal within sixty (60) days after the denial of Pension Benefits. All appeals should be submitted to the Trustees at the business address of the NEBF's administrative offices. The appeal should contain a written statement of the reasons why the applicant believes his application should be approved, and any other additional information the applicant believes may be helpful. The applicant may also, upon written request, receive copies of all NEBF documents relating to the denial of his application or the determination of the amount of his Pension Benefits.

**20.5    Decision on Appeal.** A final decision as to the denial or approval of the appeal shall be made by the Trustees no later than sixty (60) days after receipt of the appeal unless special circumstances require an extension of time. In the event an extension of time is necessary, written notice of the extension shall be provided to the applicant within sixty (60) days after the appeal is received. The notice shall explain the reasons for the extension. In that event, the Trustees shall have an

additional sixty (60) days to render their decision on the appeal. The decision denying or approving the applicant's appeal shall include specific reasons for the decision. The decision of the Trustees shall be final and binding.

**21.    RULES, REGULATIONS, AND POLICIES.** Pursuant to the Agreement, the Trustees are empowered and authorized to promulgate, adopt and thereafter amend or rescind any and all necessary rules, regulations, or policies which they deem needed or desirable to facilitate the proper administration of the NEBF and the Plan. All such rules, regulations or policies adopted by action of the Trustees shall be binding upon the Brotherhood, the Association, the National Board, Local Unions, Local Chapters, Covered Employers, and Participants and Beneficiaries and their families, dependents and/or legal representatives.

**22.    CONTRIBUTIONS.**

**22.1    Payment of Contributions.** All contributions made by Covered Employers to the NEBF shall be made in accordance with the Agreement. No contributions shall be permitted by Participants.

**22.2    Refund of Contributions.** The NEBF will refund mistaken Covered Employer contributions that were paid to the NEBF within the year prior to the date the Trustees first became aware that the contributions were made in error. Contributions paid to the NEBF more than one year prior to the date the Trustees first became aware that the contributions were made in error shall not be refundable.

**23.    LIMITATIONS UPON BENEFICIAL RIGHTS AND INTERESTS.** No Participant, Beneficiary, Covered Employer, Local Union, or other person shall have any vested interest or right, title, or other interest in or to the NEBF or any part thereof or any property of the NEBF, except as may be required by the Act, be provided by the Trustees, or be specifically provided for in this Plan. There shall be no pro rata or other distribution of any of the assets of the NEBF for any purpose or reason, except as required by law, as a result of any Local Union, Covered Employer or group of Covered Employers, Participants, or their Beneficiaries, ceasing their participation in the NEBF. Except as required by law or pursuant to a qualified domestic relations order (a "QDRO") as defined in the Act and the Code, all benefits shall be free from the interference and control of any creditor, and no benefits shall be subject to any assignment or other anticipation, nor to seizure or to sale under any legal, equitable or any other process, and in the event that any claim or benefit shall, because of any debt incurred by or resulting from any other claim or liability against any Participant or Beneficiary, by reason of any sale, assignment, transfer, encumbrance, anticipation or other disposition made or attempted by said Participant or Beneficiary, or by reason of any seizure or sale or attempted sale under any legal, equitable or other process, or in any suit or proceeding become payable, or be liable to become payable to any person other than the Participant or Beneficiary for whom the same is intended, as provided herein and pursuant hereto, the Trustees shall have power to withhold payment of such benefit to such Participant or Beneficiary until such assignment, transfer, encumbrance, anticipation or other disposition, writ or legal process is canceled or withdrawn in such manner as shall be satisfactory to the Trustees. Until so canceled or withdrawn, the Trustees shall have the right to use and apply the benefits as the Trustees may deem best, directly for the support and maintenance of such Participant or Beneficiary.

**24. WITHHOLDING PAYMENT.** In the event any question or dispute shall arise as to the proper person or persons to whom any payments shall be made hereunder, the Trustees may withhold such payment until there shall have been made an adjudication of such question or dispute which is satisfactory to the Trustees, or until the Trustees shall have been fully protected against loss by means of such indemnification agreement or bond as they determine to be adequate.

**25. OVERPAYMENTS AND MISTAKEN PAYMENTS.** To the extent permitted by law, in the event the NEBF pays Pension Benefits to a person who is deceased or to a person who is not eligible for such payment, or in the event the NEBF pays a Pension Benefit in excess of the amount owed, the overpayments or mistaken payments shall be a debt due and owing the NEBF from the person who received such payment and/or his estate. The Trustees are authorized, in their discretion, to deduct such overpayments or mistaken payments from any Pension Benefits payable or paid, insofar as such deduction is permitted by law.

**26. ANTI-REVERSION PROVISION.** It shall be impossible at any time for any part of the NEBF to revert to the Covered Employers, or to be used for, or diverted to, any purpose other than the exclusive benefit of Participants and Beneficiaries.

**27. NO DIVESTITURE.** No Participant entitled to any benefit under this Plan shall be divested for any reason, except as allowed by law.

**28. TERMINATION OR MERGER OF NEBF.** In the event of termination or partial termination of the NEBF, as defined by law, a Participant's rights to benefits accrued to the date of termination or partial termination shall be non-forfeitable.

**29. GENDER AND PLURAL USAGES.** Whenever any words are used in this Plan in the masculine gender, they shall also be construed to include the feminine or neuter gender in all situations where they would so apply and wherever any words are used in the plural, they shall also be construed to include the singular.

**30. SECTION TITLES.** The Section titles are included solely for convenience and shall, in no event, be construed to affect or modify any part of the provisions of this Plan or be construed as part thereof.

**31. SAVINGS CLAUSE.** Should any provision of this Plan or in the rules, regulations, or policies adopted by the Trustees be held to be unlawful or invalid, or unlawful or invalid as to any person or instance, such fact shall not adversely affect the other provisions herein or therein contained or the application of said provisions to any other person or instance, unless such unlawfulness or invalidity shall make impossible the functioning of the NEBF, and in such case the appropriate parties shall as quickly as practicable adopt a new provision to take the place of the unlawful or invalid provision.

**32. AMENDMENT OF PLAN.** The Trustees are authorized to amend the Plan, prospectively or retroactively, where they deem it necessary to maintain the continuation of the NEBF's tax exempt status or the Plan's qualified status under Federal Tax Law or to otherwise preserve compliance with the Act or other applicable law, and any regulations or rulings issued with respect thereto. The Trustees and the National Board are also generally authorized to amend the Plan, except where expressly limited as provided herein. No amendment shall have the effect of retroactively depriving Participants or Beneficiaries of rights already accrued under this Plan. Amendments with regard to increases in Pension Benefits may only be made jointly by the Trustees and the National Board and, at the time of the adoption of the amendment, a report by the NEBF's actuary must indicate that in the actuary's opinion (a) no withdrawal liability then exists, and (b) upon its effective date, the amendment will not produce withdrawal liability for any Covered Employer. Withdrawal liability, as used herein, shall mean the circumstances whereby a withdrawing Covered Employer would actually incur withdrawal liability to the NEBF under the Act (and, more particularly, the provisions added by the Multiemployer Pension Amendments Act of 1980).

**33. APPLICABLE PLAN OR AGREEMENT.** A Participant who is receiving a Pension Benefit or whose effective date of the Pension Benefit is prior to the effective date of this Plan, shall be governed by the Agreement and the rules, regulations, and/or policies in effect at the date of the receipt of the Pension Benefit or the effective date of the Pension Benefit, except as specifically provided herein.

LAW OFFICES

# POTTS-DUPRE, DIFEDE & HAWKINS

CHARTERED

SUITE 444

1125 FIFTEENTH STREET, N. W.

WASHINGTON, D. C. 20005

JENNIFER BUSH HAWKINS

(202) 223-0888

FAX (202)223-3868



February 27, 2004

Ernest J. Vhonoutka, Sr., President
Upper Cape Electrical, Inc.
20 Perry Avenue
Bourne, MA 02532

Re:    National Electrical Benefit Fund Contributions

Dear Mr. Vohnoutka:

This firm represents the National Electrical Benefit Fund ("NEBF"). I am writing to you with regard to delinquent pension fund contributions owed by Upper Cape Electrical, Inc. ("Upper Cape") to the NEBF on behalf of Upper Cape's covered employees.

NEBF's records show that Upper Cape is delinquent in making its required pension contributions for the period January 2000 through the present in the total amount of $23,623.42.

By this letter I am requesting that you immediately submit to the NEBF, by sending to my attention at the above address, payment of Upper Cape's delinquent contributions. In accordance with the NEBF's governing documents and federal law, the NEBF is additionally demanding payment of $7,977.95, representing liquidated damages in the amount of 20% of the aforementioned delinquent and other late contributions; $3,471.68, representing interest calculated at the rate of 10% per annum on the delinquent contributions; and $2,748.09 in audit fees.

The Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 et seq. ("ERISA"), provides that if a fund such as the NEBF is forced to go to court to collect delinquent contributions from a participating employer, the fund is entitled to recover its attorney's fees and costs, in addition to the delinquent contributions, liquidated damages, and interest. 29 U.S.C. § 1132(g). Let me assure you, if upon receipt of this letter Upper Cape does not make prompt payment of its delinquent contributions along with interest, liquidated damages, and audit fees (a total of $37,821.09), the NEBF will pursue every legal remedy available to it.

The NEBF has already authorized me to initiate legal action to recover Upper Cape's delinquent contributions. However, in an attempt to save yourself and the NEBF the effort, expense, and distraction of a legal proceeding, I am requesting that you immediately send to me a check payable to the NEBF, for all monies owed. If, within 10 days of your receipt of this letter I

POTTS-DUPRE, DIFEDE & HAWKINS

Upper Cape Electrical, Inc.
February 27, 2004
Page 2

check payable to the NEBF, for all monies owed. If, within 10 days of your receipt of this letter I
have not received full payment by Upper Cape, I am prepared to take, and I will take, appropriate
legal action on the NEBF's behalf. If a lawsuit becomes necessary, I will seek to recover the
NEBF's attorney's fees and costs, in addition to the delinquent contributions, interest, and
liquidated damages.

     If you have any questions, please do not hesitate to contact me. I look forward to hearing
from you shortly.

                    Sincerely,

                    POTTS-DUPRE, DIFEDE & HAWKINS, CHTD.

By: _____
              Jennifer Bush Hawkins

JBH:tle
cc:   Assistant Administrator John P. Sahm
       E. Vohnoutka, 1266 State Road, Plymouth, MA

LAW OFFICES

## POTTS-DUPRE, DIFEDE & HAWKINS

CHARTERED

SUITE 444

1125 FIFTEENTH STREET, N. W.

WASHINGTON, D. C. 20005

JENNIFER BUSH HAWKINS

(202) 223-0888

FAX (202)223-3868

May 21, 2004

## **CERTIFIED MAIL, RRR**

Ernest J. Vhonoutka, Sr., President
Upper Cape Electrical, Inc.
20 Perry Avenue
Bourne, MA 02532

      Re:    <u>National Electrical Benefit Fund Contributions</u>

Dear Mr. Vohnoutka:

      This firm represents the National Electrical Benefit Fund ("NEBF"). You may recall that I wrote to you in February, 2004, regarding delinquent pension fund contributions owed by Upper Cape Electrical, Inc. ("Upper Cape") to the NEBF. As of today's date, I have not received a response to my letter.

      By this letter I am renewing the NEBF's demand that Upper Cape immediately submit to the NEBF, by sending to my attention at the above address, payment of**$42,113.56**. This amount is equal to Upper Cape's delinquent contributions, which now total $26,358.19; liquidated damages in the amount of $8,524.90; interest through May 2004 in the amount of $4,482.43; and audit fees in the amount of $2,748.04.

      If I do not hear from you or receive payment by June 7th, we will not hesitate to commence a legal action against Upper Cape on the NEBF's behalf.

                Sincerely,

                POTTS-DUPRE, DIFEDE & HAWKINS, CHTD.

                By:_____
                    Jennifer Bush Hawkins

JBH:msh
cc:    Jack Sahm

LAW OFFICES

# POTTS-DUPRE, DIFEDE & HAWKINS

CHARTERED

SUITE 444

1125 FIFTEENTH STREET, N. W.

WASHINGTON, D. C. 20005

JENNIFER BUSH HAWKINS

(202) 223-0888

FAX (202) 223-3868



November 4, 2004

Ernest Vhonoutka, President
Upper Cape Electrical, Inc.
20 Perry Avenue
Bourne, MA 02532

    Re:    National Electrical Benefit Fund Contributions

Dear Mr. Vhonoutka:

As we discussed last week, you agreed that Upper Cape Electrical, Inc. could repay all amounts due the NEBF in 48 monthly payments. I have drafted a repayment agreement to this effect for your review, with payments to being on December 1, 2004. If acceptable to you, please sign both copies of the enclosed and return to my attention with your first payment by December 1, 2004. I will have both copies executed by the NEBF, and will return one to your files.

If you have any comments or would like to discuss this matter further, please contact me as soon as possible.

    Sincerely,

    **POTTS-DUPRE, DIFEDE & HAWKINS, CHTD.**

    By:    Jennifer Bush Hawkins

JBH:msh
cc:    Michael J. Reed
Enclosures

VHONOUTKA-1

## NEBF PAYMENT SCHEDULE

Upper Cape Electrical, Inc.        FRR #04-2953452
20 Perry Avenue                    EBB: 50 LU: 223
Bourne, MA 02532

| Contributions Due | $ 25,840.20 |
|---|---|
| Interest | 5,931.27 |
| Liquidated Damages | 8,421.30 |
| Audit Expense | 2,748.04 |
| Total Due | $ 42,940.81 |

| BALANCE FORWARD | PAYMENT | INTEREST | DUE | PAYMENT NUMBER |
|---|---|---|---|---|
| 42,940.81 | (1,075.00) | - | 41,865.81 | #1 |
| 41,865.81 | (1,075.00) | 339.79 | 41,130.60 | #2 |
| 41,130.60 | (1,075.00) | 333.66 | 40,389.26 | #3 |
| 40,389.26 | (1,075.00) | 327.49 | 39,641.75 | #4 |
| 39,641.75 | (1,075.00) | 321.26 | 38,888.01 | #5 |
| 38,888.01 | (1,075.00) | 314.98 | 38,127.99 | #6 |
| 38,127.99 | (1,075.00) | 308.65 | 37,361.64 | #7 |
| 37,361.64 | (1,075.00) | 302.27 | 36,588.91 | #8 |
| 36,588.91 | (1,075.00) | 295.83 | 35,809.74 | #9 |
| 35,809.74 | (1,075.00) | 289.34 | 35,024.08 | #10 |
| 35,024.08 | (1,075.00) | 282.80 | 34,231.88 | #11 |
| 34,231.88 | (1,075.00) | 276.20 | 33,433.07 | #12 |
| 33,433.07 | (1,075.00) | 269.54 | 32,627.62 | #13 |
| 32,627.62 | (1,075.00) | 262.83 | 31,815.45 | #14 |
| 31,815.45 | (1,075.00) | 256.07 | 30,996.52 | #15 |
| 30,996.52 | (1,075.00) | 249.25 | 30,170.77 | #16 |
| 30,170.77 | (1,075.00) | 242.37 | 29,338.13 | #17 |
| 29,338.13 | (1,075.00) | 235.43 | 28,498.56 | #18 |
| 28,498.56 | (1,075.00) | 228.44 | 27,652.00 | #19 |
| 27,652.00 | (1,075.00) | 221.39 | 26,798.39 | #20 |
| 26,798.39 | (1,075.00) | 214.28 | 25,937.67 | #21 |
| 25,937.67 | (1,075.00) | 207.11 | 25,069.77 | #22 |
| 25,069.77 | (1,075.00) | 199.88 | 24,194.65 | #23 |
| 24,194.65 | (1,075.00) | 192.59 | 23,312.23 | #24 |
| 23,312.23 | (1,075.00) | 185.24 | 22,422.47 | #25 |
| 22,422.47 | (1,075.00) | 177.82 | 21,525.29 | #26 |
| 21,525.29 | (1,075.00) | 170.35 | 20,620.65 | #27 |
| 20,620.65 | (1,075.00) | 162.82 | 19,708.46 | #28 |
| 19,708.46 | (1,075.00) | 155.22 | 18,788.68 | #29 |
| 18,788.68 | (1,075.00) | 147.55 | 17,861.23 | #30 |
| 17,861.23 | (1,075.00) | 139.83 | 16,926.06 | #31 |
| 16,926.06 | (1,075.00) | 132.04 | 15,983.10 | #32 |
| 15,983.10 | (1,075.00) | 124.18 | 15,032.29 | #33 |
| 15,032.29 | (1,075.00) | 116.26 | 14,073.55 | #34 |
| 14,073.55 | (1,075.00) | 108.28 | 13,106.83 | #35 |

| | | | | |
|---|---|---|---|---|
| 13,106.83 | (1,075.00) | 100.23 | 12,132.05 | #36 |
| 12,132.05 | (1,075.00) | 92.11 | 11,149.16 | #37 |
| 11,149.16 | (1,075.00) | 83.92 | 10,158.08 | #38 |
| 10,158.08 | (1,075.00) | 75.66 | 9,158.74 | #39 |
| 9,158.74 | (1,075.00) | 67.34 | 8,151.08 | #40 |
| 8,151.08 | (1,075.00) | 58.94 | 7,135.02 | #41 |
| 7,135.02 | (1,075.00) | 50.48 | 6,110.50 | #42 |
| 6,110.50 | (1,075.00) | 41.95 | 5,077.45 | #43 |
| 5,077.45 | (1,075.00) | 33.34 | 4,035.79 | #44 |
| 4,035.79 | (1,075.00) | 24.66 | 2,985.45 | #45 |
| 2,985.45 | (1,075.00) | 15.91 | 1,926.36 | #46 |
| 1,926.36 | (1,075.00) | 7.09 | 858.45 | #47 |
| 858.45 | (858.45) | 0.00 | 0.00 | #48 |

## REPAYMENT AGREEMENT

This Repayment Agreement ("Agreement") is entered into this ____ day of November, 2004, by and between the **NATIONAL ELECTRICAL BENEFIT FUND ("NEBF")**, a multiemployer pension benefit fund, with an address at 2400 Research Boulevard, Suite 500, Rockville, Maryland 20850-3266, and **UPPER CAPE ELECTRICAL, INC. ("Upper Cape")**, 20 Perry Avenue, Bourne, MA 02532.

**WHEREAS,** at all times relevant hereto, Upper Cape has been signatory to certain agreements with the International Brotherhood of Electrical Workers, Local Union 223, and the NEBF, which obligate Upper Cape to make regular monthly contributions to the NEBF on behalf of its covered and alumni employees; and

**WHEREAS,** Upper Cape had been delinquent in making its regular monthly contributions to NEBF during the period January 2000 through February 2004;

**WHEREAS,** as of the payment dates set forth in Section 1, Upper Cape will owe the NEBF a total of $42,940.81, which includes: (1) $25,840.20 in delinquent contributions (the "Delinquent Contributions"); (2) $5,931.27 in interest ("Interest"); (3) $8,421.30 in liquidated damages ("Liquidated Damages"); and (4) $2,748.04 in audit fees.

**NOW THEREFORE,** in consideration of the mutual promises and covenants herein contained, the receipt and sufficiency of which is hereby acknowledged, the NEBF and Upper Cape hereby agree as follows:

1.    **Payments to the NEBF.** Upper Cape will pay to the NEBF **forty-seven (47) monthly payments of $1,075.00** on or before the first day of each of the forty-seven (47) consecutive months commencing December 1, 2004. The **forty-eighth (48th) and final payment in the amount of $858.45** will be due on or before November 1, 2008. The payments shall be made by sending a check payable to the "National Electrical Benefit Fund" by U.S. mail, first-class, postage prepaid, to the care of NEBF Counsel as set forth in Section 6.

2.    **Current NEBF Reporting Forms and Contributions.**  Upper Cape will keep current its monthly contributions effective with the December 2004 Contribution, by making payment of its October contribution on or prior to November 15, 2004.  Each regular monthly payment thereafter shall be mailed so as to reach the NEBF's local collection agent on or prior to the 15th of the month following the month in which the work was performed.  For example, the contribution for work performed in November 2004 shall be mailed so as to reach the NEBF's local collection agent on or prior to December 15, 2004.  Upper Cape will remain current in making its NEBF contributions as required by its collective bargaining agreement and will timely submit all monthly payroll reports and contributions to the NEBF's local collection agent.

3.    **Default.**  If the NEBF or its counsel does not receive payments as set forth in Section 1 above or current contributions as set forth in Section 2 above, Upper Cape will be in default of this Agreement.  In the event of such a default: (i) any remaining Delinquent Contributions, Interest and interest hereafter accrued thereon, Liquidated Damages, audit fees, and attorneys' fees incurred by the NEBF in connection with this repayment agreement and with the collection of the aforesaid amounts, will become immediately due and payable in full, and (ii) Upper Cape agrees to a confession of judgment as is more fully explained in Section 5 below.

4.    **Legal Recourse.**  If Upper Cape fails to meet any obligation as set forth in this Agreement, Upper Cape agrees that the NEBF may take any and all legal action necessary for enforcement of this Agreement and recovery of monies owed, including Delinquent Contributions, Interest now and hereafter accrued, Liquidated Damages now and hereafter accrued, and will be entitled to an award of additional reasonable attorneys' fees and costs incurred in bringing such an action or otherwise pursuing its legal remedies.  For purposes of such an action, Upper Cape submits to the jurisdiction of the United States District Court for the District of Maryland and expressly waives any objection it may now or hereafter have to venue for any such action.

F:\WP51\WPJB\NEBF\Delinquencies\UpperCape\NEBFAgmt.doc

5. **Confession of Judgment**. Pursuant to Rule 108 of the Rules of the United States District Court for the District of Maryland, Upper Cape hereby authorizes any attorney-at-law, upon any event of default under this Agreement, to appear for and enter and confess judgment against Upper Cape for all amounts remaining unpaid pursuant to this Agreement, including unpaid delinquencies, all interest now and hereafter accrued thereon, liquidated damages now and hereafter accrued, and attorneys' fees, with or without declaration, without prior notice to Upper Cape or opportunity to be heard, with release of all errors, without stay of execution, and with reasonable attorney's fees and costs of suit. The authority to appear, enter and confess judgment shall not be exhausted by any one or more exercise thereof or by any defective exercise thereof. In granting this warrant of attorney to confess judgment, Upper Cape hereby voluntarily, knowingly, and intelligently waives any and all rights Upper Cape has or may have to prior notice and an opportunity for a prejudgment hearing on the merits of the claim under the Constitution and Laws of the United States and the State of Maryland.

6. **Notice**. Any notice or payment required herein or otherwise to be made, shall be made as follows:

> To Upper Cape:
> Ernest Vhonoutka
> Upper Cape Electrical, Inc.
> 20 Perry Avenue
> Bourne, MA 02532

> To NEBF:
> National Electrical Benefit Fund
> Attn: Michael J. Reed
> 2400 Research Blvd., Suite 500
> Rockville, MD 20850
> Telephone: (301) 590-8580
> Facsimile: (301) 590-9689

> To NEBF Counsel:
> Potts-Dupre, Difede & Hawkins, Chtd.
> Attn: Jennifer Hawkins, Esq.
> 1125 15th Street, N.W., Suite 444
> Washington, DC 20005
> Telephone: (202) 223-0888
> Facsimile: (202) 223-3868

7. **Governing Law.** This Agreement shall be governed by, construed and interpreted in accordance with the laws of the State of Maryland.

8.    **Modification.**  No change, amendment, modification, or cancellation of this Agreement or any part hereof shall be valid unless in writing and signed by both parties hereto.

9.    **Successors and Assigns.**  This Agreement and each and every covenant, agreement and other provision hereof shall be binding upon the parties hereto and their successors and assigns.

10.    **Entire Agreement.**  This Agreement constitutes the entire agreement by and between the parties hereto with respect to the subject matter hereof.  No contemporaneous or prior statement, agreement or writing shall be of any force and effect with regard to the subject matter of this Agreement.

**IN WITNESS WHEREOF,** the parties hereto, by and through their authorized representatives, have caused this Agreement to be duly executed.

Date: November _____, 2004                **UPPER CAPE ELECTRICAL, INC.**

By:    _____
                Ernest Vhonoutka, President

Date: November _____, 2004                **NATIONAL ELECTRICAL BENEFIT FUND**

By:    _____
            Michael J. Reed, Assistant Administrator

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. **TITLE OF CASE (NAME OF FIRST PARTY ON EACH SIDE ONLY)** National Electrical Benefit Fund, by its Trustees, Jon F. Walters and D.R. Borden, Jr. v. Upper Cape Electrical, Inc.

2. **CATEGORY IN WHICH THE CASE BELONGS BASED UPON THE NUMBERED NATURE OF SUIT CODE LISTED ON THE CIVIL COVER SHEET. (SEE LOCAL RULE 40.1(A)(1)).**

   ___ I. 160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

   _X_ II. 195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730, *Also complete AO 120 or AO 121
   740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950. for patent, trademark or copyright cases

   ___ III. 110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310, 315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371, 380, 385, 450, 891.

   ___ IV. 220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660, 690, 810, 861-865, 870, 871, 875, 900.

   ___ V. 150, 152, 153.

3. **TITLE AND NUMBER, IF ANY, OF RELATED CASES. (SEE LOCAL RULE 40.1(E)).**
   N/A

4. **HAS A PRIOR ACTION BETWEEN THE SAME PARTIES AND BASED ON THE SAME CLAIM EVER BEEN FILED IN THIS COURT?** YES ☐  NO ☒

5. **DOES THE COMPLAINT IN THIS CASE QUESTION THE CONSTITUTIONALITY OF AN ACT OF CONGRESS AFFECTING THE PUBLIC INTEREST? (SEE 28 USC 2403)** YES ☐  NO ☒
   **IF SO, IS THE U.S.A. OR AN OFFICER, AGENT OR EMPLOYEE OF THE U.S. A PARTY?** YES ☐  NO ☐

6. **IS THIS CASE REQUIRED TO BE HEARD AND DETERMINED BY A DISTRICT COURT OF THREE JUDGES PURSUANT TO TITLE 28 USC 2284?** YES ☐  NO ☒

7. **DO ALL PARTIES IN THIS ACTION RESIDE IN THE CENTRAL SECTION OF THE DISTRICT OF MASSACHUSETTS (WORCESTER COUNTY) - (SEE LOCAL RULE 40.1(C)).** YES ☐  NO ☒
   **OR IN THE WESTERN SECTION (BERKSHIRE, FRANKLIN, HAMPDEN OR HAMPSHIRE COUNTIES)? - (SEE LOCAL RULE 40.1(D)).** YES ☐  NO ☒

8. **DO ALL OF THE PARTIES RESIDING IN MASSACHUSETTS RESIDE IN THE CENTRAL AND/OR WESTERN SECTIONS OF THE DISTRICT?** YES ☐  NO ☒
   (a) **IF YES, IN WHICH SECTION DOES THE PLAINTIFF RESIDE?** _____

9. **IN WHICH SECTION DO THE ONLY PARTIES RESIDING IN MASSACHUSETTS RESIDE?** N/A

10. **IF ANY OF THE PARTIES ARE THE UNITED STATES, COMMONWEALTH OF MASSACHUSETTS, OR ANY GOVERNMENTAL AGENCY OF THE U.S.A. OR THE COMMONWEALTH, DO ALL OTHER PARTIES RESIDE IN THE CENTRAL SECTION:** YES ☐ NO ☐  N/A  **OR WESTERN SECTION:** YES ☐  NO ☐

(PLEASE TYPE OR PRINT)

ATTORNEY'S NAME Gregory A. Geiman

ADDRESS Segal, Roitman & Coleman, 11 Beacon Street, Suite #500, Boston, MA  02108

TELEPHONE NO. (617) 742-0208

(Categform.rev - 3/97)

JS 44
(Rev. 12/96)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

National Electrical Benefit Fund, by its
Trustees, Jon F. Walters and D.R. Borden, Jr.

## DEFENDANTS

Upper Cape Electrical, Inc.

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Gregory A. Geiman, Esquire
Segal, Roitman & Coleman
11 Beacon Street, Suite #500
Boston, MA  02108

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF
(For Diversity Cases Only)                AND ONE BOX FOR DEFENDANT)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify)

☐ 6 Multidistrict Litigation

☐ 7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | PERSONAL INJURY | PERSONAL INJURY | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury – Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury – Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | PROPERTY RIGHTS | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | | PERSONAL PROPERTY | ☐ 650 Airline Regs | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 340 Marine | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| | ☐ 345 Marine Product Liability | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 850 Securities/Commodities/Exchange |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal Property Damage | LABOR | SOCIAL SECURITY | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | | | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| REAL PROPERTY | CIVIL RIGHTS | PRISONER PETITIONS | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | HABEAS CORPUS: | | FEDERAL TAX SUITS | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | | ☐ 535 Death Penalty | | | |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 540 Mandamus & Other | ☒ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS – Third Party 26 USC 7609 | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

This is a claim to collect unpaid benefit fund contributions, brought pursuant to ERISA,
29 U.S.C. Sec. 1132.

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A CLASS ACTION
☐ UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:    ☐ YES    ☐ NO

## VIII. RELATED CASE(S) IF ANY (See instructions):

N/A

JUDGE _____    DOCKET NUMBER _____

DATE
5/10/05

SIGNATURE OF ATTORNEY OF RECORD
Gregory G. Geiman

FOR OFFICE USE ONLY

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

AGREEMENT

AND

WORKING RULES

GOVERNING THE

ELECTRICAL INDUSTRY OF

SOUTHEAST MASS. & VICINITY

BETWEEN

ELECTRICAL WORKERS UNION

LOCAL 223, IBEW

AND

RHODE ISLAND AND SOUTHEAST

MASSACHUSETTS CHAPTER,

NATIONAL ELECTRICAL

CONTRACTORS ASSOCIATION, INC.

SEPTEMBER 1, 2001 TO AUGUST 31, 2004

TABLE OF CONTENTS

Inside Construction Agreement

Basic Principles                                             A-4

ARTICLE I
Effective Date, Changes, Grievances, Disputes               A-4

ARTICLE II
Employer Rights and Obligations                             A-6
Subletting & Assignment                                     A-6
Management's Rights Clause                                   A-6
Employer Qualifications                                      A-7
Employer Doing Manual Work                                   A-7
Layoff Notification                                         A-7
Storage - Lockers - Quarters                                A-7

ARTICLE III
Union Rights and Obligations                                A-8
Rendering Assistance Clause                                 A-8
Employee-Contracting                                        A-8
Favored Nations Clause                                      A-8
Employee Membership                                         A-8
Stewards                                                    A-8
Proper Workmanship                                          A-9

ARTICLE IV
Employer Contributions and Deductions                       A-9
National Electrical Benefit Fund                            A-9
National Electrical Industry Fund                           A-10
Health & Welfare Fund                                       A-11
Dues Deduction                                              A-11
Annual Statement of Wages                                   A-11
Local Pension Fund                                          A-11
Surety Bond                                                 A-11
Delinquent Contract Termination                             A-12
Collection of Delinquent Payments                           A-12
Payroll Records Access                                      A-12
COPE/PAC Voluntary Deduction                                A-12
Deferred Income Plan & Trust                                A-12

ARTICLE V
General Working Conditions                                  A-13
Job Access                                                  A-13
Foul Weather Clothing                                       A-13
Working Rules                                               A-13
Job Deliveries - Rigging                                    A-13
Cutting - Channeling                                        A-14
Workmen Tool Responsibility                                 A-14
Workmen's Tools                                             A-14
440 Volts or Over                                           A-15

Overtime Requirements                                        A-15
Age Ratio Clause                                             A-15
Job Injury - Hospitalization                                A-15
Foreman Responsibility                                       A-15
Show Up Time                                                 A-15
Pick Up Time                                                 A-16
Shift Work                                                   A-16
Jack Hammer Work                                             A-17
Height Related Work                                          A-17
Foreman & General Foreman Requirements                       A-17
Superintendent Requirements                                  A-17
Employee Recall                                              A-18
Work Hours                                                   A-18
Wage Payments                                                A-19
Layoff Payment                                               A-19
Wages                                                        A-19
Foreman and General Foreman Rate                             A-20
General Foreman                                              A-20
Electric Crane Operator                                      A-20
Welder                                                       A-20
Apprentice Rates                                             A-20
Travel                                                       A-20
Shafts, Tunnels, Subways                                     A-21
Portability                                                  A-22

ARTICLE VI
Apprenticeship and Training                                  A-22

ARTICLE VII
Temporary Light & Power                                      A-26

ARTICLE VIII
Atomic Energy                                                A-28

ARTICLE IX
Referral Procedure                                           A-29
Journeyman Wireman                                           A-30

ARTICLE X
Joint Safety Committee                                       A-33

ARTICLE XI
Labor Management Cooperation Committee (LMCC)                A-33
National Labor Management Cooperation Committee (NLMCC)      A-34

ARTICLE XII
Substance Abuse                                              A-36

ARTICLE XIII
Closing Language                                             A-36
Signature Page                                               A-37

## AGREEMENT

AGREEMENT by and between the Rhode Island and Southeast Massachusetts Chapter, NECA and Local Union No. 223, I.B.E.W.

It shall apply to all firms who sign a Letter of Assent to be bound by this Agreement.

As used hereinafter in this Agreement, the term "CHAPTER" shall mean the Rhode Island and Southeast Massachusetts Chapter of NECA, and the term "UNION" shall mean Local Union No. 223, I.B.E.W.

The term "EMPLOYER" shall mean an individual firm who has been recognized by an assent to this Agreement.

## BASIC PRINCIPLES

1.   The Employer and the Union have a common and sympathetic interest in the Electrical Industry.   2.   Therefore, a working system and harmonious relations are necessary to improve the relationship between the Employer, the Union and the Public.   3.   Progress in industry demands a mutuality of confidence between the Employer and the Union.   4.   All will benefit by continuous peace and by adjusting any differences by rational, common-sense methods.

Now, therefore, in consideration of the mutual promises and agreements herein contained, the parties hereto agree as follows:

## ARTICLE I

### Effective Date - Changes - Grievances - Disputes

**Section 1.1 -** This Agreement shall take effective September 1, 2001, and shall remain in effect until August 31, 2004, unless otherwise specifically provided for herein.   It shall continue in effect from year to year thereafter, from September 1 through August 31 of each year, unless changed or terminated in the way later provided herein.

**Section 1.2 (a) -** *Either party or an Employer withdrawing representation from the Chapter or not represented by the Chapter, desiring to change or terminate this Agreement must provide written notification at least 90 days prior to the expiration date of the Agreement or any anniversary date occurring thereafter.*

**(b) -** Whenever notice is given for changes, the nature of the changes desired must be specified in the notice, *or no later than the first negotiating meeting unless mutually agreed otherwise.*

**(c)** – The existing provisions of the Agreement, *including this Article*, shall remain in full force and effect until a conclusion is reached in the matter of proposed changes.

**(d)** – *Unresolved issues or disputes arising out of the failure to negotiate a renewal or modification of this Agreement that remain on the 20th of the month preceding the next regular meeting of the Council on Industrial Relations may be submitted jointly or unilaterally to the Council for adjudication. Such unresolved issues or disputes shall be submitted no later than the next regular meeting of the Council following the expiration date of this Agreement or any subsequent anniversary date. The Council's decisions shall be final and binding.*

**(e)** – When a case has been submitted to the Council, it shall be the responsibility of the Negotiation Committee to continue to meet weekly in an effort to reach a settlement on the local level prior to the meeting of the Council.

**(f)** – *Notice of a desire to terminate this Agreement shall be handled in the same manner as a proposed change.*

**Section 1.3** – This Agreement shall be subject to change or supplement at any time by mutual consent of the parties hereto. Any such change or supplement agreed upon shall be reduced to writing, signed by the parties hereto, and submitted to the International Office of the IBEW for approval, the same as this Agreement.

**Section 1.4** – There shall be no stoppage of work either by strike or lockout because of any proposed changes in this Agreement or dispute over matters relating to this Agreement. All such matters must be handled as stated herein.

**Section 1.5** – There shall be a Labor-Management Committee of three representing the Union and three representing the Employers. It shall meet regularly at such stated times as it may decide. However, it shall also meet within 48 hours when notice is given by either party. It shall select its own Chairman and Secretary. *The Local Union shall select the Union representative and the Chapter shall select the management representative.*

**Section 1.6** – All grievances or questions in dispute shall be adjusted by the duly authorized representatives of each of the parties to this Agreement. In the event that these two are unable to adjust any matter within 48 hours, they shall refer the same to the Labor-Management Committee.

**Section 1.7** – All matters coming before the Labor-Management Committee shall be decided by a majority vote. Four members of the Committee, two from each of the parties *hereto*, shall be a quorum for the transaction of business, but each party shall have the right to cast the full vote of its membership and it shall be counted as though all were present and voting.

**Section 1.8 –** Should the Labor-Management Committee fail to agree or adjust any matter, such shall then be referred to the Council on Industrial Relations for the Electrical Contracting Industry for adjudication.  The Council's decisions shall be final and binding.

**Section 1.9 –** When any matter in dispute has been referred to conciliation or arbitration for adjustment, the provisions and conditions prevailing prior to the time such matters arose shall not be changed or abrogated until agreement has been reached or a ruling has been made.

### ARTICLE II
### Employer Rights and Obligations

**Section 2.1 –** The Local Union is a part of the International Brotherhood of Electrical Workers, and any violation or annulment by an individual Employer of the approved Agreement of this or any other Local Union of the IBEW, other than violations of Section 2.2 (a) of this Article, will be sufficient cause for the cancellation of this Agreement by the Local Union, after a finding has been made by the International President of the Union that such a violation or annulment has occurred.

**Section 2.2 (a) – Subletting and Assignment.**  The subletting, assigning or transfer by an individual Employer of any work in connection with electrical work to any person, firm or corporation not recognizing the IBEW or one of its Local Unions as the collective bargaining representative of his Employees on any electrical work in the jurisdiction of this or any other Local Union to be performed at the site of the construction, alteration, painting, or repair of a building, structure or other work, will be deemed a material breach of the Agreement.

**Section 2.2 (b) –** All charges of violations of Section 2.2 (a) of this Article shall be considered as a dispute and shall be processed in accordance with the provisions of this Agreement covering the procedure for the handling of grievances and the final and binding resolution of disputes.

**Section 2.3 – Management's Rights Clause.**  The Union understands the Employer is responsible to perform the work required by the Owner.  The Employer shall therefore have no restrictions, except those specifically provided for in the collective bargaining agreement in planning, directing and controlling the operation of all his work, in deciding the number and kind of employees to properly perform the work, in hiring and laying of employees, in transferring employees from job to job within the Local Union's geographical jurisdiction, in determining the need and number as well as the person who will act as Foreman, in requiring all employees to observe the Employer's and/or Owner's rules and regulations not inconsistent with this Agreement, in requiring all employees to observe all safety regulations, and in discharging employees for proper cause.

**Section 2.4 – Employer Qualifications.**  Certain qualifications, knowledge, experience and financial responsibility are required of everyone desiring to be an Employer in the Electrical Industry. Therefore, an Employer who contracts for electrical work is a person, firm or corporation having these qualifications and who maintains a permanent place of business, a suitable financial status to meet payroll requirements, Workmen's Compensation and other insurance protective requirements; must possess a Master's License (Certificate "A"), as required by Chapter 141 of the General Laws of Massachusetts, be a principal officer of the corporation, and must employ not less than one (1) working Journeyman continuously from the date of recognition of this Agreement, which shall be in addition to the Management holder of  Certificate "A", Master's License.

**Section 2.5 –** For all employees covered by this Agreement, the Employer shall carry Workmen's Compensation insurance with a company authorized to do business in the State, Social Security and such other protective insurance as may be required by the laws of this State, and shall furnish satisfactory proof of such to the Union.  He shall also make contributions to the Massachusetts Unemployment Compensation Commission.

**Section 2.6 –** The Employer shall not discriminate against any employee because of age, provided the Employee is qualified to do the work.

**Section 2.7 – Employer Doing Manual Work.**  Not more than one member of a firm (Employer) shall be permitted to work with the tools at any time, and then only during regular working hours, providing at least one Journeyman is employed on the job with him at any time.

**Section 2.8 –** Any violation of the terms and conditions of this Agreement and Working Rules by any individual Employer shall be handled as a dispute as provided for in Article I of this Agreement.

**Section 2.9 – Layoff Notification.**  The Employer must notify the Business Manager's Office of the number of people to be laid off twenty-four (24) hours prior to any layoff, if possible.

**Section 2.10 – Storage – Lockers – Quarters.**  The  Employer shall furnish lockers or chests for storage of workmen's clothing and tools. Suitable quarters containing adequate heat shall be furnished when necessary and feasible.

## ARTICLE III

### Union Rights and Obligations

**Section 3.1 -** The Union reserves the right to discipline its Members for violation of its Laws, Rules and Agreement.

**Section 3.2 (a) - Rendering Assistance Clause.** This Agreement does not deny the right of the Union or its representatives to render assistance to other labor organizations by removal of its members from jobs when necessary, and when the Union or its proper representative decide to do so, but no removal shall take place until notice is first given to the Employer involved.

**Section 3.2 (b) -** When such removal takes place, the Union or its representative shall direct the workmen on such job to carefully put away all tools, equipment or any other property of the Employer in a safe manner. The Union will be financially responsible for any loss to the Employer for neglect in carrying out this provision, but only when a safe place is provided for such material, tools and equipment by the Employer.

**Section 3.3 - Employee-Contracting.** No member of Local Union No. 223, while he remains a member of such Local subject to employment by Employers operating under this Agreement, shall himself become a contractor for the performance of any electrical work. The Union shall determine which Employers are to be recognized as Union Employers.

**Section 3.4 - Favored Nations Clause.** The Union agrees that if, during the life of this Agreement, it grants to any other Employer in the Electrical Contracting Industry on work covered by this Agreement, any better terms or conditions than those set forth in this Agreement, such better terms or conditions shall be made available to the Employer under this Agreement and the Union shall immediately notify the Employer of any such concession.

**Section 3.5 - Employee Membership.** All employees covered by this Agreement who are members of the Union on the effective date of this Agreement, shall, as a condition of employment, maintain their membership in the Union during the terms of this Agreement, and all employees who become members of the Union shall, as a condition of employment, maintain their membership in the Union during the terms of this Agreement from and after the thirty-first day following their employment or the effective date of this Agreement, whichever is later.

**Section 3.6 (a) - Stewards.** The Business Manager of Local Union No. 223 may appoint a Steward on a job when he deems it necessary to protect the interests of the Union and the Employer. Such Steward shall not be discharged without just cause. The Steward shall be a working Journeyman, except when actually performing his duties as Steward.

**Section 3.6 (b)** - No Steward shall be discriminated against by any Employer because of his faithful performance of his duties as Steward.

**Section 3.6 (c)** - In the event any controversy is not adjusted between the Employer and the Steward, workmen employed on such jobs shall continue working and the Steward shall notify the Business Manager of the Union, who shall proceed to the job and use his best efforts to adjust any difficulty.

**Section 3.6 (d)** - The Union agrees to notify the Employer in writing whenever a Steward has been appointed at any job or shop.

**Section 3.6 (e)** - In an attempt to protect the interests of the Union and the Employer, the Employer will notify the Local Union three (3) days prior to the lay-off of any Steward.  The Steward will complete an approved Steward course.

**Section 3.7 - Proper Workmanship.**  In any case where Journeymen have installed electrical work in an unsafe or faulty manner, or contrary to the Massachusetts Electrical Code, he may be reported by the Employer or the Business Manager to the Labor-Management Board. Where an Employer or his representative directs electrical work to be installed in an unsafe manner, or contrary to the Massachusetts Electrical Code, the Journeyman shall report same to the Business Manager of the Union, who will then report same to the Labor-Management Board.

## ARTICLE IV

### Employer Contributions and Deductions

**Section 4.1 - National Electrical Benefit Fund.**  It is agreed that in accord with the Employees Benefit Agreement of the National Electrical Benefit Fund ("NEBF"), as entered into between the National Electrical Contractors Association and the International Brotherhood of Electrical Workers on September 3, 1946, as amended, and now delineated as the Restated Employees Benefit Agreement and Trust, that unless authorized otherwise by the NEBF the individual Employer will forward monthly to the NEBF's designated local collection agent an amount equal to 3% of the gross monthly labor payroll paid to, or accrued by, the employees in this bargaining unit, and a completed payroll report prescribed by the NEBF.  The payment shall be made by check or draft and shall constitute a debt due and owing to the NEBF on the last day of each calendar month, which may be recovered by suit initiated by the NEBF or its assignee. The payment and the payroll report shall be mailed to reach the office of the appropriate local collection agent not later than fifteen (15) calendar days following the end of each calendar month.

The individual Employer hereby accepts, and agrees to be bound by, the Restated Employees Benefit Agreement and Trust.

An individual Employer who fails to remit as provided above shall be additionally subject to having his agreement terminated upon **seventy-two (72) hours** notice in writing being served by the Union, provided the individual Employer fails to show satisfactory proof that the required payments have been paid to the appropriate local collection agent.

The failure of an individual Employer to comply with the applicable provisions of the Restated Employees Benefit Agreement and Trust shall also constitute a breach of his labor agreement.

**Section 4.2 – National Electrical Industry Fund.**  Each individual Employer shall contribute an amount not to exceed one percent (1%) nor less than .2 of 1% of the productive electrical payroll, as determined by each Local Chapter and approved by the Trustees, with the following exclusions:

(1)  Twenty-five percent (25%) of all productive electrical payroll in excess of 75,000 man-hours paid for electrical work in any one Chapter area during any one calendar year, but not exceeding 150,000 man-hours.

(2)  One hundred percent (100%) of all electrical payroll in excess of 150,000 man-hours paid for electrical work in any one Chapter area during any one calendar year.

Productive electrical payroll is defined as the total wages (including overtime) paid with respect to all hours worked by all classes of electrical labor for which a rate is established in the prevailing labor area where the business is transacted.

Payment shall be forwarded monthly to the National Electrical Industry Fund in a form and manner prescribed by the Trustees no later than fifteen (15) calendar days following the last day of the month in which the labor was performed.  Failure to do so will be considered a breach of this Agreement on the part of the individual Employer.

Only members of the National Electrical Contractors Association, Inc. are entitled to participate in the National Electrical Industry Fund.

**Section 4.3 – Health & Welfare Fund.**  It is mutually agreed between the parties hereto, that the Employer will contribute the following amount to the Trustees of the Health & Welfare Fund, established by Declaration of Trust dated June 24, 1954, as amended, by Local Union No. 223 I.B.E.W. and the Rhode Island and Southeast Massachusetts Chapter, NECA, and will remit such amount on or before the fifteenth (15th) of the month immediately following the month in which the work was performed:

Sixteen Percent (16%) of total gross wages paid

**Section 4.4 – Dues Deduction.**  The Employer agrees to deduct and forward to the Financial Secretary of the Local Union, upon receipt of a voluntary written authorization, the additional working dues from the pay of each IBEW Member.  The amount to be deducted shall be the amount specified in the approved Local Union Bylaws.  Such amount shall be certified to the Employer by the Local Union upon request by the Employer.

**Section 4.5 – Annual Statement of Wages.**  The Employer agrees to send an annual "Statement of Wages" to the Union Office on or before the February 1st following the calendar year in which the work was performed.  The "Statement of Wages" will be signed by the Employer and will be a true declaration of all wages paid to employees working under the terms of this Agreement.

**Section 4.6 – Local Pension Fund.**  It is mutually agreed between the parties hereto that the Employer will contribute the following amount to the Trustees of the Local Pension Fund, established by Declaration of Trust dated January 1, 1963, as amended, by Local Union No. 223 I.B.E.W. and the Rhode Island and Southeast Massachusetts Chapter, NECA, and will remit such amount on or before the fifteenth (15th) of the month immediately following the month in which the work was performed:

Sixteen Percent (16%) of total gross wages paid

**Section 4.7 – Surety Bond.**  The Union shall have the right to require new Employers, Traveling Contractors, and Signatory Contractors with a known pattern of tardiness with respect to Trust Fund payments under Section 4.9 as determined by the Joint Conference Committee, to post sufficient and acceptable bond as determined by the Committee to insure payments on all wages and benefits required by this Agreement, to execute and deliver to the Union a Surety Bond in the amount of:

|  |  |
|---|---|
| 1 to 10   Employees | $20,000.00 |
| 11 to 20 Employees | $34,000.00 |
| 21 to 30 Employees | $50,000.00 |
| 31 to 40 Employees | $67,000.00 |
| 41 to 50 Employees | $84,000.00 |

**Section 4.8 – Delinquent Contract Termination.**  Employers who fail to remit regularly, as required by one or all of the above sections of this Article IV (Sections 4.1 through 4.7), shall be subject to having this Agreement terminated upon seventy-two (72) hours notice in writing being served by the Union, provided the Employer fails to show proof that delinquent payments have been made in accordance with said sections.

**Section 4.9 – Collection of Delinquent Payments.**  The Electrical Construction Trust Funds as contained herein shall serve, under the direction of the Trustees or their designees, as collection agent for all jointly administered Trust Funds.  The individual Employer as defined herein shall be bound by rules and regulations promulgated by the Trustees of the Trust Funds as regard collection procedures, including but not limited to legal fees and interest charges.

The required report and payment by check shall be sent or delivered to the Electrical Construction Trust Fund Office to arrive not later than the fifteenth (15th) of the month following the incurring of the obligation.

In the event there shall exist a dispute as to the amount due from an Employer to the Trustees of one or more of the Fringe Benefit Funds hereunder, or in the event that an Employer shall fail to pay an amount which is acknowledge by it as due, the Union, the Fund(s), or the Employer may refer the matter to the Labor Management Committee to be handled in accordance with Article I, Sections 1.5 through 1.9.  Judgment may be entered on the decision of the Labor Management Committee.

In accordance with the terms of this Agreement, if as a result of delinquency in payments by an Employer or his agent to the various joint Trust Funds and it is necessary for the Union and/or Trustees of the joint Trust Funds to institute court or legal action for the recovery of the delinquent funds, the Employer shall pay in addition to the delinquent funds, interest at prime rate, accountants and attorneys fees, court costs and any legal or filing fees.

**Section 4.10 – Payroll Records Access.**  The parties to this Agreement, upon reasonable request, shall be allowed to examine the Employers' payroll records of all employees working under the terms of this Agreement.

**Section 4.11 – Cope/Pac Voluntary Deduction.**  Upon receipt of written voluntary authorization for payroll deduction, the Employer will deduct five cents ($.05) per hour from IBEW employees and forward such amount to Cope/Pac headquarters.  The Union will bear all costs in payroll deduction forms and such other material as they may require for such deductions.

**Section 4.12 – Deferred Income Plan & Trust.**  It is mutually agreed between the parties hereto that the Employer will contribute

the following amount to the Trustees of the Deferred Income Plan & Trust, established by a Declaration of Trust dated September 1, 1988, by Local Union No. 223 I.B.E.W. and the Rhode Island and Southeast Massachusetts Chapter, NECA, and will remit such amount on or before the fifteenth (15th) of the month immediately following the month in which the work was performed.

Effective September 1, 2001 through August 31, 2004
Five and one half percent(5.5%) of total gross wages paid

**ARTICLE V**

|     |                            |      |
|-----|----------------------------|------|
| (A) | General Working Conditions | 5.1  |
| (B) | Working Rules              | 5.4  |
| (C) | Hours                      | 5.23 |
| (D) | Wages                      | 5.26 |
| (E) | Travel                     | 5.29 |

(A)

**Section 5.1 - General Working Conditions.**  The policy of the members of the Local Union is to promote the use of materials and equipment manufactured, processed and repaired under economically sound wage, hour and working conditions by their fellow members of the International Brotherhood of Electrical Workers.

**Section 5.2 -  Job Access.**  The representative of the Union shall be allowed access to any shop at any reasonable time where workmen are employed under the terms of this Agreement.

**Section 5.3 - Foul Weather Clothing.**  Employers requesting men to work during inclement weather shall furnish without expense to the employee foul weather clothing, which shall consist of raincoat, rainpants, hat and boots which shall be of the pull-over type.  The employee shall sign for such foul weather clothing on a form furnished by the Employer and shall return equipment when requested by the Employer and the employee shall have the right to return such equipment when no longer needed.  Failure of the employee to return equipment when requested shall permit the Employer to charge the employee the fair value of the equipment.

**Section 5.4 - Working Rules.**  The work referred to in these Working Rules consists of the installation of all electrical distribution systems and apparatus which use electricity and includes the installation and fabrication of all such devices as are made necessary by thcsc installations.

**Section 5.5 (a) - Job Deliveries - Rigging.**  All electrical materials, apparatus and tools delivered on the job shall be handled when within property lines by employees under this Agreement.  This shall not apply to persons making small deliveries to a single destination on the job site.  These deliveries shall not be more than

can normally be carried on a public conveyance. This includes the unloading of all material and equipment, crated or uncrated, storage on job site, distribution of such, locating, erecting and connecting of such equipment in accordance with Chapter 141 of the General Laws of Massachusetts.

Where stock or tool rooms are established on the job, they shall be in control of employees subject to this Agreement.

**Section 5.5 (b)** - All individual electrical equipment that might, because of its size or weight require special equipment to handle, may be handled by a compatible and qualified rigger under the supervision of a Journeyman Electrician.

**Section 5.6 - Cutting - Channeling.** All channeling, cutting, welding, and burning required for the installation of electrical work shall be done by employees covered by this Agreement, only when qualified personnel are available and accredited by IBEW Local Union No. 223.

**Section 5.7 -** No workman shall use his automobile, motorcycle, or other vehicle for the transportation of material which could not normally be carried in a public conveyance.

**Section 5.8 - Workmen Tool Responsibility.** Workmen will be held responsible for the tools or equipment issued to them providing the Employer furnishes the necessary lockers, tool boxes or other safe places for storage.

**Section 5.9 (a) - Workmen's Tools.** Each Journeyman shall furnish a suitable tool box (approximate dimensions 24" x 10" x 10"), containing the following tools, and these only:

| | |
|---|---|
| Knife | Hacksaw frame |
| Pencil | Level (18" max.) |
| Six-foot rule | Plumbob |
| Pliers-cutting | Chalkline |
| Pliers-adjustable | Square (combination) |
| (2 pairs) | Tap wrench handles |
| Screw drivers (six) | (up to 1/4") |
| Wood chisel (small) | Claw hammer |
| Awl | Half round file |
| Center punch | Wiggenton voltage tester |
| Cold chisel (small) | Diagonal pliers |
| Compass saw | Romex stripper |
| Long nose pliers | 25' Tape Measure |
| Roto Stripper | Allen Wrenches up to 3/8" |
| 3/8 Drive Socket Set **or** | Open End Wrenches |
| (up to 3/4") | (up to 3/4") |

**Section 5.9 (b) -** In addition to the prescribed tools, workmen may carry any tool supplied by their Employer from job to job within

the shop, provided that these tools are in the category of hand tools and are of such size that they will fit into the prescribed tool box.

**Section 5.9 (c)** - All personal tools furnished by the Electrician that are required to be stored in the approved locked tool boxes or shanty or trailers shall be covered by insurance against fire at all times and theft outside of working hours.  The liability of the Employer shall be limited to the tools listed above, less the first $25.00.  This amount will be the responsibility of the employee.

**Section 5.10 - 440 Volts or Over.**  On all energized circuits or equipment that carry 440 volts or over and are within exposure to workmen, as a safety measure, two or more qualified workmen must work together or be within sight of each other.  Appropriate, adequate and positive safeguards shall be provided to insure that accidental or inadvertent exposure to hazard be minimized when on or near any high voltage equipment.

**Section 5.11 (a) - Overtime Requirements.**  All workmen must notify the Union Office before starting any overtime work.

**Section 5.11 (b)** - Men working on the job site shall be given preference on overtime work.

**Section 5.12 - Age Ratio Clause.**  On all jobs requiring five (5) or more Journeyman, at least every fifth Journeyman, if available, shall be fifty (50) years of age or older.

**Section 5.13 - Job Injury - Hospitalization.**  Any (Electrician) employee injured on the job and requiring hospitalization, or being sent home by a doctor after treatment, shall be paid for the day by the Employer.

Employees required to take time off from their employment during working hours to secure treatment because of job-related injuries arising out of and in the course of their employment, shall receive pay for such time, plus necessary travel expenses incurred in so doing on the day of the injury.

**Section 5.14 - Foreman Responsibility.**  On jobs having a Foreman, he shall be responsible to the Employer for the job placed in his charge.  Workmen are not to take directions or orders or accept layout of any job from anyone except the Foreman or in his presence.

**Section 5.15** - No work shall be performed on Labor Day except in case of emergency and then only after permission is granted by the Business Manager of the Union.

**Section 5.16 (a) - Show Up Time.**  When men are directed to report to work and do not start work due to weather conditions, lack of material, or other causes beyond their control, they shall receive

two (2) hours pay unless notified one hour before starting time. When an Employer requests workmen from the Union, and once an employee has started to work, he should receive eight (8) hours of productive work or pay, providing conditions permit, inclusive of the travel allowance.

**Section 5.16 (b)** – Employees reporting to the shop and not being put to work shall not remain after 10:00 am. Any employee requested to remain by the Employer after 10:00 am shall be considered employed.

**Section 5.17** – Workmen required to report directly to the job shall be on the job ready for work at 8:00 am. Where a brassing system is used to check on manpower, they shall not leave the change quarters to pick up brass until 8:00 am.

All workmen shall be allowed a ten (10) minute rest period in the morning and another ten (10) minute rest period in the afternoon, during which rest periods non-alcoholic beverages and coffee shall be made available to be purchased when over ten (10) men are employed. These rest periods are not to be construed to be taken collectively.

**Section 5.18 – Pick Up Time.** For the purpose of putting away supplies, materials, and equipment, workmen shall be allowed ten (10) minutes "pick-up" time at 4:20 pm each day but shall not leave the job until quitting time at 4:30 pm.

**Section 5.19 – Shift Work.** When so elected by the Contractor, multiple shifts of eight (8) hours for at least five (5) days' duration may be worked. When two (2) or three (3) shifts are worked:

The first shift (day shift) shall consist of eight (8) consecutive hours worked between the hours of 8:00 a.m. and 4:30 p.m. Workmen on the "day shift" shall be paid at the regular hourly rate of pay for the hours worked.

The second shift (swing shift) shall consist of eight (8) consecutive hours worked between the hours of 4:30 p.m. and 1:00 a.m. Workmen on the "swing shift" shall be paid at the regular hourly rate of pay plus 17.3% for all hours worked.

The third shift (graveyard shift) shall consist of eight (8) consecutive hours worked between the hours of 12:30 a.m. and 9:00 a.m. Workmen on the "graveyard shift" shall be paid at the regular hourly rate of pay plus 31.4% for all hours worked.

The Employer shall be permitted to adjust the starting hours of the shift by up to two (2) hours in order to meet the needs of the customer.

If the parties to the Agreement mutually agree, the shift week may commence with the third shift (graveyard shift) at 12:30 a.m. Monday to coordinate the work with the customer's work schedule.

However, any such adjustment shall last for at least a five (5) consecutive day duration unless mutually changed by the parties to this Agreement.

An unpaid lunch period of thirty (30) minutes shall be allowed on each shift. All overtime work required before the established start time and after the completion of eight (8) hours of any shift shall be paid at one and one-half times the "shift" hourly rate.

There shall be no pyramiding of overtime rates and double the straight time rate shall be the maximum compensation for any hour worked. There shall be no requirement for a day shift when either the second or third shift is worked.

**Section 5.20 - Jack Hammer Work.** When Journeymen employed under the terms of this Agreement are required to operate a heavy duty air operated "Jack Hammer", they shall receive fifty cents ($.50) per hour above the basic rate.

**Section 5.21 - Height Related Work.** On jobs where workmen are required to work at a platform height level of 31' to 50' above permanent floor level, they shall receive ten percent (10%) per hour above the regular straight time rate of pay and from 51' to 100' twenty percent (20%) per hour above the regular straight time rate of pay. Anything over 100' shall be paid for at twenty-five percent (25%) per hour above the regular straight time rate of pay.

This rule does not apply to permanently built protected catwalks, or to the use of standard bucket-type platform and/or ladder trucks commonly used.

**Section 5.22 (a) - Foreman and General Foreman Requirements.** When three (3) Journeymen and Apprentices are on the job, one (1) Foreman is required. From eight (8) Journeymen and Apprentices to Fourteen (14) Journeymen and Apprentices, two (2) Foremen, etc.

A General Foreman is a man in charge of a construction project where fifteen (15) or more Journeymen and Apprentices are employed, or in charge of more than one job, each of which has a Foreman in charge. No General Foreman shall have charge of more than seven (7) Foremen at any time.

A General Foreman and a Foreman must be able to qualify as a Journeyman in the major branch of the trade in which he is directing. No Foreman of any job shall at the same time perform work on any other job as a Foreman. The Employer can select from the Out of Work List a Foreman or a General Foreman by name. However, this individual must be employed by the employer for the project duration, or 1000 man hours, whichever is longer.

**Section 5.22 (b) - Superintendent Requirements.** A Superintendent, as covered under the terms of this Agreement, shall

be an individual who is an active member of IBEW Local #223 and must be able to qualify as a Journeyman Wireman. An individual employed under this classification on any job <u>shall not</u> at the same time be allowed to perform productive labor on that or any other job and shall only serve in a supervisory capacity.

An appropriate form shall be signed by and between the individual employed as a Superintendent under this Agreement and the Local Union Business Manager acknowledging the fact that he/she is aware of this classification.

**Section 5.22 (c) - Employee Recall.** The Employer shall be allowed to recall for employment any former employee covered by this Agreement, within ninety (90) calendar days of said employee's lay-off, provided that the Employer has not hired any additional manpower during the recall period, unless mutually agreed to by the parties to this Agreement. The Employer agrees not to utilize any reduced work week, work day or furlough program, except under the terms of this paragraph or as mutually agreed to by the parties to this Agreement. This recall provision only applies to the employees' immediate past employer.

**Section 5.23 (a) - Work Hours.** Eight hours work, between the hours of 8:00 AM to 12:00 noon and 12:30 PM to 4:30 PM shall constitute a work day. Work performed during the lunch period, 12:00 noon to 12:30 PM, that is installation or repair of electrical work that must be done due to job conditions, shall be paid at the overtime rate. Forty hours within five days - Monday through Friday inclusive - shall constitute a work week. The normal workday is usually between the hours of 8:00 AM and 4:30 PM with one-half hour for lunch. This workday may be varied by no more than two (2) hours by mutual agreement between the Union and the Employer.

**Section 5.23 (b) -** Work performed for the first four (4) hours after working the regularly scheduled work day 8:00 AM to 4:30 PM Monday through Friday and eight (8) hours on Saturday between 8:00 AM and 4:30 PM shall be paid at one and one-half (1 1/2) times the straight time rate of pay. Worked performed outside of these stated hours shall be paid for at double the straight time rate of pay. As described in Section 5.23 (a), the work day may be varied by no more than two (2) hours by mutual agreement between the Union and the Employer.

Work performed outside the stated hours and on  Sundays, New Year's Day, Washington's Birthday, Patriot's Day, Memorial Day, Fourth of July, Labor Day, Columbus Day, Veteran's Day, Thanksgiving Day, and Christmas Day, shall be paid for at the rate of double time. If all the Southeastern Massachusetts and the Brockton and Vicinity Building Trades agree to celebrate Martin Luther King Day as a holiday, same will be recognized in this Agreement.

**Section 5.24 (a) – Wages Payments.** Wages shall be paid in cash weekly not later than quitting time on Friday or by check weekly not later than Thursday and not more than three days wages may be withheld at any time.  A record of all deductions must accompany all wages.

**Section 5.24 (b) –** Any Employer paying wages to an employee by check or draft, shall provide facilities for such employee for the cashing of such check or draft at a bank, or elsewhere, without charge by deductions from the amount thereof.

**Section 5.25 – Layoff Payment.** Any workmen reporting for work and being laid off, not having been notified the day previous of such layoff, shall receive not less than four (4) hours wages in order to gather his tools and personal belongings and shall be paid all his wages in full immediately.  In the event that he is not paid off, waiting time at the regular rate shall be charged until payment is made.

**Section 5.26 – Wages.** Abington, Acushnet, Avon, Barnstable, Berkley, Bourne, Brewster, Bridgewater, Brockton, Buzzards Bay, Carver, Chatham, Dartmouth, Dennis, Dighton, Duxbury, East Bridgewater, Eastham, Easton, Fairhaven, Fall River, Falmouth, Freetown, Halifax, Hanover, Hanson, Harwich, Holbrook, Kingston, Lakeville, Manomet, Mansfield, Marion, Marshfield, Mashpee, Mattapoisett, Middleboro, New Bedford, North Abington, North Easton, Norton, Norwell, Onset, Orleans, Otis Air Base, Pembroke, Plainville, Plymouth, Plympton, Provincentown, Randolph, Raynham, Rehoboth, Rochester, Rockland, Sagamore, Sandwich, Scituate, Somerset, South Easton, Stoughton, Swansea, Taunton, Tisbury, Truro, Wareham, Wellfleet, West Bridgewater, Westport, Whitman, Yarmouth, plus Nantucket, Martha's Vineyard and all Islands.

| EFFECTIVE | **9-1-01** | **3-1-02** | **9-1-02** | **3-1-03** | **9-1-03** | **3-1-04** |
|---|---|---|---|---|---|---|
| Wages | $25.85 | $26.63 | $27.43 | $28.25 | $29.10 | $29.97 |
| Health & Welfare (16% of Gross Wages) | 4.14 | 4.26 | 4.39 | 4.52 | 4.66 | 4.80 |
| Local Pension (16% of Gross Wages) | 4.14 | 4.26 | 4.39 | 4.52 | 4.66 | 4.80 |
| Deferred Income (5.5% of Gross Wages) | 1.42 | 1.46 | 1.51 | 1.55 | 1.60 | 1.65 |
| J A T F (2% of Gross Wages) | .52 | .53 | .55 | .57 | .58 | .60 |
| N E B F (3% of Gross Wages) | .78 | .80 | .82 | .85 | .87 | .90 |
| L M C C ($.05 Per Hour) | .05 | .05 | .05 | .05 | .05 | .05 |
| **Subtotal** | $36.90 | $37.99 | $39.14 | $40.31 | $41.52 | $42.77 |
| N E I F (1% of Gross Wages If Applicable) | .26 | .27 | .27 | .28 | .29 | .30 |
| **TOTAL** | $37.16 | $38.26 | $39.41 | $40.59 | $41.81 | $43.07 |

**Section 5.27 (a) - Foreman and General Foreman Rate.** The minimum rate of wages effective September 1, 1999 shall be:

Where a Foreman is required by Section 5.22 above, the Foreman's rate will be ten percent (10%) per hour above the Journeyman Wireman rate.

**Section 5.27 (b) - General Foreman.** The rate will be twenty percent (20%) per hour above the Journeyman Wireman rate.

**Section 5.27 (c) - Electric Crane Operator.** Any Employee who is qualified as an electric crane operator and has a State License to operate equipment will be paid ten percent (10%) per hour over the Journeyman's rate of pay while operating the equipment.

**Section 5.27 (d) - Welder.** Any Employee who is required to do certified welding and is rightly certified as a welder will be supplied with safe and proper welding equipment and protective clothing when welding and will be paid ten percent (10%) per hour over the Journeyman's rate of pay. When certification of welders is required for a particular job, the certification shall be at the expense of the Employer.

Employers shall supply milk for galvanized welders while performing this type of work.

**Section 5.28 - Apprentices.** All Apprentices entering the industry shall be paid not less than the following progressively increasing scale of wages during the period of Apprenticeship:

| EFFECTIVE | 9-1-01 | 3-1-02 | 9-1-02 | 3-1-03 | 9-1-03 | 3-1-04 |
|---|---|---|---|---|---|---|
| First Six Months - A* | $10.35 | $10.65 | $11.00 | $11.30 | $11.65 | $12.00 |
| Second Six Months - B* | $11.65 | $12.00 | $12.35 | $12.70 | $13.10 | $13.50 |
| Third Six Months - C* | $12.95 | $13.30 | $13.70 | $14.15 | $14.55 | $15.00 |
| Fourth Six Months - D | $14.25 | $14.65 | $15.10 | $15.55 | $16.00 | $16.50 |
| Fifth Six Months - E | $15.50 | $16.00 | $16.45 | $16.95 | $17.45 | $18.00 |
| Sixth Six Months - F | $16.80 | $17.30 | $17.85 | $18.35 | $18.90 | $19.50 |
| Seventh Six Months - G | $18.10 | $18.65 | $19.20 | $19.80 | $20.35 | $21.00 |
| Eighth Six Months - H | $19.40 | $20.00 | $20.60 | $21.20 | $21.85 | $22.50 |

No less than 1,000 hours shall constitute a six-month OJT increment period.
    * First, second and third step Apprentices will not receive Pension or Deferred Income contributions.

**Section 5.29 (a) - Travel.** No traveling time shall be paid before of after working hours to workmen for traveling to or from any job in the jurisdiction of the Union when workmen are required to report on-the-job.

**Section 5.29 (b)** – Effective 9-1-99, travel expense and arrangements for Martha's Vineyard, Nantucket, and all Islands covered by this Agreement shall be mutually agreed upon between the Union and the Employer prior to the start of the job.

**Section 5.29 (c)** – When workmen are requested to report to the shop, the Employer shall furnish safe and suitable transportation from shop to job, job to job, and job to shop.  On all jobs within the jurisdiction of Local No. 223 when workmen are requested and agree to furnish their own transportation, they shall be reimbursed at the rate of thirty-one cents ($.31) per mile from the shop to and from the job.  Extra mileage such as trips to the shop or supply house, etc., authorized by the Employer shall be paid for at this rate.

**Section 5.30 – Shafts, Tunnels, Subways.**  When a tunnel is mutually declared a Tunnel, Shaft or Subway Job or Project, then provisions of this Section shall prevail, from that time, until the Tunnel is secured and the mining operations are completed and holed out.  It will then become a Building Trades Project subject to all of the terms and conditions applicable under the Principal Agreement.

**(a)**  Hours of work per shift shall conform to all applicable State and Federal rules and regulations for Tunnels, Shafts, and Subways, and work under Compressed Air.  However, not less than eight hours pay each day shall be paid.

All overtime work after the regular shift shall be at the double time rate, except when shift work for shafts, tunnels and subways is scheduled on four consecutive Saturdays, the rate shall be time and one-half.  Sundays and holidays shall be at the double-time rate.

If an employee is called in for emergency work or extra duty, he shall be paid no less than a day's pay for the work.

**(b)**  1.  All workmen assigned to Shaft, Tunnel or Subway jobs or projects shall receive ten percent (10%) above the applicable Journeyman rate as established in this Collective Bargaining Agreement for all hours worked.  This rate shall apply to all work performed in conjunction with the operation and construction of a shaft, tunnel, or subway job or project.

2.  There shall be a Journeyman Wireman topside at all times.

3.  Where headings are 1500 feet or more apart, it shall require two Journeyman Wiremen to work together.

4.  Journeyman Wiremen will receive a sixteen (16) hour break before shifts or shall be paid at the rate of double-time for working such additional shift.

**(c)** 1. Regular shifts in atmosphere of compressed air may be set up to meet job requirements in the following manner:  five consecutive days, Monday through Friday, eight (8) hours per day shall constitute a shift.

2. The rate of pay for Journeymen working under compressed air in excess of five (5) pounds above normal atmospheric pressure shall be time and one-half (1-1/2).

3. If an employee works one hour under pressure, he shall be paid the same rate for the remainder of the shift.

This Section does not apply to existing subways, subway stations, or jobs using an open cut method.

**Section 5.31 – Portability.** An employer signatory to a collective bargaining agreement or to a letter of assent to an agreement with another IBEW Local Union, who signs an assent to this Agreement, may bring up to four bargaining unit employees employed in that Local Union's jurisdiction into this Local's jurisdiction and up to two bargaining unit employees per job from that Local's jurisdiction for specialty or service and maintenance work.  All charges of violations of this section shall be considered as a dispute and shall be processed in accordance with the provisions of this agreement for the handling of grievances with the exception that any decision of a Local Labor–Management Committee that may be contrary to the intent of the parties to the National Agreement on Employee Portability, upon recommendation of either or both the appropriate IBEW International Vice President or NECA Regional Executive Director, is subject to review, modification, or rescission by the Council on Industrial Relations.

## ARTICLE VI

### APPRENTICESHIP AND TRAINING

**Section 6.1** – There shall be a Local Joint Apprenticeship and Training Committee (JATC) consisting of a total of six members who shall also serve as Trustees to the Local Apprenticeship and Training Trust.  An equal number of three members each shall be appointed, in writing, by the local chapter of the National Electrical Contractors Association (NECA) and the Local Union of the International Brotherhood of Electrical Workers (IBEW).

The local apprenticeship standards shall be in conformance with the national guideline standards and policies.  All apprenticeship standards shall be registered with the NJATC and thereafter submitted to the appropriate registration agency.

The JATC shall be responsible for the training of apprentices, journeymen, installers, technicians, and all others (unindentured, intermediate journeymen, etc.).

**Section 6.2** - All JATC member appointments, reappointments and acceptance of appointments shall be in writing. Each member shall be appointed for a three-year term, unless being appointed for a lesser period of time to complete an unexpired term. The terms shall be staggered, with one (1) term from each side expiring each year. JATC members shall complete their appointed term unless removed for cause by the party they represent or they voluntarily resign. All vacancies shall be filled immediately.

The JATC shall select from its membership, but not both from the same party, a chairman and a secretary who shall retain voting privileges. The JATC will maintain one (1) set of minutes for JATC committee meetings and a separate set of minutes for trust meetings.

The JATC should meet on a monthly basis, and also upon the call of the chairman.

**Section 6.3** - Any issue concerning an apprentice or an apprenticeship matter shall be referred to the JATC for its review, evaluation and resolve; as per standards and policies. If the JATC deadlocks on any issue, the matter shall be referred to the Labor-Management Committee for resolution as outlined in Article I of this agreement; except for trust fund matters, which shall be resolved as stipulated in the local trust agreement.

**Section 6.4** - There shall be only one (1) JATC and one (1) local apprenticeship and training trust. The JATC may, however, establish joint subcommittees to meet specific needs, such as residential or telecommunications apprenticeship. The JATC may also establish a subcommittee to oversee an apprenticeship program within a specified area of the jurisdiction covered by this agreement. All subcommittee members shall be appointed, in writing, by the party they represent. A subcommittee member may or may not be a member of the JATC.

**Section 6.5** - The JATC may select and employ a part-time or a full-time training director and other support staff, as it deems necessary. In considering the qualifications, duties and responsibilities of the training director, the JATC should review the Training Director's Job Description provided by the NJATC. All employees of the JATC shall serve at the pleasure and discretion of the JATC.

**Section 6.6** - To help ensure diversity of training, provide reasonable continuous employment opportunities and comply with apprenticeship rules and regulations, the JATC, as the program sponsor, shall have full authority for issuing all job training assignments and for transferring apprentices from one employer to another. The employer shall cooperate in providing apprentices with needed work experiences. The local union referral office shall be notified, in writing, of all job training assignments. If the employer is unable to provide reasonable continuous employment for apprentices, the JATC is to be so notified.

**Section 6.7** - All apprentices shall enter the program through the JATC as provided for in the registered apprenticeship standards and selection procedures.

An apprentice may have their indenture canceled by the JATC at any time prior to completion as stipulated in the registered standards.   Time worked and accumulated in apprenticeship shall not be considered for local union referral purposes until the apprentice has satisfied all conditions of apprenticeship.   Individuals terminated from apprenticeship shall not be assigned to any job in any classification, or participate in any related training, unless they are reinstated in apprenticeship as per standards, or they qualify through means other than apprenticeship, at sometime in the future, but no sooner than two years after their class has completed apprenticeship, and they have gained related knowledge and job skills to warrant such classification.

**Section 6.8** - The JATC shall select and indenture a sufficient number of apprentices to meet local manpower needs.   The JATC is authorized to indenture a total number of apprentices not to exceed a ratio of one (1) apprentice to three (3) Journeyman Wiremen normally employed in the jurisdiction, unless they are authorized and instructed to increase the number by the parties to the local IBEW/NECA collective bargaining agreement.   The JATC shall indenture a larger number of apprentices provided the individuals are entering the program as the result of direct entry through organizing; as provided for in the registered apprenticeship standards.

**Section 6.9** - Though the JATC cannot guarantee any number of apprentices; if a qualified employer requests an apprentice, the JATC shall make reasonable efforts to honor the request.   If the JATC is unable to fill the request within ten (10) working days, and the JATC has less than a one (1) to three (3) ratio indentured; they shall select and indenture the next available person from the active list of qualified applicants.   An active list of qualified applicants shall be maintained by the JATC as per the selection procedures.

**Section 6.10** - To accommodate short-term needs when apprentices are unavailable, the JATC shall assign unindentured workers who meet the basic qualifications for apprenticeship.   Unindentured workers shall not remain employed if apprentices become available for OJT assignment.   Unindentured workers shall be used to meet job site ratios except on wage-and-hour (prevailing wage) job sites.

Before being employed, the unindentured person must sign a letter of understanding with the JATC and the employer - agreeing that they are not to accumulate more than two thousand (2,000) hours as an unindentured, that they are subject to replacement by indentured apprentices, and that they are not to work on wage-and-hour (prevailing wage) job sites.

Should an unindentured worker be selected for apprenticeship, the JATC will determine, as provided for in the apprenticeship standards,

if some credit for hours worked as an unindentured will be applied
toward the minimum OJT hours of apprenticeship.

The JATC may elect to offer voluntary related training to
unindentured; such as Math Review, English, Safety,
Orientation/Awareness, Introduction to OSHA, First-Aid and CPR.
Participation shall be voluntary.

**Section 6.11** - The employer shall contribute to the Local Health
and Welfare Plans and to the National Electrical Benefit Fund (NEBF)
on behalf of all apprentices and unindentured.  Contributions to
other benefit plans may be addressed in other sections of this
agreement.

**Section 6.12** - Each job site shall be allowed a ratio of two (2)
apprentices for every three (3) Journeyman wiremen or fraction
thereof as illustrated below.

| Number of Journeymen | Maximum Number of Apprentices/Unindentured |
|---|---|
| 1 to 3 | 2 |
| 4 to 6 | 4 |
| 7 to 9 | 6 |
| " | " |
| 97 to 99 | 66 |
| etc. | etc. |

The first person assigned to any job site shall be a Journeyman
Wireman.

A job site is considered to be the physical location where employees
report for their work assignments.  The employer's shop (service
center) is considered to be a separate, single job site.

All other physical locations where workers report for work are each
considered to be a single, separate job site.

**Section 6.13** - An apprentice is to be under the supervision of a
Journeyman Wireman at all times.  This does not imply that the
apprentice must always be in sight of a Journeyman Wireman.
Journeymen are not required to constantly watch the apprentice.
Supervision will not be of a nature that prevents the development of
responsibility and initiative.  Work may be laid out by the
employer's designated supervisor or Journeyman based on their
evaluation of the apprentice's skills and ability to perform the job
tasks.  Apprentices shall be permitted to perform job tasks in order
to develop job skills and trade competencies.  Journeymen are
permitted to leave the immediate work area without being accompanied
by the apprentice.

Apprentices who have satisfactorily completed the first four years of related classroom training using the NJATC curriculum and accumulated a minimum of 6,500 hours of OJT with satisfactory performance, shall be permitted to work alone on any job site and receive work assignments in the same manner as a Journeyman Wireman.   An apprentice shall not be the first person assigned to a job site and apprentices shall not supervise the work of others.

**Section 6.14** - Upon satisfactory completion of apprenticeship, the JATC shall issue all graduating apprentices an appropriate diploma from the NJATC.   The JATC shall encourage each graduating apprentice to apply for college credit through the NJATC.   The JATC may also require each apprentice to acquire any electrical license required for journeymen to work in the jurisdiction covered by this agreement.

**Section 6.15** - The parties to this Agreement shall be bound by the Local Joint Apprenticeship and Training Trust Fund Agreement which shall conform to Section 302 of the Labor-Management Relations Act of 1947 as amended, ERISA and other applicable regulations.

The Trustees authorized under this trust agreement are hereby empowered to determine the reasonable value of any facilities, materials or services furnished by either party.   All funds shall be handled and disbursed in accordance with the Trust Agreement.

**Section 6.16** - All employers subject to the terms of this agreement shall contribute the amount of funds specified by the parties signatory to the local apprenticeship and training trust agreement.   The current rate of contribution is:   2%.   This sum shall be due the Trust Fund by the same date as is their payment to the NEBF under the terms of the Restated Employees Benefit Agreement and Trust.

### ARTICLE VII
### TEMPORARY LIGHT & POWER --
### INSTALLATION AND MAINTENANCE

**Section 7.1** - Where wiring systems and equipment are required for temporary lighting, power, heat, etc. during the period of construction of a building, these systems and equipment shall be installed, maintained and operated by workmen under the terms of this Agreement.   Temporary wiring performed outside the stated work hours as set in Section 5.23 (a), shall be paid at one and one-half (1-1/2) times the straight time rate except on Sundays, and legal holidays, at which time workmen will receive fifty cents ($.50) over the time and one half hourly rate of pay.

**Section 7.2 (a)** – The following conditions pertaining to temporary light and or power are the work of the Electrician and shall be strictly adhered to:

To protect the jurisdiction of the inside electrical worker, it is mutually agreed that the Journeyman employees covered by the terms of this Agreement shall be assigned to maintain the temporary lighting and power on all construction jobs when other crafts and tradesmen are working productively or when temporary lighting and power in excess of ten (10) Kilowatts are being consumed, exclusive of watchmen's night lights.

However, at certain times, and under certain conditions which may arise in the course of construction, an installation may be deemed "inactive" as far as the electrical work in concerned. Such projects may, upon permission of the Business Manager, leave not more than two energized pigtail cord connectors available for certain minimum power requirements. In no case are these circuits to be used for temporary lighting or to avoid compliance with other provisions of Article VII.

If an electrician is required to perform productive overtime work other than the maintenance of temporary light, he shall be paid in accordance with the provisions of this Agreement as outlined in Article VI.

**Section 7.2 (b)** – The installing, maintaining, connecting and shifting or repairing of all wiring for temporary lighting and power and the maintenance of pumps, fans, electrical welding apparatus, stress relief apparatus and blowers and all other electrical equipment on all construction projects, in new buildings undergoing alternations, subways, bridges, roadways and railways shall be performed by Journeymen electricians who are employed by a recognized Electrical Contractor. It is agreed that trailers or extension lights shall consist of a socket attachment plug and not more than fifty (50) feet of flexible wire. They shall be made up and repaired by electricians, but may be placed in various sockets or receptacles by the trades using them. This applies to either lighting or power appliances.

**Section 7.2 (c)** – All temporary switches operating light and power shall be maintained by an electrician only. All temporary main switches controlling light, power and heat shall be enclosed in a locked cabinet provided with a lock and two (2) keys. These keys shall be in the possession of the temporary light man and the Foreman electrician.

**Section 7.2 (d)** – When temporary lights are installed in stairways, hallways, gauge lights, watchman's lights, or job shack lights, and are used for safety purposes only, and are properly protected with guards and on circuits, separate from other temporary lighting, no maintenance will be necessary.

**Section 7.2 (e)** - All overtime on temporary light and power shall be equitably allocated to Journeymen working on-the-job.

**Section 7.2 (f)** - The following ratio of Journeymen may, at the option of the Business manager, be required to maintain temporary light, power and maintenance when a given number of men of various trades are performing productive work:

```
One (1)    Journeyman    -    First 1 to 20 men
Two (2)    Journeymen    -    21 to 50 men
Three (3) Journeymen    -    50 to 100 men
One (1) man for each additional fifty (50) men
```

**Section 7.2 (g)** - All standard safety laws shall be complied with on jobs where workmen employed under the terms of this Agreement are required to work.

## ARTICLE VIII
## ATOMIC ENERGY

**Section 8.1** - Employers contemplating doing work in the so-called "HOT" areas of atomic laboratories, atomic plants, or on the premises of anyone engaged in handling or storing radioactive materials, shall inform and receive permission from the Union before sending men into such "HOT" areas.

**Section 8.2** - Unless a responsible approved governmental authority provides protection where men are exposed to radioactive materials and/or radiation in excess of 1/10 of the maximum permissible limits (MPL) as established by the National Commission on Radiation Protection, or Title 10, Part 20 CFR Atomic Energy Commission, the Employer shall employ qualified radiation monitor Journeymen. Such radiation monitors shall determine the location of the hazardous zones, and shall be responsible for the radiation hazard therein. He shall maintain permanent and accurate time checks, records, and pertinent data on all men entering or leaving such zones, including radiation zones. He shall be in charge of any decontamination of personnel, their tools, materials, or equipment. The monitors shall have the authority to stop any personnel who are not properly equipped or authorized from entering any radiation zone. He shall record all surveys and data and report to his supervisor and the Union. It is agreed that before such work is started a proper measurement of the amount of radioactivity present shall be made by a radioaction monitor Journeyman. Radiation measurements shall be taken and a proper analysis made before the work is started and at proper intervals during the progress of the job. These tests shall meet all standards set by municipal, state, federal, and other codes in the area for protection of personnel. Physical checkups, including a blood count, shall be made available to all men engaged in this type of work before starting, and at the completion of the job. These examinations are to be made by a qualified graduate physician.

**Section 8.3 –** Proper protecting clothing (Anti C) and radiation protective equipment shall be furnished by the Employer.

**Section 8.4 –** If an Employee reaches his maximum allowable exposure in any one quarter (as allowed in applicable governmental regulation), he shall be offered employment in a non-radiation area for the remainder of said quarter, or the duration of the job, whichever is longer.

**Section 8.5 –** If an Employee is terminated because he received his maximum allowable radiation exposure as set by the applicable governmental regulations, he shall be paid for the work lost for the duration of the job, providing the worker cannot find or be furnished with other employment.

**Section 8.6 –** The Industry shall provide the educational courses to qualify Journeymen as radiation monitors.

**Section 8.7 –** The Employer shall furnish each Employee and the Local Union with a report of the Employee's radiation exposure, upon termination of employment, or when a request is received from an Employee or the Local Union.

**Section 8.8 –** When an Employee is contaminated with radiation, whether on his person, clothing, tools, etc., the Employer must assume all expenses incurred, including the replacing of clothing, tools, etc. and also loss of time.

### ARTICLE IX

### REFERRAL PROCEDURE

**Section 9.1 –** In the interest of maintaining an efficient system of production in the industry, providing for an orderly procedure of referral of applicants for employment, preserving the legitimate interest of the employees in their employment status within the area and of eliminating discrimination in employment because of membership or non-membership in the Union, the parties hereto agree to the following system of referral of applicants for employment.

**Section 9.2 –** The Union shall be the sole and exclusive source of referral of applicants for employment.

**Section 9.3 –** The Employer shall have the right to reject any applicant for employment.

**Section 9.4 –** The Union shall select and refer applicants for employment without discrimination against such applicants by reason of membership or non-membership in the Union and such selection and referral shall not be affected in any way by rules, regulations, bylaws, constitutional provisions or any other aspect or obligation of Union membership policies or requirements. All such selection and referral shall be in accord with the following procedure.

**Section 9.5** - The Union shall maintain a register of applicants for employment established on the basis of the Groups listed below. Each applicant for employment shall be registered in the highest priority Group for which he qualifies.

<div align="center">

**JOURNEYMAN WIREMAN**

</div>

GROUP I
All applicants for employment who have four or more years' experience in the trade, are residents of the geographical area constituting the normal construction labor market, have passed a Journeyman Wireman's examination given by a duly-constituted Inside Construction Local Union of the I.B.E.W. or have been certified as a Journeyman Wireman by an Inside Joint Apprenticeship and Training Committee and who have been employed in the trade for a period of at least one year in the last four years in the geographical area covered by the collective bargaining agreement.

GROUP II
All applicants for employment who have four or more years' experience in the trade and who have passed a Journeyman Wireman's examination given by a duly constituted Inside Construction Local Union of the I.B.E.W. or have been certified as a Journeyman Wireman by an Inside Joint Apprenticeship and Training Committee.

GROUP III
All applicants for employment who have two or more years' experience in the trade, are residents of the geographical area constituting the normal construction labor market and who have been employed for at least six months in the last three years in the *geographical area covered by the collective bargaining agreement.*

GROUP IV
All applicants for employment who have worked at the trade for more than one year.

**Section 9.6** - If the registration list is exhausted and the Local Union is unable to refer applicants for employment to the Employer within 48 hours from the time of receiving the Employer's request, Saturdays, Sundays and holidays excepted, the Employer shall be free to secure applicants without using the Referral Procedure, but such applicants, if hired, shall have the status of "temporary employees".

**Section 9.7** - The Employer shall notify the Business Manager promptly of the names and social security numbers of such "temporary employees" and shall replace such "temporary employees" as soon as registered applicants for employment are available under the Referral Procedure.

**Section 9.8 –** "Normal construction labor market" is defined to mean the following geographical area plus the commuting distance adjacent thereto, which includes the area from which the normal labor supply is secured:

ALL OF BRISTOL (EXCEPT ATTLEBORO, NORTH ATTLEBORO & SEEKONK), BARNSTABLE, DUKES AND NANTUCKET COUNTIES.

NORFOLK COUNTY – AVON, RANDOLPH, HOLBROOK, STOUGHTON, PLAINVILLE TOWNSHIPS.

PLYMOUTH COUNTY – ENTIRE COUNTY, EXCLUDING HINGHAM AND HULL TOWNSHIPS.

The above geographical area is agreed upon by the parties to include the area defined by the Secretary of Labor to be the appropriate prevailing wage areas under the Davis-Bacon Act to which the Agreement applies.

**Section 9.9 –** "Resident" means a person who has maintained his permanent home in the above defined geographical area for a period of not less than one year or who, having had a permanent home in this area, has temporarily left with the intention of returning to this area as his permanent home.

**Section 9.10 – "Examinations" –** An "examination" shall include experience rating tests if such examination shall have been given prior to the date of this procedure, but from and after the date of this procedure, shall include only written and/or practical examinations given by a duly constituted Inside Construction Local Union of the IBEW.   Reasonable intervals of time for examinations are specified as ninety days.   An applicant shall be eligible for examination if he has four years' experience in the trade.

**Section 9.11 –** The Union shall maintain an "Out of Work List" which shall list the applicants within each Group in chronological order of the dates they register their availability for employment.

**Section 9.12 –** An applicant who has registered on the "Out of Work List" must renew his application every thirty days or his name will be removed from the "list".

**Section 9.13 –** An applicant who is hired and who receives, through no fault of his own, work of forty hours or less, shall, upon registration, be restored to his appropriate place within his Group.

**Section 9.14 –** Employers shall advise the Business Manager of the Local Union of the number of applicants needed.   The Business Manager shall refer applicants to the Employer by first referring applicants in GROUP I, in the order of their place on the "Out of Work List" and then referring applicants in the same manner successively from the "Out of Work List" in GROUP II, then GROUP III,

and then GROUP IV.  Any applicant who is rejected by the Employer shall be returned to his appropriate place within his GROUP and shall be referred to other employment in accordance with the position of his GROUP and his place within his GROUP.

**Section 9.15** - The only exceptions which shall be allowed in this order of referral are as follows:

**(a)** - When the Employer states bona fide requirements for special skills and abilities in his request for applicants, the Business Manager shall refer the first applicant on the register possessing such skills and abilities.

**(b)** - The age ratio clause in the Agreement calls for the employment of an additional employee or employees on the basis of age.  Therefore, the Business Manager shall refer the first applicant on the register satisfying the applicable age requirements provided, however, that all names in higher priority Groups, if any, shall first be exhausted before such overage reference can be made.

**Section 9.16** - An Appeals Committee is hereby established composed of one member appointed by the Union, one member appointed by the Employer or by the Association, as the case may be, and a Public Member appointed by both these members.

**Section 9.17** - It shall be the function of the Appeals Committee to consider any complaint of any employee or applicant for employment arising out of the administration by the Local Union of Section 8.4 through 8.5 of this Agreement.  The Appeals Committee shall have the power to make a final and binding decision on any such complaint which shall be complied with by the Local Union.  The Appeals Committee is authorized to issue procedural rules for the conduct of its business, but it is not authorized to add to, subtract from, or modify any of the provisions of this Agreement and its decisions shall be in accord with this Agreement.

**Section 9.18** - A representative of the Employer or of the Association, as the case may be, designated to the Union in writing, shall be permitted to inspect the Referral Procedure records at any time during normal business hours.

**Section 9.19** - A copy of the Referral Procedure set forth in this Agreement shall be posted on the Bulletin Board in the offices of the Local Union and in the offices of the Employers who are parties to this Agreement.

**Section 9.20** - Apprentices shall be hired and transferred in accordance with the apprenticeship provisions of the Agreement between the parties.

**Section 9.21** - When making reductions in the number of employees due to lack of work, Employers shall use the following procedure:

**(a)**  Temporary employees, if any are employed, shall be laid off first.  Then employees in GROUP IV shall be laid off next, if any are employed in the GROUP.  Next to be laid off are employees in GROUP III, if any are employed in this GROUP, then those in GROUP II, and then those in GROUP I.

**(b)**  Paragraph (a) will not apply so long as the special skills requirement as provided for in Section 9.15 (a) is required.

**(c)**  Supervisory employees covered by the terms of this Agreement will be excluded from layoff as long as they remain in a supervisory capacity.  When they are reduced to the status of Journeyman, they will be slotted in the appropriate GROUP in paragraph (a) above.

## ARTICLE X

**Joint Safety Committee** – There shall be a Joint Safety Committee consisting of three members representing the Employer, members shall be selected by the Electrical Contractors Association and three members representing the Union, members shall be selected by Local #223, IBEW.

The Joint Safety Committee shall hold Safety Meetings, as needed, at mutually agreeable locations.

Should a dispute arise relative to safety between the Union and the Employer, the matter shall be referred to the Joint Safety Committee (which shall meet within 48 hours when called by either party) for settlement.  In case of a deadlock, the matter shall be referred to the Labor Management Committee.

## ARTICLE XI

### Labor Management Cooperation Committee (LMCC)

**Section 11.01 (a)** – The parties agree to participate in the Labor Management Cooperation Committee, or its successor, which is established under the authority of Section 6 (b) of the Labor Management Cooperation Act of 1978, 29 USC S175(a) and S302(c) (9) of the Taft-Hartly Act, 29 USC S186(c) (9).  The purposes of this Committee are:

1.  To improve communications between representatives of Labor and Management;
2.  To provide workers and Employers with opportunities to study and explore new and innovative joint approaches to achieving organizational effectiveness;

3.   To assist workers and Employers in solving problems of mutual concern not susceptible to resolution within the collective bargaining process;

4.   To study and explore ways of eliminating potential problems which reduce the competitiveness and inhibit the economic development of the construction industry;

5.   To enhance the involvement of workers in making decisions that affect their working lives;

6.   To do any and all other lawful activities authorized under the Act.

The Committee shall function in accordance with, and as provided in the Articles of Incorporation and Bylaws of the Labor Management Cooperation Committee, and the subsequent amendments thereto. Employers making contributions shall be entitled to participate therein, as provided in said Articles of Incorporation and Bylaws.

The Employer's party to this collective bargaining agreement shall contribute five cents ($.05) per hour worked under this Agreement on a monthly basis with checks payable to the Southeast Mass. LMCC, Inc., due on or before the fifteenth (15th) day of the following month.

**Section 11.01 (b)** - One cent ($.01) of the five cents ($.05) contributed to the Southeast Mass. LMCC, Inc. shall be forwarded to the NECA-IBEW National Labor Management Cooperation Fund (NLMCC) to satisfy the requirement of Article XI, Section 11.02.

**Section 11.02 (a) - NECA-IBEW National Labor Management Cooperation Fund (NLMCC).**  *The parties agree to participate in the NECA-IBEW National Labor-Management Cooperation Fund, under authority of Section 6(b) of the Labor-Management Cooperation Act of 1978 U.S.C. S175(a) and Section 302(c)(9) of the Labor-Management Relations Act, 29 U.S.C. S186(c)(9).  The purposes of this Fund include the following:*

1.   to improve communication between representatives of labor and management;

2.   to provide workers and employers with opportunities to study and explore new and innovative joint approaches to achieving organizational effectiveness;

3.   to assist workers and employers in solving problems of mutual concern not susceptible to resolution within the collective bargaining process;

4.   to study and explore ways of eliminating potential problems which reduce the competitiveness and inhibit the economic development of the electrical construction industry;

6.  to encourage and support the initiation and operation of similarly constituted local labor-management cooperation committees;

7.  to engage in research and development programs concerning various aspects of the industry, including, but not limited to, new technologies, occupational safety and health, labor relations, and new methods of improved production;

8.  to engage in public education and other programs to expand the economic development of the electrical construction industry;

9.  to enhance the involvement of workers in making decisions that affect their working lives; and

10.  to engage in any other lawful activities incidental or related to the accomplishment of these purposes and goals.

**Section 11.02 (b) -** The Fund shall function in accordance with, and as provided in, its Agreement and Declaration of Trust, and any amendments thereto and any other of its governing documents. Each Employer hereby accepts, agrees to be bound by, and shall be entitled to participate in the NLMCC, as provided in said Agreement and Declaration of Trust.

**Section 11.02 (c) -** Each employer shall contribute one cent ($.01) per hour worked under this Agreement up to a maximum of 150,000 hours per year.  Payment shall be forwarded monthly, in a form and manner prescribed by the Trustees, no later than fifteen (15) calendar days following the last day of the month in which the labor was performed.  The Rhode Island and Southeast Mass. Chapter, NECA, or its designee, shall be the collection agent for this Fund.

**Section 11.02 (d) -** If an Employer fails to make the required contributions to the Fund, the Trustees shall have the right to take whatever steps are necessary to secure compliance.  In the event the Employer is in default, the Employer shall be liable for a sum equal to 15% of the delinquent payment, but not less than the sum of twenty dollars ($20), for each month payment of contributions is delinquent to the Fund, such amount being liquidated damages, and not a penalty, reflecting the reasonable damages incurred by the Fund due to the delinquency of the payments.  Such amount shall be added to and become a part of the contributions due and payable, and the whole amount due shall bear interest at the rate of ten percent (10%) per annum until paid.  The Employer shall also be liable for all costs of collecting the payment together with attorney's fees.

## ARTICLE XII

**Substance Abuse.** The dangers and costs which alcohol and other chemical abuses can create in the electrical contracting industry in terms of safety and productivity are significant. The parties to this Agreement resolve to combat chemical abuse in any form and agree that to be effective, programs to eliminate substance impairment should contain a strong rehabilitation component. The parties recognize the Employers' right to adopt and implement a drug and alcohol policy subject to all applicable laws and regulations, procedural safeguards, scientific principles, and legitimate interests of privacy and confidentiality. However, the Union reserves the right to negotiate regarding the terms of the Employer's policy before the policy is implemented by the Employer. When drug and alcohol testing is performed, all testing shall be conducted in accordance with the procedures outlined in the aforementioned policy.

## ARTICLE XIII

**Section 13.01 (a) -** Approval of this Agreement has been given with the understanding that any section that does not conform to existing State and/or Federal laws will be corrected by the parties signatory thereto. Such changes, if any, must be reduced in writing in the form of an amendment and forwarded in the usual manner for approval.

**Section 13.01 (b) -** Should any provision of this Agreement be declared illegal by any court of competent jurisdiction, such provisions shall immediately become null and void, leaving the remainder of the Agreement in full force and effect and the parties shall, thereupon, seek to negotiate substitute provisions which are in conformity with the applicable laws.

**Section 13.01 (c) -** This Agreement will come into full force and effect when approved by the International President of the IBEW.

**Section 13.01 (d) -** The parties agree that they have bargained fully with respect to all proper subjects of collective bargaining and have settle such matters as set forth in this Agreement.

IN WITNESS THEREOF, the parties have executed this Agreement this 31st day of August, 2001.

Signed for the RHODE ISLAND AND SOUTHEAST MASSACHUSETTS CHAPTER, NECA.

---------------------------------
G. Thomas Chabot

---------------------------------
Herbert Tyler

---------------------------------
Ernest W. Audet, Jr.

---------------------------------
Peter Landerholm

Signed for the INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL UNION NO. 223.

---------------------------------
Timothy M. Cayton

---------------------------------
David W. Fenton

---------------------------------
Scott Ramsay

---------------------------------
Francis M. Welch